UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FRANCESCO PORTELOS,          *     Case No. 12-CV-3141(RRM)
                            *
         Plaintiffs,   *     Brooklyn, New York
                            *     April 17, 2014
    v.                 *
                            *
CITY OF NEW YORK, et al.,   *
                            *
         Defendants.   *
                            *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:         BRYAN D. GLASS, ESQ.
                         Glass Krakower LLP
                         100 Church Street, 8th Fl
                         New York, NY  10007

For the Defendants:         JESSICA GIAMBRONE, ESQ.
                         New York Law Department
                         100 Church Street
                         New York, NY  10007

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

Fiore Reporting and Transcription Service, Inc.
4 Research Drive, Suite 402
Shelton, Connecticut 06484 (203)929-9992

2

1          (Proceedings commenced at 3:13 a.m.)

2               THE COURT:  Okay.  So we're here for Portelos v.

3    City of New York.  Thank you for calling back.

4               So, for the -- well, first, it's Portelos v. City of

5    New York, 12-CV-3141.  So for the plaintiff?

6               MR. GLASS:  Bryan Glass, here with Mr. Portelos.

7               THE COURT:  Okay.  So I couldn't really hear you.

8    Can you say it again?

9               MR. GLASS:  I'm sorry.  I'm Bryan Glass, here with

10   Mr. Portelos.

11              THE COURT:  Okay.  And then for the City defendants?

12              MS. GIAMBRONE:  Jessica Giambrone on behalf of the

13   defendants.  Good afternoon, Your Honor.

14              THE COURT:  Good afternoon.  Okay.  And in

15   connection with the call I have the April 15th letter from Mr.

16   Glass's firm, and April 16th letter from the City.

17              So let's start with the issues in the April 15th

18   latter.  Do you want to -- anything you think I should hear

19   besides what's in your letter, Mr. Glass?

20              MR. GLASS:  Yeah.  I just wanted to kind of update

21   on where we are with the case, and (inaudible).

22              THE COURT:  Okay.  So, I don't know if maybe you're

23   on speaker because he's there, but it's really hard to hear

24   you.  So --

25              MR. GLASS:  I'll try to talk --

3

1          THE COURT:  Yes, that's better.

2          MR. GLASS:  Let me just update factually where

3    things are and then we can decide how to --

4          THE COURT:  Okay.

5          MR. GLASS:  So what happened is starting in, I

6    believe, December, Mr. Portelos' hearing started.

7          THE COURT:  Yes.

8          MR. GLASS:  And the testimony concluded in February;

9    February 12th.  It's in front of the arbitrator at this point

10   so we don't have a decision.  It was supposed to finish here

11   two weeks ago.  It was not issued yet and I think he told us

12   it would be a few more weeks.

13         Part of the reason we didn't do his deposition

14   because we thought it could be attacked on the 30.20(a).

15   At this point we're waiting for a decision on that.

16         Since then I put in the letter he had been arrested,

17   there was some publicity about that, about something he had

18   put on a blog post, and we claim it's false arrest because it

19   was dismissed.  Turns out he was handcuffed and then he was

20   released after about 33 hours.

21         Also since the hearing, one of the charges against

22   him that was brought against him originally SCI basically

23   recanted on and said it was no longer an issue.  And as we

24   contacted the arbitrator as the case concluded and said that

25   would be withdrawn.  So that's kind of where we are right now.

4

1      As far as -- so that's where Mr. Portelos is right now.

2              Well, (inaudible) there were 34 investigations --

3              THE COURT:  Sorry.  You're fading out.  Say it

4      again.  There were something?

5              MR. GLASS:  (Inaudible) special commissioner

6      investigation, and the Office of Special Investigation

7      (inaudible) are entities of the City that do investigations of

8      teachers or against --

9              THE COURT:  Right.  I now a little bit about it, but

10     not --

11             MR. GLASS:  So what's happened was that Mr. Portelos

12     first launched an allegation of double-dipping against the

13     principal about two years ago.  That's the only investigation

14     that's really actually open as far as we're aware that they're

15     claiming still to be an open investigation.  It had to do with

16     double-dipping or fraud in the school, or financial

17     impropriety.

18             There were 19 other investigations that Mr. Portelos

19     had launched in his administration after that.  It's my

20     understanding that he has been told that they've all been

21     closed or administratively closed, and so they should be

22     closing investigations at this point.  And then none of them

23     were substantiated according to what he'd been told by the

24     City.

25             Against Mr. Portelos there were 34 investigations

1    against him, and his understanding is only one of them has

2    ultimately been substantiated as well. (Inaudible) only one of

3    them was actually substantiated.

4           What we're really looking for is basically in our

5    letter -- and so it's frustrating figuring out how to do

6    thist, you know, the 19 investigations that are closed

7    (inaudible) the City provided nothing.  You know, we've been

8    asking for this for months.  The investigation has been going

9    on for years now; probably about two years, and we get back

10   these responses that, you know, unless (inaudible) separate

11   agency and not part of the (inaudible), they're not my

12   clients.  (inaudible) so I mean, saying that SCI is separated

13   and -- you know, (inaudible) position is that she doesn't have

14   control over them like she has control over DOE.

15          But in any case, these are closed investigation and

16   they seem to be very important information in these

17   investigations because they all -- I mean, Mr. Portelos

18   (inaudible) everything he complained about was legitimate and

19   we don't know what kind of investigation they did.   They're

20   not sharing notes, they're not sharing anything about the

21   investigation to see why they performed all these

22   investigations.  And there could be some serious, very helpful

23   exculpatory information in these investigations that might

24   provide a defense (inaudible), but also provides part of our

25   retaliation and (inaudible).

1          Recently, after (inaudible) confidentiality order

2     (inaudible).  But I'm not even sure what we were (inaudible)

3     confidentiality at this point because when I tried to get more

4     detail, you know, what exactly she's planning on bank records,

5     you know, and a lot of information in there, and that they're

6     afraid of fraud.

7          We went through this before the confidentiality and

8     they stepped away from it at some point in time and turned it

9     over.  So we're not really sure what they're protecting

10    (inaudible) confidentiality order concerned us a little bit

11    because it may be very helpful things for the case.  And

12    there's nothing really to support that to say that, you know,

13    why should this be -- everything be subject to this

14    confidentiality order?  They tried this before and they backed

15    down on it.  And we're not completely -- we're  (inaudible)

16    someone's personal bank records, he's not going to be blogging

17    that all over the internet but if it's something that's very

18    probative to the case what basis is there (inaudible)?  Most

19    of it should be FOILable anyway; hopefully FOILable.

20         So, the other thing we're running into is that, you

21    know, Ms. Giambrone keeps claiming that everything

22    (inaudible).  I mean, everything we're requesting as far as

23    this case, whether we (inaudible) and he has been successful

24    in getting some things through FOIL that he hasn't gotten

25    through the case.  That's not really the point.  I mean, it

1    was all supposed to be discoverable and it should be being

2    provided by the City any way as part of (inaudible).  We

3    should have them before (inaudible)to get more information

4    (inaudible).

5           And that's why we know, for example, like the ones

6    (inaudible) Chancellor Wolcott, it's not that the City

7    provided us anything in discovery in this case.  They

8    responded in the FOIL response and there were emails from

9    Wolcott about Mr. Portelos, and that's why we think there

10   might be a basis to depose him.

11          So, you know, I know it's a large entity and there's

12   a lot of different sources to get information from the Board

13   of Ed.  It's a very big bureaucracy, but he's getting

14   information from his 30.28 case and from FOIL that's not being

15   provided in this case.  And so really it's an issue to clarify

16   (inaudible).  And then there's the representation that there's

17   no e-mails between a number of entities that we have with us

18   here, there's a representation then there's nothing from

19   Andrew Gordon's e-mail address  (inaudible). There's nothing

20   from Dennis Wolcott's e-mails (inaudible).

21          So, you know, we're relying on the credibility of,

22   you know, the Board telling us what and what they don't have

23   and sometimes it's not turning out to be true because they do

24   keep (inaudible) things out there that's, you know, it turns

25   out they selectively disclosed the information to us

1    (inaudible).

2          And so it puts us in a different position to know

3    exactly what they have, what they're holding, what they're

4    cloaking in attorney/client privilege.  It's a very difficult

5    thing to deal with right now.  So I don't think there's a

6    strong basis for that.

7          And I just want to point out a recent case that just

8    came down yesterday (inaudible), where the Nassau County

9    Police Department was trying to say an open investigation

10   can't be turned over, they can't turn over discovery in an

11   open investigation, and I think it's called Avella v.

12   (inaudible), in Nassau County and judge rejected that theory.

13   You know, you can't just cloak it under open investigation.

14         I mean, think about the first investigation that was

15   lodged for double-dipping from Linda Hill, and this is over

16   two years ago, and they found that investigation open.  And I

17   asked about whether we can probe about that and (inaudible).

18         THE COURT:  All right.  Sorry, you have to slow down

19   and speak loudly and closer to the phone.  I got up to the

20   Nassau County and then I didn't hear the rest of it.

21         MR. GLASS:  Yes, well the case was Avella v.

22   (inaudible), 11.906, of '13.  And it involved the (inaudible)

23   Nassau County Police Department in civil litigation trying to

24   claim that they don't have to turn over anything regarding

25   investigation because they're open investigations.

1          And our concern is that they're using that, for

2     example -- well, a serious allegation against Principal Hill

3     is the double-dipping and financial improprieties.  They're

4     telling us we can't even ask about that because that's still

5     an open investigation.

6          That investigation started and launched this whole

7     thing in the first place, it was back about two years ago at

8     this point, and for some reason they haven't closed it.  I

9     don't know why they haven't closed it.  I think that's

10    specifically why they haven't closed it.  But, you know that's

11    the only open investigation out there and 48 investigations,

12    you know, against him or (inaudible).

13         So, you know, again, if you look -- what we need is

14    we need assistance from the Court to finish discovery.  We're

15    not that far away.  I think most of it has been done.  You

16    know, we don't have a lot left.

17         I think it's just a matter of one or two -- I mean,

18    Mr. Portelos, we're open for deposition on April 24th.  I

19    think we have agreement on that.  We'd like to depose -- bring

20    back Mr. Gordon.  We finally got the policy that was

21    referenced.  It took a lot of work but we finally got the

22    policy.  And we'd like to depose Mr. Wolcott.

23         I mean, I know typically high-level officials are

24    protected, but in this case, you know, he was on public

25    television, asked about Mr. Portelos, (inaudible) suggesting

1    that he had knowledge about the situation and he's no longer

2    the chancellor anymore either.  So, I don't know what

3    protective privilege really they're asserting here, and we

4    want to ask a few questions of Mr. Wolcott.  And so we really

5    only have a couple short depositions left.

6              The other issue with (inaudible) arrest was on the

7    police report, I guess he's the treaty officer for the Board.

8    (Inaudible) officer and we'd like to depose him to see why Mr.

9    Portelos was arrested.  But those are the only remaining

10   depositions.

11             And then the main discovery for us right now is to -

12   - we'd like to see the, you know, the 20 investigations that

13   Mr. Portelos made complaints about, we'd like the material

14   that, you know, what was the investigation, why was it closed,

15   (inaudible) the investigation.  Was it investigated or was it

16   just buried and not even investigated?  I think those are

17   probative to our theory of retaliation.  I think that's a big

18   part of this case.

19             Your Honor, at the heart of this case when we

20   brought it, he wasn't up on so many charges.  He was basically

21   claiming that he was reassigned, you know, after making a

22   complaints about his principal for financial improprieties.

23   That's what launched this whole case.  Everything that

24   happened since is really  stemming from that and he had a

25   completely clean record when this investigation started.

1          So you know, they turned it into him being the bad

2     guy and, you know, and being disciplined and out of control.

3     But the reality was this was a very simple retaliation case of

4     him being reassigned after the complaint of (inaudible)

5     activity and that's why I think the motion in this was denied.

6          So, (inaudible) got much more complicated, but, you

7     know, I think we can finish it shortly.  I think we have a

8     late May discovery deadline, and as long as the City

9     cooperates and gives us the remaining documents, we'll get to

10    the final depositions and be ready for trial or summary

11    judgment (inaudible).

12          THE COURT:  All right.  Before I hear from the City

13    defendant's counsel, let me ask, are you agreeing or

14    disagreeing about the status of SCI as a different separately

15    legal entity from either the City of New York *and/or* the

16    Department of Education, which even if corp counsel were to

17    represent it, which I don't know if that's what would happen,

18    are you disagreeing that it's separate?

19          MR. GLASS:  Your Honor, I understand -- I said

20    (inaudible) City of New York and Department of Education.  The

21    reason I do that is because I know that sometimes the City

22    claims that SCI is independent of the Department of Education,

23    Department of Education claims SCI is a city agency, and

24    they're all part of the City.

25          So, you know, it does seem a little facetious to

1    say, I can't get to SCI because they don't really represent

2    them.  I mean, you can't sue SCI individually.  They will not

3    allow you to sue them.  We've tried on other cases, but

4    they --

5            THE COURT:  What does that mean, they won't allow

6    you?

7            MR. GLASS:  Well, they'll claim it's not a suable

8    entity, if you sue SCI.

9            THE COURT:  That it's like the police department?

10           MR. GLASS:  Yeah.  Yeah.  (Inaudible.)

11           THE COURT:  I thought they went the other way in

12   cases and said, actually, if you don't name them you have a

13   problem.

14           MR. GLASS:  Your Honor, I'm aware of another case

15   that I had taken over.  A couple of Teachers sued SCI

16   (inaudible) and they said SCI is not a city agency.  They

17   can't -- they're not a suable entity.  So, I mean, I knew the

18   City of New York, it's all under the umbrella of the City of

19   New York.

20           The reason SCI was created was because it was

21   initially thought that they have to have some independence

22   from the DOE because of (inaudible) DOE.  Then they want the -

23   - you know, they wouldn't be separated as far as, you know,

24   they're investigations.  They want (inaudible) on this piece

25   anyway.  It's part of their budget.  So.

1          MS. GIAMBRONE:  That's not true.

2          THE COURT:  All right.  I don't want to -- don't

3    interrupt.  Just, let's finish.

4          MR. GLASS:  Regardless, it's part of the City of New

5    York (inaudible) and the City of New York has been named as an

6    entity here.  So (inaudible) playing games to try to cloak

7    them from having to provide -- I mean, I don't know of any

8    case where SCI is suable as a separate entity.  Perhaps you

9    can show me, but I can show you a case where they were sued

10   and then it was dismissed because they said that SCI was not a

11   suable entity.  So, that's my understanding of the law.

12         THE COURT:  All right.  For the City?

13         MS. GIAMBRONE:  Yes, Your Honor.  First and

14   foremost, I did want to apologize for missing that April 10th

15   status date.  That was my error and I do apologize for that.

16         THE COURT:  Okay.

17         MS. GIAMBRONE:  With regard to plaintiff's

18   allegations, he makes a levy of allegations against the

19   defendants and I just have to try to address all of them.

20         With regards to the fact that these grandiose

21   statements that I represented there are no Wolcott e-mails,

22   Andrew Wolcott was not -- and his e-mails were not the subject

23   of the electronic discovery agreement that we entered into.

24   So there has never been any representation that Chancellor

25   Wolcott did not have any e-mails with Portelos.  And in fact

14

1    I'm sure there are because Portelos would often CC the

2    chancellor on a variety of e-mails.

3            With regards to the confidentiality agreement and

4    counsel's argument that he should be permitted to use this

5    potentially exculpatory evidence in his 30.20(a) proceeding, I

6    agreed with counsel and said that I would enter into a

7    provision stating that these materials could be used for this

8    federal litigation, and also could be used in the accompanying

9    30.20A proceeding.

10           So with regards to that argument, that fails because

11   I certainly took that argument into account and was willing to

12   compromise on that point.

13           THE COURT:  Yes.

14           MS. GIAMBRONE:  SCI is a sub-agency that was created

15   by the Department of Investigation.  It is an independent

16   oversight agency that is an agency of the City of New York,

17   but as I have told counsel, it's not that I have no control

18   over them, it's that they take their investigations and the

19   confidentiality into their investigations extremely seriously.

20   They have not provided me with these materials, and so I've

21   had great difficulty in obtaining the unsubstantiated records,

22   and only recently in the last week was I permitted to come and

23   see what the documents were so that I could articulate why

24   they should be afforded confidentiality.

25           And as I have told counsel, is that within the bulk

1    of these -- within the unsubstantiated records, is that we

2    have information of minors, which is protected by federal law,

3    we have personal information of non-parties, we have bank

4    records, and we have addresses.  We have non-parties who have

5    been accused by the plaintiffs of sexual misconduct and

6    corporal punishment.

7           And so we believe that these individuals, these

8    accused, who ultimately there has been no affirmative findings

9    against them, should be protected and granted some -- and have

10   a strong privacy interest.

11          And while I understand that generally speaking the

12   Courts favor transparency in these proceedings, here we're

13   speaking about non-parties who have compelling privacy

14   interests, not to mention a variety of protections in the

15   federal law when it comes to the monetary.

16          I've tried for weeks to work with counsel to draft

17   the confidentiality agreement, which is generally never a

18   problem in cases of this kind.  And he has not responded

19   affirmatively whether or not he would do so.  So I take it at

20   this point that he is not entering into the confidentiality

21   agreement.  And SCI will not provide the unsubstantiated

22   records without a court order, and have not provided me with

23   copies of the documents.  And I would implore the Court to

24   consider ordering confidentiality agreements in this case so

25   that these documents can be afforded some protection from the

1    public forum.

2              With regard to Chancellor Wolcott's deposition, as I

3    had indicated to counsel, he is no longer employed by the City

4    of New York.

5              But regardless of that fact I don't believe and I

6    don't believe there's been any showing, and now counsel refers

7    to e-mails, but I don't believe there is any showing that

8    Chancellor Wolcott had any involvement in the reassignment of

9    the plaintiff, any direct involvement in his discipline.  And

10   frankly, there's nothing that Chancellor Wolcott would testify

11   to that there is not a more appropriate individual who would

12   testify to those facts.

13             And in fact, Andrew Gordon was that, to use --

14   generally the head of personnel, and was the individual who

15   was involved in the reassignment, et cetera.  And that person

16   has been -- although he no longer works for the City of New

17   York, he was produced for a deposition and we are working to

18   have him reproduced when we can settle on a date that works

19   for everyone.

20             With regards to Linda Hill, there is an open

21   investigation against her.  I am not privy to the details of

22   that investigation.  I don't know what the status is.  And as

23   I had objected to at the first deposition, I believe that she,

24   as there are open allegations of wrongdoing against her,

25   should be protected from having to answer in a deposition,

1    questions about that open investigation.

2          And until that investigation is concluded, I said

3    when the investigation was concluded that she would be

4    reproduced to discuss the facts that -- any facts that

5    plaintiff wishes to pose to her about that complaint that he

6    levied against her.

7          THE COURT:  Are you saying she's taking the Fifth?

8          MS. GIAMBRONE:  Yes.

9          THE COURT:  Okay.

10          MS. GIAMBRONE:  Yes.

11          THE COURT:  Okay.  What about these closed -- this

12    point that the plaintiff's counsel is making that they suspect

13    that you're saying that many of these investigations, so as 19

14    or I guess 20 with one open, brought by him and then 34

15    against him, that one of the reasons you're not producing all

16    the documents is because of either they're open or some other

17    reason.  So what's the story with those investigations?

18          MS. GIAMBRONE:  That is the SCI investigation.

19          THE COURT:  Uh-huh.

20          MS. GIAMBRONE:  And my understanding is that Linda

21    Hill is being investigated by OSI.

22          THE COURT:  And what's OSI?

23          MS. GIAMBRONE:  Office of Special Investigations,

24    which is part of the DOE.

25          THE COURT:  That's different from SCI?

18

1          MS. GIAMBRONE:  Correct.

2          THE COURT:  Okay.

3          MS. GIAMBRONE:  Those are the investigatory

4    materials, Your Honor, that I am asking the Court to order a

5    confidentiality agreement.

6          THE COURT:  Okay.  So the 19 and the 34.  But --

7          MS. GIAMBRONE:  Well, I'm not going to subscribe,

8    necessarily, to those numbers, but yes there are quite a

9    number of investigations.

10         THE COURT:  Okay.  So aside from the confidentiality

11   position do you have other objections to the producing of

12   those materials, besides the one that is about Ms. Hill?

13         MS. GIAMBRONE:  Well, Your Honor, they may be

14   irrelevant, but as I said, I have not been able to obtain them

15   from the client; from SCI myself.  So I have not been able --

16   I perused them and I spent a day going through them, but I

17   would have to Bates stamp them and --

18         THE COURT:  Right.

19         MS. GIAMBRONE:  -- specifically in order to see if

20   there is some other articulable objection.

21         THE COURT:  Okay.  So since you're the person on

22   this call who has actually seen these documents, you're

23   suggesting there be a blanket confidentiality order that

24   covers those documents.

25         Is there a reason there can't be a set that is, I

1    guess marked for redaction, and the redactions being

2    information that would not be allowed to be public, and then

3    you know, a complete set subject to a confidentiality

4    agreement that the plaintiff and counsel could seek?  I mean,

5    is there a reason not to separate out the things that you're

6    concerned about, like bank statements, children's names?

7    Whatever other --

8              MR. GLASS:  We'd be fine with that, Your Honor.

9    That would make more sense to us.  You know, (inaudible) could

10   be redacted.  You know, it's just two blankets.  I mean, I

11   agree on a complete, you know --(inaudible).

12             THE COURT:  All right.  So I want to know what the

13   City's position is, as to that.

14             MS. GIAMBRONE:  Just so I understand; so one, an

15   unredacted copy to plaintiff which would be covered by a

16   confidentiality agreement, and then a copy with redactions --

17             THE COURT:  That could be public if, you know, they

18   wanted it to be public.

19             I don't know if that's something practical, but

20   since you're the only one who's seen what they are --

21             MS. GIAMBRONE:  Right.

22             THE COURT:  -- and you're going to presumably be

23   reviewing it as you're producing it --

24             MS. GIAMBRONE:  That's --

25             THE COURT:  -- the review could be done.

20

1          MS. GIAMBRONE:  Well, the issue is that if plaintiff

2     is then going to take the unredacted copies and, you know,

3     kind of pretty much take the redacted copies and disseminate

4     them in the public forum, and put in his editorial about who

5     they pertain to.

6          THE COURT:  Yeah, but I mean, what grounds do I have

7     for stopping him from doing that?

8          MS. GIAMBRONE:  Well, there's a non-party that

9     plaintiff has made allegations of sexual misconduct --

10         THE COURT:  Uh-huh.

11         MS. GIAMBRONE:  -- and that was found completely

12    unsubstantiated by the investigation.

13         THE COURT:  Uh-huh.

14         MS. GIAMBRONE:  And prior to this plaintiff put on

15    his blog that she had engaged in a sexual misconduct, that she

16    had engaged in corporal punishment, and I believe this non-

17    party educator should have strong privacy interests.

18         MR. GLASS:  But he could make that allegation

19    regardless of whether they're substantiated or not.  I mean,

20    you know, the reality is wondering what does the evidence show

21    when they did the investigation.  Just because it's

22    unsubstantiated does not mean that it's not true.  It just

23    (inaudible) we wanted to see what they did with that

24    investigation because we have evidence that it is true.

25         And even if (inaudible) of whether (inaudible) if he

1    wants to allege that this teacher engaged in sexual misconduct

2    with this assistant principal, he's certainly free to do that

3    and that's going to support that (inaudible) investigation.

4    So if it's a sham why shouldn't he say that SCI or OSI refused

5    to do a real investigation (inaudible) and criticize that

6    investigation?

7              MS. GIAMBRONE:  Because the federal --

8              THE COURT:  All right.  I only want to hear from one

9    person.

10             So, basically plaintiff's point is, what's to stop

11   him from saying it?  Obviously, defamation laws would be what

12   would be to stop him from saying it if it turns out that it's

13   not true or he doesn't have a reasonable belief basis to

14   believe that it's true.  That would be the curtailment.

15             MS. GIAMBRONE:  Right.

16             THE COURT:  But from the defendant's side, say what

17   you're going to say.

18             MS. GIAMBRONE:  Your Honor, I believe that he is

19   misusing this litigation to embarrass and shame people when

20   there's absolutely no evidence to support these statements.  I

21   don't think it's appropriate to obtain government documents

22   that frankly -- and then twist them and make it appear as

23   though they're something that they're not.

24             THE COURT:  Okay.  You're saying you don't like his

25   use of it.  That's not the same thing as whether the subject

1    matter is entitled to confidentiality in the documents to

2    begin with, when --

3           MS. GIAMBRONE:  Well, I (inaudible) that non-parties

4    have strong privacy interests in investigatory materials.  If

5    not then we could always obtain, anyone who is accused of a

6    crime, we could perhaps unseal their records and splash it all

7    over the internet.

8           THE COURT:  Well, but is there --

9           MS. GIAMBRONE:  (Inaudible.)

10          THE COURT:  -- an equivalent protection here?  So

11   160.50 protection, if you're cleared, right, or if your arrest

12   is sealed, whatever happens such that that's the result, then

13   you know, then you're right.  You have protections.  Is there

14   some analogous provision here?

15          Right.  So --

16          MS. GIAMBRONE:  (Inaudible) Your Honor.

17          THE COURT:  Okay.  Are you saying that that notion

18   or concept or idea applies to all of these investigations,

19   or --

20          MS. GIAMBRONE:  I think there's a general public

21   policy matter when you're talking about unsubstantiated

22   complaints --

23          THE COURT:  Uh-huh.

24          MS. GIAMBRONE:  -- there are dangers of releasing

25   those without confidentiality protection particularly when

1       we're dealing with non-parties.

2              THE COURT:  Okay.  So let's talk about that.

3       There's two different kinds of investigations here.  One are

4       the ones -- let's talk about the easier ones.  One are the

5       ones against the plaintiff, and his number was 34.  You're not

6       agreeing that's the number, but whatever that number is --

7              MS. GIAMBRONE:  Right.

8              THE COURT:  -- they're obviously about him, so

9       what's the concern about releasing those materials to him?

10             MS. GIAMBRONE:  With the appropriate redactions, I

11      don't think there are.

12             THE COURT:  Okay.  Then the other ones, which are

13      his allegations about other individuals, you're saying that

14      there's a general public policy of --

15             MS. GIAMBRONE:  Of non --

16             THE COURT:  Of non-disclosure when there's

17      unsubstantiated allegations, except this is a lawsuit about

18      alleged government failure to conduct appropriate

19      investigations.  And so totally understand that the

20      defendant's position is that that's not true.  You know, we've

21      handled these things appropriately and I assume SCI's -- by

22      extension, that would be the same argument that they would

23      make. But how do we get to the heart of the question that the

24      plaintiff is raising, and I mean --

25             MS. GIAMBRONE:  I don't really think that it -- I

1    don't really think a negligent investigation, or it is the

2    subject of this lawsuit, Your Honor.  I believe that

3    plaintiff's complaint was that he spoke out at IS239 and

4    thereafter from speaking out he was subjected to discipline

5    and reassignment.  I understood that to be the claim.  I

6    thought this was a, you know, a First Amendment retaliation

7    claim.

8              THE COURT:  Right.  Well, correct me if I'm wrong,

9    but it seems like his claim is, I've made multiple complaints,

10   I make serious allegations, there is evidence about it that

11   supports me being a person making reasonable complaints, and

12   by looking at the investigations you would know that, so that

13   would be to plaintiff's point if there is -- these

14   investigation files are valuable sources of information.

15             And for whatever reason, and we don't know what that

16   is yet, either -- possible things that happened are they

17   ignore it because it's coming from me.  They do a half-baked

18   investigation because it's coming from me.  They say bad

19   things about me.  They suggest that I should be shut down and

20   punished and whatever, and, you know, the likelihood of this

21   in writing gets less and less and less.

22             But the implication being that plaintiff's

23   complaints are not afforded the appropriate consideration and

24   investigation.  And that would support, again by extension,

25   his position that there was retaliation because they are not

1    handling the complaints, not taking them seriously, not

2    interested in what he has to say, and the extension being,

3    they don't want him to continue to do this.

4            And I think that's the sort of milieu that plaintiff

5    is just generally describing that he operates in.

6            So you know, it's not because you failed to

7    investigate this properly I suffered a direct immediate harm,

8    you know, like whatever.  Somebody continued on the job and

9    was able to punish me.

10           I mean, I don't know what the particular allegations

11   were.  It's not that kind of an allegation, but it is more

12   along the lines of what I described.  I think that is what

13   this is about.

14           So to the extent that the plaintiff says that he's

15   entitled to explore what was going on with his investigations,

16   because -- his proposed investigations, obviously, because he

17   made the complaint and is saying you should look into this.

18   What happened in the investigation is fair game.  That's the

19   argument.

20           MS. GIAMBRONE:  Well, I feel like it's not even the

21   complaint, factually or otherwise.

22           THE COURT:  Yes.

23           MS. GIAMBRONE:  So --

24           THE COURT:  Okay.  But I'm looking right now.  I

25   just pulled up a case while we were talking and it's -- this

26

1      is just one example, so it's Jeter --

2                MR. GLASS:  That was my case, Your Honor.  That's --

3                THE COURT:  Right.  So *Jeter v. New York City*, and

4      the statement in the case is, defendants assert and plaintiff

5      does not dispute that the department investigation of the City

6      of New York and SCI are mayoral agencies of the City of New

7      York that are not amenable to suit.

8                And the defendant's cite -- now I'm summarizing.

9      The New York City Charter and then it says, "Plaintiff's

10     claims against DOI and SCI are accordingly dismissed."  And

11     so --

12               MS. GIAMBRONE:  Yes, Your Honor, but while the

13     agencies themselves might not be suable entities, there are

14     cases here where factually those agencies are the target of a

15     complaint or a summons and complaint.

16               Here, factually, Portelos has not made any

17     allegations against those agencies; against SCI.

18               THE COURT:  The point of pointing out the very close

19     relationship between SCI and DOE is to say that there's not

20     necessarily a wall between the two of them.  That's --

21               MS. GIAMBRONE:  But, Your Honor, SCI and DOI.  I --

22               THE COURT:  DOI.  DOI.  DOI.

23               MS. GIAMBRONE:  Well, still it's Department of

24     Investigation.  It's not Department of Education.

25               MR. GLASS:  Well, we do have an executive order that

1   says that SCI comes out of the DOE's budget.  It's Executive

2   Order Number 11 of 1990.  It says the commissioner on

3   education should appoint a deputy commissioner of education

4   for the city school district who shall be independent from the

5   Board of Education.  But Section 5 requires that the

6   (inaudible) commissioner and their staff shall be (inaudible)

7   by the Board of Education within a budget allocation usually

8   agreed upon by the Board of Education and the City.  So

9   (inaudible).

10          THE COURT:  Look, I don't even know if we need to

11  have it.  The point is, even a step beyond that, above that,

12  the mayoral agencies and his point, they work together, they

13  cooperate in looking into the same kind of conduct, behavior,

14  they look at the allegations.

15          Obviously, the output of the various reports that

16  SCI -- sorry.  I get my acronyms mixed up.  That they put out

17  are about DOE activities or the conducts of individuals in

18  DOE.  So, you know, it doesn't seem so farfetched to me to say

19  that what happens at SCI could have something to do with the

20  Department of Ed in terms of people's knowledge.

21          But let's get back to the heart of the question for

22  what -- defendant's counsel, what you want is confidentiality

23  order with regard to those investigations.

24          And I'm just asking the question is, given that

25  those investigations, I think from what I understand about

1    plaintiff's claim, are in the mix, potentially overlapping

2    communications among the people who would either provide

3    information to the investigating body, or who the

4    investigating body would interested in, all of whom from

5    plaintiff's perspective are potentially people with

6    information that relate to this and potentially actors who

7    acted against him.  Why should that information be screened

8    from the public?

9            Now, you know, whether what the plaintiff does with

10   that information is defamatory or harassing or whatever it is,

11   he would be fully accountable for that.  But I mean, I just

12   want to hear what your argument is.  I'm not saying I --

13           MS. GIAMBRONE:  Well it seems like --

14           THE COURT:  I'm not agreeing, necessarily with

15   plaintiff.  I just want to hear what your position is.

16           MS. GIAMBRONE:  Well, as I -- Your Honor, while the

17   Courts favor transparency there is also a balancing that takes

18   place in protecting the privacy interests of non-parties.

19           And what I am submitting is that when it comes to

20   non-party information contained within these unsubstantiated

21   records, those individuals should be afforded the protections

22   of a confidentiality order because they are serious

23   allegations.

24           And those individuals should be protected from

25   having this information disseminated on the public forum and

1    this federal law suit being used as a vehicle for obtaining

2    potentially embarrassing information allegation.  That's one

3    issue.

4              THE COURT:  Uh-huh.

5              MS. GIAMBRONE:  The second issue is that there are

6    documents within these investigatory materials that are of

7    minors, which are protected --

8              THE COURT:  No, no, I get that.  But that we already

9    answered, which is that you could redact the other.  But

10    you're saying something beyond that, right?

11              So the redaction would work for the confidential

12    information that are in the 34 approximate investigations that

13    relate to the plaintiff himself.  And then we're talking about

14    the 19 or 20 of his investigation, and you could redact out

15    bank accounts, tax numbers, whatever.  You know, minor's

16    names, reports or minors, people's mental and physical health

17    reports.  That could all come out.

18              But the --

19              MS. GIAMBRONE:  So to the extent that you --

20              THE COURT:  Your argument basically is that third

21    parties shouldn't have to deal with the public -- potential

22    public humiliation or embarrassment or just revealing their

23    confidential -- arguably confidential information through this

24    discovery.

25              MS. GIAMBRONE:  Additionally, Your Honor, this

30

1     agency, although plaintiff believes that everyone is in a

2     conspiracy, this agency does serve as an oversight agency,

3     just as the new Inspector General of the NYPD will serve in

4     oversight function, and allow these materials to be exchanged

5     and not protect non-parties, complainants, et cetera, will

6     have a chilling effect on people feeling comfortable to go to

7     this independent agency and make complaints.

8              THE COURT:  All right.  Okay.  So that is -- all

9     right.  So we've talked about Wolcott, Hill in particular, the

10    different files that are with SCI.  How about are there other

11    e-mail accounts that something else this -- all right.  Sorry.

12    Hold on.

13         (Pause.)

14              THE COURT:  I'm sorry.  I think you have now touched

15    on the e-mail issue.  Is that right?

16              MS. GIAMBRONE:  E-mail issue.

17              THE COURT:  I'm just looking at the letter.  It was

18    this --

19              MS. GIAMBRONE:  The first SCI e-mail, Your Honor --

20              THE COURT:  Uh-huh.

21              MS. GIAMBRONE:  The SCI e-mails were not part of the

22    electronic discovery agreement.  Plaintiffs, several weeks

23    ago, counsel contacted me to ask me if I could assist with a

24    FOIL request that was outstanding, and I'm not --

25    unfortunately that FOIL request goes directly to the agency,

1   and I believe that he has been in touch with them about the

2   FOIL.  I am not and there's really nothing I can assist that,

3   so --

4           MR. GLASS:  Sorry.  Why (inaudible) discovery in

5   this case?  I don't quite understand the difference.

6           THE COURT:  Yes, I don't understand the relevance of

7   FOIL.  I mean, except if there are protections in FOIL that

8   you're saying should be considered here.

9           MS. GIAMBRONE:  Well, that's --

10          MR. GLASS:  The reason we're --

11          THE COURT:  I just, I want to hear from defendant's

12  counsel.  I'm not asking you.  Go ahead.

13          MS. GIAMBRONE:  Plaintiff FOILed the agency

14  directly.  I didn't --

15          THE COURT:  No, I understand.  But the point is why

16  -- I don't have a full appreciation of what Mr. Gordon's e-

17  mail account's relevance would be here, but the -- okay.  But

18  the point is, why is he getting things from FOIL, or trying to

19  get things from FOIL that he shouldn't -- that are not showing

20  up here?

21          MS. GIAMBRONE:  Oh, I'm sorry, Your Honor.  I think

22  there were two issues.  There was a FOIL that he previously

23  FOILed from DOE.

24          THE COURT:  Uh-huh.

25          MS. GIAMBRONE:  There's these recent FOILs or

1      something that only came to my attention recently.

2               With regard to Andrew Gordon's e-mails --

3               THE COURT:  Uh-huh.

4               MS. GIAMBRONE:  -- we exchanged -- we searched

5      through 14,000 e-mails at the time of the request.  That was

6      what we recouped.

7               Recently plaintiff's counsel has indicated that he

8      had obtained Andrew Gordon e-mail through a FOIL request that

9      I guess he had -- I now know he made in June 2012, before this

10     case had even commenced.  And my understanding is that he did

11     obtain e-mails from Andrew Gordon's mailbox in connection with

12     that foil demand.

13              After doing some investigation my understanding is

14     that at the time of the FOIL request, before this litigation

15     had started, is that the DOE FOIL unit had recouped e-mails

16     from Andrew Gordon and put it in their own system, which we

17     had no knowledge of.

18              THE COURT:  Okay.

19              MS. GIAMBRONE:  And so Andrew Gordon is now retired.

20     And at the time that we recovered his e-mails I guess there

21     were several months that were not contained within our search.

22              I'm happy to do another search, and now to go

23     through the FOIL --

24              THE COURT:  Uh-huh.

25              MS. GIAMBRONE:  -- but it seems to me almost that

1  this is a red herring because evidently the plaintiff already

2  has these e-mails.

3          THE COURT:  Uh-huh.

4          MS. GIAMBRONE:  And I have had a chance to review

5  the FOIL request that he made, and his FOIL request has the

6  same terms that we had in our electronic discovery agreement.

7          I'm not going to go back and do another search, but

8  I feel that there will be anything (inaudible) 42 there.

9          THE COURT:  Okay.  Then what about the other

10  people's e-mails that I mentioned in the plaintiff's letter?

11  This is Item 5 and 6.

12          MS. GIAMBRONE:  Yes.  The --

13          THE COURT:  Page 2 of his letter from the 15th of

14  April.

15          MS. GIAMBRONE:  Yes.  Number 5, I don't know what he

16  was talking about from (inaudible).  And number 6, as I said,

17  plaintiff's counsel and I entered into an electronic discovery

18  agreement, and these e-mails would not entail electronic

19  discovery agreement, and only recently did I learn that

20  apparently he had made a FOIL request directly to SCI.

21          THE COURT:  Uh-huh.

22          MS. GIAMBRONE:  So, I don't believe that I have a

23  duty with regards to an independent FOIL request, directly to

24  an agency.  If he would like to revisit the electronic

25  discovery agreement that we have entered into, that's going to

1  protract this litigation and I imagine that SCI is going to

2  have a lot of privilege concerns.

3          But, you know, as it stands now I don't believe that

4  these e-mails are part of the discovery that he and I had

5  engaged in at this point.

6          THE COURT:  All right.  And just for my information,

7  who are Condon, Fennel, and Lockrin?

8          MS. GIAMBRONE:  Richard Condon is the commissioner.

9  T. Fennel, I believe, is a head investigator.  Regina Lockrin

10  is a deputy commissioner.

11          THE COURT:  Okay.

12          MS. GIAMBRONE:  And I don't know who the other

13  three --

14          THE COURT:  Romano, Martucci, and Marrow.  Okay.

15  Okay.

16          Let me ask plaintiff's counsel, what's the issue in

17  number 5, this point about the dates?

18          MR. GLASS:  (Inaudible) people we listed, like

19  Dennis Wolcott, was part of that originally.  You know, they

20  e-mailed -- Mr. Wolcott e-mailed (inaudible)--

21          THE COURT:  I can't hear you.  Sorry.  Say that

22  again.

23          MR. GLASS:  I'm sorry. Dennis Wolcott was one of the

24  people in number 5, and we didn't get a single e-mail about

25  Dennis Wolcott from defense counsel, even though in FOIL we

1    got several e-mails indicating Wolcott was, you know, a party

2    to e-mails about himself.

3         David Weiner is another person who is coming up in

4    FOIL requests left and right with having knowledge about Mr.

5    Portelos and his situation (inaudible).  And we don't have any

6    of this from plaintiff counsel.  I mean, defense counsel.

7         I don't know exactly what joint discovery agreement

8    she's referring to.  I'd like to see the document she's

9    referring to.  We started with the names that she has

10   (inaudible).  But we gave her other names and we really didn't

11   get much.  I mean, we got some things back but we got nothing

12   on Andrew Gordon at all, not a single e-mail produced about

13   Andrew Gordon.  And we got nothing on Wolcott even though they

14   do exist.

15        And that's what's concerning us because I don't know

16   what searches she's doing and she's controlling the searches.

17   And the (inaudible) can say that, you know, (inaudible). There

18   are e-mails with David Weiner about (inaudible) submitted to

19   DOE.  We know there's relevant e-mails there.  There are e-

20   mails -- a lot of these people would have knowledge about

21   (inaudible) situation, how it was being handled, and it goes

22   to your point earlier about, you know, (inaudible) doing

23   investigation.  The question is are they doing true

24   investigations or are these investigations a shame that, you

25   know, that they're shutting down these investigations, and

1  these are the people we'd be talking about.  Richard Condon,

2  Thomas Fennel, Regina Lockrin.  These are the people high in

3  SCI who would be discussing how to handle his investigation.

4  And that is (inaudible) in this case is that why is

5  SCI being used as a tool, to, you know (inaudible) the

6  investigation and shut down.  Even though we had credible

7  evidence, and every allegation we made, we don't have -- we do

8  have evidence these things happened.

9  THE COURT:  Okay.  Let me ask --

10  MS. GIAMBRONE:  Your Honor, I would direct the Court

11  to docket number 148.

12  THE COURT:  Uh-huh.

13  MS. GIAMBRONE:  The electronic discovery agreement

14  that we submitted to the Court.  And at that time plaintiff

15  does not make any request for Wolcott's e-mails, or any of

16  these other individuals.  And what defendants agreed to search

17  were A through D.  And we looked through 14,000 e-mails for

18  Andrew Gordon alone, so I know that I myself spent weeks and

19  weeks going through these documents and I turned over

20  thousands of documents to plaintiff's counsel, which I know he

21  will not dispute at this point.

22  So for him to plead ignorance about this electronic

23  discovery agreement is shocking to me.

24  THE COURT:  All right.  This is what we're going to

25  do for these outstanding issues.  Look, SCI needs to produce

1    some documents.  You need to have a confidentiality order for

2    the following reasons and parts that I'm going to talk about.

3           I would like you to try to consult whether you want

4    to use the agreement that you had before, or you want to use a

5    new one or whatever, you have to talk about it and figure out

6    what that agreement is going to be and submit to me a proposed

7    confidentiality agreement.  We'll talk about dates in a

8    second, but --

9           MS. GIAMBRONE:  There's just one more issue with

10   regards to confidentiality, Your Honor.

11          THE COURT:  Yes.

12          MS. GIAMBRONE:  SCI has indicated to me, and I have

13   not -- they have not even released it to me, but my

14   understanding is there may or may not be documents within the

15   unsubstantiated records that involve an investigation in

16   conjunction with or at the behest of the Conflict of Interest

17   Board.

18          THE COURT:  Uh-huh.

19          MS. GIAMBRONE:  That pursuant to New York City

20   Charter, Section 2603, and I can submit to the Court the

21   specific details of that statute, but that those documents are

22   per se, confidential.  So --

23          THE COURT:  And that goes to what?  To one, two,

24   more than -- how many?  Or just one investigation?

25          MS. GIAMBRONE:  I haven't seen it but I believe it's

1    one investigation and I believe it's a minor portion of that

2    investigation.

3          THE COURT:  Okay.  All right.  So for the

4    investigations under the ones against Mr. Portelos, they need

5    to turn over the files that they have, but you can redact the

6    information that you're identifying as confidential.  I mean,

7    you could have the, you know, what we had started out

8    describing earlier.  There could be a copy that you understand

9    is going to be public, and there can be a complete copy to the

10   plaintiff and his counsel.  And so your confidentiality

11   agreement should reflect that you understand that this is

12   what's going to happen.

13         For things that you are saying are per se

14   confidential, and there's some kind of, essentially, a

15   privilege that we haven't discussed in detail, include that in

16   the equivalent of a privilege log.  And then if there's some

17   dispute from the plaintiff about that, we can revisit that.

18         It sounds like you don't have enough information on

19   what it is, and I don't know enough about how the Conflict of

20   Interest Board statute works, or Charter Provision, whatever

21   it is.  So that's what's going to happen as to the

22   investigations against him.

23         As to the 19 or so, whatever it is, investigations

24   that were done for now, they can be produced confidentially,

25   and they can't be disseminated by the plaintiff or plaintiff's

1    counsel beyond just being used in this litigation.

2          If on review there's some reason to think that that

3    confidentiality provision should not be in play then you can

4    raise that with me.  But I think given the argument, I think

5    there's merit to defendant's argument and I'm not going to

6    waive the confidentiality provisions or say that those

7    concerns are unmerited, given the description of the

8    documents, which is that they include unsubstantiated

9    allegations against individuals.  They're serious allegations.

10   They include private information.  So until we have seen them

11   we can't say whether that should be the kind of information

12   that's out in the public or not.

13         And I agree with the point that defendant's counsel

14   is making, that it is a point of reasonable concern to think

15   about if information about either complaints made and witness

16   statements given and information provided is automatically

17   going to be available to the public, then that could have a

18   chilling effect on people coming forward and there's a public

19   interest in encouraging that.

20         I don't know if that's ultimately going to be

21   outweighed by concerns about really a public view of what's

22   happening with these investigatory bodies, but for now without

23   having seen the documents, really, I can't say that they

24   should be public.  So, those documents should be provided and

25   Mr. Portelos and counsel, you have to understand that the

40

1    confidentiality order is binding on you, and if you violate it

2    then you could be held in contempt of court.  So that's where

3    that's going to go.

4            As to the e-mail account for Mr. Gordon, yes, it

5    seems worth it for defendant's counsel for you to just go back

6    and make sure you've done the complete production that you

7    should do.

8            As to the individuals that are identified by their

9    e-mail address in number 6 in the plaintiff's letter, counsel

10   you need to have a much more specific discussion about what it

11   is you're looking for and compare it to whatever this original

12   agreement was, see why you're disagreeing as to what it was,

13   see what it is that defendant's counsel has already searched.

14   I'm not asking them to go back unless there's a reason to

15   think what they did the first time was not correct.  This, I

16   guess, is really touching on 5 and 6.  Or actually maybe it's

17   just 5.

18           But if you want me to resolve disputes about whether

19   the e-mail searches have been thorough and complete and

20   covered enough of the time period, I need to know as to which

21   individuals, which account, what dates you're talking about.

22           And then as to six, I don't think where we stand now

23   it doesn't make sense to go back -- or to go and look at all

24   of the SCI e-mails that might talk about Portelos, until you

25   see the files.  That may answer all the questions that you

1   have.

2          And these e-mail search endeavors take a lot of

3   resources, given that there may be a better source for the

4   information, or at least a source that will give you enough

5   information, let's start with the files and then see where to

6   go from there.

7          Let's just talk from the City, your perspective on

8   the police reports about -- that were filed by Mr. Candia.

9          MS. GIAMBRONE:  Yes.

10         THE COURT:  It's the number three --

11         MS. GIAMBRONE:  (Inaudible.)

12         THE COURT:  -- in the April 15th letter.  What's the

13  story there?

14         MS. GIAMBRONE:  (Inaudible) Mr. Candia said that he

15  had made two complaints in Police 3-6 in Stanton Island.  I

16  believe he said he identified plaintiff in one and the other

17  one he did not.

18         Mr. Candia does not have copies of the complaint and

19  unfortunately I have pressed the -- and he does not have a

20  (inaudible) --

21         THE COURT:  Sorry.  Whoever -- if you can turn off

22  the phone or whatever that is?

23         MR. GLASS:  I'm not sure I can.  I'll try.

24         THE COURT:  All right.  I'm sorry.  So, Mr. Candia

25  doesn't have the document and then --

1          MS. GIAMBRONE:  And he doesn't have the dates that

2     he filed them so NYPD is having a very hard time locating the

3     complaints.  But be that as it may, I don't know how relevant

4     and necessary these complaints are to plaintiff's claims.  But

5     I am searching for them.  I'm trying to get them.

6          THE COURT:  All right.  So see what you can do about

7     that.  Okay.

8          MR. GLASS:  That's (inaudible) the number 2.

9          THE COURT:  Uh-huh.

10         MR. GLASS:  I understand she was taking the position

11    that SCI --

12         THE COURT:  I'm sorry.  I should say the Hill

13    investigation for now does not need to be produced if it is in

14    fact an open investigation.

15         But we may have to revisit that and have more

16    information about exactly what's going on there.  So,

17    defendant's counsel, you should anticipate having to answer

18    more questions about what's going on.  But for now, if what's

19    being said is that Ms. Hill is going to take the Fifth

20    Amendment and that that's an active, live investigation, they

21    don't have to produce it now.

22         MS. GIAMBRONE:  Thank you.

23         MR. GLASS:  My question is with number one and two.

24         THE COURT:  Uh-huh.

25         MR. GLASS:  They're taking a different position

43

1    regarding OSI investigations versus SCI.  But just so you

2    understand what happened is SCI ultimately referred the

3    investigation back to the DOE investigators, and then OSI --

4    because it's covering this SCI investigation (inaudible)

5    particular confidentiality order?  I mean, you must be --

6                 MS. GIAMBRONE:  I think --

7                 MR. GLASS:  Or the investigation --

8                 MS. GIAMBRONE:  I would ask that OSI be afforded the

9    same protection; that essentially it served, you know, many of

10   the same functions as SCI.

11                MR. GLASS:  (Inaudible.)

12                MS. GIAMBRONE:  I'm sorry?

13                MR. GLASS:  I'm just trying to find out how many

14   were OSI -- the ones that he initiated were referred to OSI as

15   opposed to SCI.  Do you know?

16                MS. GIAMBRONE:  I don't, but my understanding is the

17   bulk of the investigatory files are SCI.  But, I don't know.

18   I can't --

19                THE COURT:  All right.  For now you should expect

20   that you're going to treat them, the SCI, OSI files in the

21   same way; the ones that are about Mr. Portelos, the private

22   information about individuals that are of a sensitive nature

23   that we've already talked about; that can be redacted.

24                If there's a privilege issue that comes up, I don't

25   know whichever case it is it's going to have this conflict of

1    interest issue in it, you can assert essentially the privilege

2    in that.  And then the other ones, the complaints that he made

3    about other people, they're going to be subject to the

4    confidentiality agreement.  Okay.  All right.  We have to wrap

5    it up here.

6         Amending the complaint you have to raise that with

7    the District judge by a pre-motion conference letter.  And

8    then the deposition dates, you should work them out

9    yourselves.  I think that it's reasonable for the plaintiff to

10   know what the position of the defendant is with regard to

11   folks who no longer work for the Department.

12        And then Chancellor Wolcott, as it stands now, I

13   don't think the plaintiff, that you've made a sufficient

14   showing that you've basically worked your way up the chain of

15   people who potentially or arguably knew about anything having

16   to do with Mr. Portelos.  The fact that the chancellor

17   received or had e-mails about Mr. Portelos in and of itself is

18   not sufficient to justify his deposition.

19        If you have either substantive information from

20   those e-mails that would suggest that he had meaningful

21   information or was involved in whatever it is, you know, the

22   various allegations that Mr. Portelos is making, that might

23   require a different result with regard to his deposition.  Or

24   if you do the depositions of people who, whatever, worked for

25   him, with him, and obviously everyone in the DOE was working

```
1    for him, but you know, who were under his supervision and that
2    suggest that he might have personal information about Mr.
3    Portelos, then you can renew the request to take the
4    chancellor's deposition.
5              Obviously he's no longer the chancellor --
6              MR. GLASS:  (Inaudible.)
7              THE COURT:  Hang on.  Hold on.  Do not interrupt me.
8              The fact that he's no longer the chancellor reduces
9    the protections that he is afforded, but he still had a high-
10   level position; the highest level position in the DOE and
11   before his deposition can be taken it needs to be something
12   that you can substantiate.  But it's a reasonable, you know,
13   endeavor.
14             So if you haven't done that yet, I'm not saying you
15   can't, but it's not -- so as of now, you can't take the
16   chancellor's -- former chancellor's deposition.  If you can
17   show more or persuade the City's lawyer, then that's fine.  If
18   you want to put together a better case for why you should be
19   able to take it, then you can let me know.
20             MR. GLASS:  I probably should mention that -- sorry.
21             THE COURT:  Go ahead.
22             MR. GLASS:  I mean, we do have (inaudible) Mr.
23   Portelos, and we could show you the links to those things and
24   if you want to put someone in a stronger basis for the
25   (inaudible) a letter, I believe that's appropriate.
```

1           But it's more of just an e-mail.   (Inaudible) e-

2    mails were redacted.  That's the one we have with his name on

3    it but we do have him being asked on public television about

4    Mr. Portelos, saying that he has no knowledge of it and it's

5    not a case where they say, you know, the chancellor doesn't

6    know anything.  He's too high up.  He was asked on public

7    television about Mr. Portelos and his reassignment.  So, you

8    know, on the one hand around (inaudible) so I don't know what

9    the best way to handle that is.  So we'd like to revisit that.

10          THE COURT:  All right.  Well, you know, the one

11   paragraph in what you just said doesn't suggest to me that the

12   chancellor, former chancellor, has sufficient information to

13   make it fair to take his deposition, or that it's reasonably

14   likely to lead to admissible evidence in this case.  But if

15   there is other information that you want to present all

16   together, you can do that.

17          So, we're going to wrap this up.  Let's talk about

18   the time line.  When do you want to submit your proposed

19   confidentiality order?  If you can't agree on it then submit

20   what you agree and let me know which are the parts that you

21   don't agree.

22          MS. GIAMBRONE:  Today is the 17th.  Perhaps by next

23   Friday, Your Honor.

24          THE COURT:  Mr. Glass?

25          MR. GLASS:  We'd like to (inaudible) as fast as

1    possible because we may ask him for these --

2              MS. GIAMBRONE:  No, that's fine.  The 23rd?

3              MR. GLASS:  I'm just saying that (inaudible)

4    investigations we've been asking for months, she's represented

5    that she has to go meet with them and see and all that.  But

6    that's --

7              THE COURT:  All right.  That's not the question that

8    you're being asked.

9              MR. GLASS:  I'd like to (inaudible).

10             THE COURT:  The question is, when do you want to

11   submit the proposed confidentiality order.

12             MR. GLASS:  I think she said the next Wednesday,

13   would be -- probably okay.

14             THE COURT:  Okay.  All right.  And then assuming

15   that gets signed by you all and submitted, then in terms of

16   producing -- so, the files.  I would see them as being

17   arguably, potentially produced in two separate sets.  There's

18   going to be the ones that need the redactions made, and the

19   ones that don't.  So let's talk about when you want to produce

20   the ones that need to be redacted.

21             MS. GIAMBRONE:  Well, we are talking about thousands

22   of documents.  Can I -- would Your Honor consider a month?

23             THE COURT:  Yes.  Okay.  So, May 16th.

24             MS. GIAMBRONE:  Yes.

25             THE COURT:  Okay.

1          MS. GIAMBRONE:  So this is for Portelos, SCI and OSI

2   redacted documents?

3          THE COURT:  Yes.

4          MS. GIAMBRONE:  Thank you.

5          THE COURT:  All right.  And how about the ones

6   you're not going to redact but are subject to the

7   confidentiality order?

8          MS. GIAMBRONE:  I assume a week thereafter, because

9   at that point they'll already be organized.

10          THE COURT:  I'm sorry.  Say that again?

11          MS. GIAMBRONE:  I said, I don't think I would need

12   too much time thereafter because at that point they'll already

13   be organized and what not.  So the 28th?

14          THE COURT:  Wait.  I'm sorry.  Of --

15          MS. GIAMBRONE:  Of May.

16          THE COURT:  Of May.  I'm sorry, why would you be

17   producing those ones afterwards?  You're basically --

18          MS. GIAMBRONE:  Oh, okay.  So I was a little

19   confused by that, Your Honor.  So, yeah, I would ask for a

20   month to do the unredacted and then --

21          THE COURT:  Okay.

22          MS. GIAMBRONE:  -- several weeks thereafter for --

23          THE COURT:  All right.  Say 5/30 for the redacted

24   ones, and 5/16 for the unredacted ones.

25          MR. GLASS:  Your Honor, just to clarify for the

1    confidentiality order, is it only the ones that are redacted

2    that are subject to confidentiality, or is everything subject

3    to --

4              THE COURT:  No.  There's two groups of documents.

5    There is the ones that are about Mr. Portelos, those are the

6    investigations about him.  In those there needs to be a -- I'm

7    saying those can generally be public.  But what counsel has

8    said is there is significant confidential information, such as

9    the names of minors, bank account information, other

10   identifying numbers relating to people.  That can all be

11   redacted.

12             Then you all get that redacted set, do what you want

13   to do with it.  But obviously what you do has to be within the

14   bounds of the law.  And there will be an unredacted set that

15   you cannot -- you and your client cannot circulate or share

16   with anyone outside of this case.

17             As to the other documents which are the ones about

18   the investigations that Mr. Portelos's complaints initiated,

19   which is the other set you're looking for, we're not going to

20   go through the exercise of redacting those because they're

21   subject to the confidentiality agreement and confidentiality

22   order.

23             So they don't need to be redacted except there is,

24   it seems like, an issue of a privilege which related to the

25   Conflict of Interest Board in one of these files.  I don't

1    know which, as to that.  For now they're going to assert that

2    there is -- I'm calling it a privilege, but there is some

3    confidentiality statue which I don't know enough about.  We're

4    erring on the side of caution here.  If that needs to be, you

5    know, revealed, then we can address that at a later date.

6           So by 5/16 you're getting the entirely confidential

7    but unredacted file.  And by 5/30 -- files.  And by 5/30

8    you're getting the redacted ones, the redacted copies may be

9    made public.  The unredacted -- sorry, the complete, meaning

10   the unredacted copies, cannot be made public.

11          Okay.  When are you going to meet and discuss the

12   electronic discovery so that you can be very specific about

13   what you're looking for, what's been done and not produced,

14   what's been done and has been produced, and what you really

15   need?

16          MR. GLASS:  So we're still doing -- are we doing his

17   deposition on April 24th?  You can do it as part of a

18   (inaudible).

19          MS. GIAMBRONE:  That's fine.

20          THE COURT:  All right.  So you're going to let me

21   know by, say, April 30th, what the status is and any of the

22   outstanding requests with regard to electronic discovery.

23          MS. GIAMBRONE:  Yes.

24          THE COURT:  Okay.

25          MS. GIAMBRONE:  Just a logistical matter, Your

1    Honor --

2              THE COURT:  Uh-huh.

3              MS. GIAMBRONE:  -- SCI will not release the

4    documents to me without a court order.

5              THE COURT:  Well, they're going to see this on the

6    docket.

7              MS. GIAMBRONE:  Yes, is it possible for you to just

8    order that SCI release the files to the corporation counsel

9    for compliance with --

10             THE COURT:  Okay.

11             MS. GIAMBRONE:  I realize --

12             THE COURT:  Right.  They're your client, but okay.

13             MS. GIAMBRONE:  Thank you.

14             THE COURT:  Do you want a date?

15             MS. GIAMBRONE:  Let's see.  Today is the -- I

16    suppose they could be like April 30th.

17             THE COURT:  Okay.  So hang on one second, let me

18    just get these notes right here.

19             And you need it for both, OSI and SCI?

20             MS. GIAMBRONE:  No, OSI will release them.

21             MR. GLASS:  I think OEO might have been deferred one

22    of the investigations, so I would like to keep that in there

23    was well.  SCI originally probably got all these

24    investigations and then SCI has deferred them to OSI or OEO,

25    which is the Office of Equal Employment Opportunity.  So we'd

1      like (inaudible) in there as well.

2              THE COURT:  I have no idea who you're talking about.

3      Who is that?

4              MR. GLASS:  OEO is another agency that SCI basically

5      defers the investigation to OSI, or if it has like a sexual

6      harassment element or a discrimination element they might

7      defer it through OEO, which is another internal DOE agency, or

8      entity.  So I would just ask that that be incorporated.

9              If in fact one of these SCI investigations was

10     deferred to OEO, we'd obviously like to get, you know, what

11     was the investigation (inaudible) there.  Like from the group

12     of 19 or (inaudible) SCI deferred one of those to OEO and to

13     OSI.  so it should be included.

14             THE COURT:  Defense counsel?

15             MS. GIAMBRONE:  So I would think that the OEO should

16     be treated the same way as the SCI concerning non-parties.

17             THE COURT:  Uh-huh.

18             MS. GIAMBRONE:  Because I believe there was a sexual

19     harassment claim lodged against a non-party and to the extent

20     that there is an investigation and that did occur, I would

21     just ask that it be treated the same way.

22             THE COURT:  All right.  Do you need the order to

23     relate to them?

24             MS. GIAMBRONE:  No, OEO is the Office of Equal

25     Employment (inaudible) --

1      THE COURT:  Right.  Oh, okay.  So it's actually

2   within your client.  Okay.  Okay.  Sorry, I'm just writing it

3   down here.

4      All right.  So by 4/30/14 SCI must produce the

5   Portelos related files to corporation counsel for review and

6   production as ordered during the conference.  All right.  Will

7   that work?

8      MS. GIAMBRONE:  Yes, thank you.

9      THE COURT:  All right.  All right.  All right.  So

10  that's 4/30.  By 5/16 you're going to produce the files that

11  you're not redacting, 5/30 you're producing the ones that you

12  are redacting, and then just some earlier dates by 4/23, are

13  you giving me the proposed confidentiality order, and by 4/30

14  you're going to let me know what the status is on

15  electronically discovery discussions.

16     The Wolcott deposition is not going to happen.  Or,

17  you know, I'm denying the request for that without prejudice,

18  and I'm just telling you the request to amend has to go to the

19  District Judge.  Okay.  Are there other issues?

20     MS. GIAMBRONE:  Your Honor, at this --

21     MR. GLASS:  (Inaudible.)

22     THE COURT:  Go ahead.

23     MR. GLASS:  The discovery cut off, I guess  at this

24  point would be --

25     THE COURT:  All right.  So what's the date that

1    you're --

2         MS. GIAMBRONE:  May 30th was the original date, Your

3    Honor.

4         THE COURT:  Okay.

5         MS. GIAMBRONE:  But I have a trial starting on June

6    9th, and if counsel is amending and adding in more parties

7    and --

8         THE COURT:  I don't know if that's going to happen,

9    but it depends.  Okay.

10        MS. GIAMBRONE:  I don't know.  Bryan, what do you

11   propose?

12        MR. GLASS:  (Inaudible) July 31st, maybe.

13        THE COURT:  What do you think?

14        MS. GIAMBRONE:  Oh, that's fine.

15        THE COURT:  Okay.  So --

16        MR. GLASS:  And I appreciate the fact that you're

17   (inaudible).

18        THE COURT:  All right.  And then the dispositive

19   motion practice needs to start by August 29th.  You should

20   look at the District Judge's rules.

21        Okay.  I don't have time to talk about this in any

22   detail now, but I'm going to ask you for the umpteenth time,

23   has anybody talked about settlement?

24        MS. GIAMBRONE:  I think preliminarily there was a

25   discussion.

```
1              THE COURT:  Uh-huh.

2              MS. GIAMBRONE:  But there was some equitable relief

3    that was requested which I could not provide at that time.

4              THE COURT:  Right.

5              MS. GIAMBRONE:  I don't know if counsel is

6    interested --

7              THE COURT:  Right.  I mean, it may be that you want

8    to wait until the arbitrator's decision comes down, I don't

9    know.  But --

10             MR. GLASS:  It's probably going to be necessary I

11   imagine, (inaudible).

12             THE COURT:  I'm sorry.  What you said is mumbled.

13   Say it again.

14             MR. GLASS:  Well, I think they finished the hearing

15   so it's going to have to (inaudible)I guess.  I don't know if

16   they want to draw this (inaudible), but, you know, are they

17   going to do that?

18             THE COURT:  Uh-huh.  All right.  Well, whatever.

19             MR. GLASS:  (Inaudible.)

20             THE COURT:  Okay.  Okay.  I think we've covered

21   everything that's there.  All right.  I'll have my deputy just

22   schedule another telephone call, probably in mid July just to

23   make sure everything is wrapping up.

24             MS. GIAMBRONE:  Thank you.

25             THE COURT:  Okay.
```

1              MS. GIAMBRONE:  All right.

2              THE COURT:  Thank you very much.

3              MR. GLASS:  Thank you.

4              THE COURT:  Take care.  Bye.

5          (Proceedings concluded at 4:25 p.m.)

6

7      I, CHRISTINE FIORE, Certified Electronic Court Reporter

8  and Transcriber and court-approved transcriber, certify that

9  the foregoing is a correct transcript from the official

10  electronic sound recording of the proceedings in the above-

11  entitled matter.

12

13          *Christine Fiore*

14  _____          April 23, 2014

15          Christine Fiore, CERT

16

17

18

19

20

21

22

23