```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

-----------------------------X  Docket#
FRANCESCO PORTELOS,           : 12-cv-03141-RRM-VMS
              Plaintiff,      :
                              :
    - versus -                : U.S. Courthouse
                              : Brooklyn, New York
CITY OF NEW YORK, et al.,     :
              Defendant       : September 5, 2014
-----------------------------X
```

```
            TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
             BEFORE THE HONORABLE VERA M. SCANLON
               UNITED STATES MAGISTRATE JUDGE
```

**A  P  P  E  A  R  A  N  C  E  S:**


**For the Plaintiff:**       **Bryan D. Glass, Esq.**
Glass Krakower LLP
100 Church Street, 8th Fl.
New York, NY 10007


**For the Defendant:**       **Jessica Giambrone, Esq.**
New York Law Dept.
100 Church Street
New York, NY 10007


**Transcription Service:**       **Transcriptions Plus II, Inc.**
740 Sharon Road
Copiague, New York 11726
rl.transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                         Proceedings

1            THE CLERK:  So we're here for Portelos v. City

2    of New York, et  al., 12-cv-03141.

3            So for the plaintiff?

4            MR. GLASS:  Bryan Glass --

5            THE COURT:  All right.  So you should both pull

6    the mics close to you and make sure the green light is on

7    and if it's not, hit the bar at the bottom.

8            And for the City defendants?

9            MS. GIAMBRONE:  For the defendants, Jessica

10   Giambrone, Assistant Corporation Counsel.

11           THE COURT:  All right.  So I have your August

12   20th letter from Mr. Glass, the August 28th letter from

13   Corporation Counsel.

14           All right.  So is it right that some of the

15   issues that were raised in the beginning of Mr. Glass'

16   letter have been resolved?

17           MS. GIAMBRONE:  Well, I hope so.

18           MR. GLASS:  Yes, I believe we're making

19   progress.

20           THE COURT:  Okay.

21           MR. GLASS:  (Indiscernible).

22           THE COURT:  So hang on.  You're -- I think --

23   hit the bar on the bottom.  Yes, so say that again.

24           MR. GLASS:  Yes.

25           THE COURT:  There you go; great.

3

Proceedings

1          MR. GLASS:  Yes, I would just say that as of

2    yesterday, I got some more discovery, actually an

3    important piece of discovery we were waiting for for some

4    time.  Mr. Portelos hasn't even seen it yet but we just

5    got it last night and that involved one of the

6    substantiated allegations against Linda Hill.  So I got

7    that last evening.  I just saw it today.

8          There's still some questions about the e-mails.

9    I think that as far as document discovery, the main issue

10   seems to be certain e-mails between like Andrew Gordon

11   before we redepose him.  It does appear that there are

12   other e-mails out there regarding Andrew Gordon who was

13   the former HR person -- HR director during the relevant

14   time period.

15         And we have -- he had done a FOIL -- Mr.

16   Portelos had done a FOIL request before this litigation

17   really ramped up and had gotten some information from the

18   DOE FOIL office with some of the Gordon e-mails, many of

19   which appear to be redacted, even though they might not

20   be privileged and I showed Ms. Giambrone a sample of what

21   I was talking about.

22         So before we schedule Gordon's deposition, we

23   don't want to waste our time.  You know, we would like to

24   get the document discovery to look through any other e-

25   mails that might be relevant before we bring him back.

4

Proceedings

1  So that was sort of the delay on that.

2          There are also e-mails he has between, for

3  example, Dennis Wolcott and David Weiner, neither who are

4  attorneys that, you know, would fall within his request.

5  So I think that's really the most --

6          THE COURT:  You're saying he got these in FOIL

7  and so what?

8          MR. GLASS:  Some of them were in early FOIL

9  responses before we got into discovery.  Like he had done

10  this FOIL back in 2012 and so we know they exist.  You

11  know, we don't know exactly what exists but there appear

12  to be other e-mails that are relevant regarding Mr.

13  Portelos that, you know, have not been provided and I

14  think Ms. Giambrone said she has some to go through yet.

15  I guess there's -- she believes there are some maybe in

16  the office that she has to review and redact.  But --

17          MS. GIAMBRONE:  Well, if I could just respond.

18  On May 27th when we were before your Honor, there was the

19  issue of Andrew Gordon e-mails.  Apparently, I believe,

20  there was one month of e-mails that had been housed in an

21  alternate location --

22          THE COURT:  Right.

23          MS. GIAMBRONE:  -- because he separated from

24  the DOE.  And as I indicated to Mr. Glass, the litigation

25  support person in my office who was savvy and knew where

5

Proceedings

1    these materials were has left, so there's just been a

2    little delay in me personally being able to recover them

3    and review them for privilege but since it is only about

4    a month or so of e-mails, I don't anticipate it being

5    particularly lengthy and I do intend to review those and

6    exchange those, you know, hopefully in the next week or

7    two.

8           You know, in terms of FOIL and redactions, I'm

9    not quite sure what that has to do with this.  As far as

10   defendants can see, the only outstanding matter of

11   discovery at this point -- and we have exchanged a number

12   of materials at this point -- we've exchanged close to

13   7,000 documents related to OSI and SCI and about 4,000

14   documents related to electronic discovery, not including

15   personnel records and other materials.

16          We believe the only outstanding discovery --

17   documentary discovery at this point is these Andrew

18   Gordon e-mails.  So we intend to provide those as soon as

19   possible and we believe that there are a number of other

20   depositions which now can proceed.  I have been having

21   difficulty in getting counsel to communicate to me what

22   days are feasible.  And in terms of Andrew Gordon, as I

23   indicated, he's now a vice president at NYU and his

24   schedule is extremely difficult.  So I would like to

25   schedule that so that even -- and we then we can exchange

6

Proceedings

1   the e-mails in advance of that, if that's the only

2   outstanding issue.

3            MR. GLASS:  The reason we didn't -- you know,

4   we didn't commit to scheduling Gordon and Hill, Hill we

5   were waiting for this report which we have received now

6   just yesterday.  Yeah, I don't mind scheduling these

7   going forward at this point.  The next two weeks are

8   pretty brutal on my schedule but late September, early

9   October --

10           THE COURT:  We're supposed to be finished.

11  Finished!  Finished!

12           MR. GLASS:  Well, we were hoping --

13           THE COURT:  Finished!

14           MR. GLASS:  I was hoping to do some of them

15  earlier but we were waiting for discovery and then I

16  believe Ms. Giambrone was away the last week of August

17  when I was hoping to do at least Mr. Portelos.  So there

18  aren't a lot more to do.

19           Well, the other issue becomes the amended

20  complaint.

21           THE COURT:  Well, hold on.  So this is -- I

22  think that Ms. Giambrone's letter, page 2 of the three

23  page letter that's on the docket at 52, summarizes what I

24  think is left from --

25           MS. GIAMBRONE:  This --

7

Proceedings

1        THE COURT:  -- plaintiffs but --

2        MS. GIAMBRONE:  Right.

3        THE COURT:  -- where are you on these Rodi, EEO

4    -- you know, these other issues that are identified?

5        MS. GIAMBRONE:  Your Honor, this was a joint

6    letter which I did draft --

7        THE COURT:  Right.

8        MS. GIAMBRONE:  -- on behalf of the parties and

9    it includes issues that plaintiff was bringing up.  We

10   produced -- you know, as far as we stand, we believe that

11   all discovery that has been previously ordered and which

12   is appropriate has been provided.  Counsel seems to be

13   including new requests here which we are vehemently

14   opposed to.

15        Additionally, he asks for the OEO files which

16   we would submit -- one of them, I'm unaware of what it

17   is.  The other one involves a non-party administrator who

18   has not been named in this suit and is not a party to the

19   retaliation.

20        THE COURT:  All right.  Hang on.

21        MS. GIAMBRONE:  It's been unsubstantiated.

22        THE COURT:  So, wait.  Let's just go through

23   this.

24        MS. GIAMBRONE:  Okay.

25        THE COURT:  Okay.  The Gordon one You're going

8

Proceedings

1    to deal with.  What about Rodi?  What's going on there?

2              MS. GIAMBRONE:  Well, the way counsel words it

3    is any e-mail and then he talks about Dennis Wolcott and

4    whatnot.  There was a previous agreement.  It's on the

5    record on the May 27th.  We intend to comply with that.

6              Any e-mail from Katherine Rodi; it's been

7    represented to me that there was only one document that

8    was responsive to the electronic discovery agreement.  If

9    counsel has other -- plaintiff is aware of over 100 other

10   e-mails.  I don't know what these e-mails are.  I don't

11   believe there's any indication.  Katherine Rodi has not

12   been named as an actor in this case.  I don't really

13   believe that these materials are relevant to the First

14   Amendment retaliation claim and the whistleblower

15   retaliation claim.

16             So we would oppose any further discovery on

17   that point.  We believe there's been extensive electronic

18   discovery and plaintiff at this point doesn't make an

19   adequate showing that there is any need for any

20   additional discovery.

21             THE COURT:  All right.  So let me hear from

22   plaintiff about that.

23             MR. GLASS:  Well, I just -- Mr. Portelos is on

24   his way.  So I would like him to --

25             THE COURT:  He's late.

Proceedings

1              MR. GLASS:  Well, he --

2              THE COURT:  I mean --

3              MR. GLASS:  I asked to move the conference back

4    but Ms. Giambrone would not consent and I didn't want to

5    create further confusion for the Court.

6              THE COURT:  He's late.  So let's go.

7              MR. GLASS:  But in any case, my understanding

8    is one e-mail was turned over and he believes that there

9    are many others.  No, I'm not asking for -- we're not

10   asking for every e-mail from Ms. Rodi.  We're asking for

11   e-mails relating to Mr. Portelos.  She took over for Mr.

12   Gordon at some point later in the process and to the

13   extent there are relevant e-mails, I don't think this is

14   a new request.  This would --

15             THE COURT:  Well, what is this?  I mean we had

16   the 5/27 conference and the summary of the

17   agreement/order --

18             MR. GLASS:  Well, I think we're just asking for

19   compliance with the agreement which we discussed last

20   time.  We got one e-mail and we believe there are more.

21   So if she could just go back and check and see if there's

22   anything else that's relevant regarding Ms. Rodi.  It's

23   not a new request.  I think it -- I'm  not asking it

24   again.  This is just a follow-up to say it's hard to

25   believe there's one -- there's hundreds of e-mails

Proceedings

1   regarding Gordon.  There's one e-mail from Rodi?  I mean,

2   he's been there with -- raising issues with them for --

3   you know, he's been e-mailing her.  There's a lot of

4   e-mails that he's sent to her.  To say that there's one

5   e-mail, that's all we could find, it just raises a

6   question, is that an extensive search.  That's our point

7   on that.

8         The only other --

9         THE COURT:  Well, hang on.  What do you want to

10  do about that?

11        MS. GIAMBRONE:  I mean I --

12        THE COURT:  Put an affidavit of the person who

13  did the search.  Do you -- what do you want to do?  I

14  don't know what was involved in the search.  I mean, I

15  think the one thing you would know putting aside any

16  FOILs that he's saying he sent e-mails, then you might

17  have a good idea that he did actually send them.

18        MS. GIAMBRONE:  I'll re-run the search, your

19  Honor, that was previously agreed to.

20        THE COURT:  I mean or just, you know, confirm

21  that it -- the search that you did didn't yield anything

22  else.  I don't know.  All right.  So you're going to

23  check on the Portelos, Rodi e-mails.

24        All right.  What's the story with the notes and

25  these two DOE EEO cases?

11

Proceedings

1      MR. GLASS:  Okay.  This was discussed at the

2   last conference, too and I think Mr. Portelos had

3   mentioned that he had -- he was aware that some of the

4   investigations he initiated were referred to OEO and it

5   was my understanding these are the case numbers he had.

6   He was told that these were being investigated no longer

7   by OSI or SCI but OEO.  So, I mean really this is just a

8   request for, you know, those files.  She did turn over a

9   lot of files regarding OSI and I think it's just a matter

10  of contacting OEO and seeing what's under those case

11  numbers.

12      I don't really understand what the City's

13  position is.  You're saying it didn't concern Mr.

14  Portelos or were not initiated by Mr. Portelos?

15      MS. GIAMBRONE:  My understanding is the

16  subjects, at least one of them, I'm unaware of the other

17  one but the subjects -- first of all, they've been

18  unsubstantiated.  The subjects which we have -- the City

19  has a strong policy of not turning over unsubstantiated,

20  irrelevant OEO investigations and reports for the very

21  reason that these investigations and communications and

22  interviews are all done under the guise of

23  confidentiality to afford non-parties and protect the

24  non-parties' privacy interests and I don't believe that

25  Mr. Portelos has any reason or any means of showing how

12

Proceedings

1  these OEO investigations are in any fashion relevant to

2  this case.

3          THE COURT:  To your knowledge, do they involve

4  Mr. Portelos?

5          MR. GLASS:  Yeah, these are -- I think this is

6  nothing more than the agreement we had on the other

7  issue.  We discussed this at the last conference.

8          THE COURT:  No, this is -- isn't this back at

9  the 4/18 conference?

10         MR. GLASS:  I believe we discussed that.  What

11 happens is when Mr. Portelos makes a complaint against --

12 initiates his own complaint, the City -- the DOE decides

13 how they want to handle it.  They could either send it to

14 OSI, they could send it to SCI, they could refer it back

15 to their principal or they might refer it to OEO if they

16 think it's more of like an EEO-type complaint.

17         So what the -- all we're asking for -- and I

18 don't understand this.  We have a confidentiality

19 agreement in place.  So, you know, he's not -- we can't

20 disclose it but the whole point of this whole order, I

21 believe, was that we would get the results of his

22 investigations to see how they were handled, to see if

23 they were substantiated or not and they were -- and I

24 think one of the other concerns he raised to me was it

25 wasn't -- we did get several OSI investigations that he

Proceedings

1  initiated and we got some of the investigative materials

2  but they've redacted the conclusions and I don't think

3  that was part of the agreement.  The agreement was they

4  were going to provide to him to see what the results

5  were.

6         Now he wasn't able to disclose it, especially

7  unsubstantiated reports but did -- did the order say that

8  we can't see them or see what the results were?  Because

9  what we really want to know is how are they -- now we did

10  find out the one he did initiate, one of the first ones

11  he initiated ultimately has been substantiated and we

12  just got it yesterday.

13         But the whole point of this and the big part of

14  this case is that his argument is when I initiate

15  investigations, they get buried and the ones that were

16  initiated against me led to 3020-a charges.  And so what

17  he wants to know and one of the things we're trying to

18  prove in this case is that when he launched these

19  investigations, they were buried, they were not

20  investigated, they were unsubstantiated for -- without

21  really doing a full investigation and that's why I

22  thought we entered into an order to find out how these

23  were ultimately resolved.

24         And these are just two -- this happened to be

25  two that OSI or SCI didn't keep, they referred it to OEO

14

Proceedings

1    and so, you know, it's not that we can go out and start

2    waving it around and publishing it.  I recognize her

3    concerns but on the other hand, it's part of our case to

4    say the investigations that he initiated were handled

5    differently than the ones initiated against him.  And we

6    gave her a very specific case numbers.  All we want to

7    see is what happened to those cases and we're in the same

8    vain of every other request we've made.  They're not new

9    requests.  He just found out that those two happened to

10   be referred to another agency within the DOE.

11           MS. GIAMBRONE:  Well, actually it's not part of

12   his case.  His case is a First Amendment retaliation case

13   against Linda Hill.  There is no Monell claim in this

14   case.  There's no claim that the DOE has engaged in an

15   unconstitutional policy and practice against him whereby

16   they've treated him differently than others.

17           His claim is that Linda Hill retaliated against

18   him for speaking out as a citizen.  And what OSI and SCI

19   and OEO may have done in their investigations, frankly,

20   is not relevant.  Notwithstanding that fact a number of

21   materials have been turned over but when it comes to OEO

22   allegations, allegations of sexual harassment, things in

23   that vein, it's particularly sensitive not to turn over

24   unsubstantiated investigations.

25           And the fact that the complaint against Linda

Proceedings

1    Hill was substantiated only goes to bolster the fact that

2    these agencies did adequately investigate and did take

3    his allegations seriously.

4         So one that was unsubstantiated that has to do

5    with sexual harassment against a non-party who has

6    nothing to do with this First Amendment retaliation

7    really bears no relevance and flies against the policy of

8    keeping these materials private.  And it will have a

9    chilling effect as I've stated before and frankly,

10   although there is a confidentiality agreement, we believe

11   that it's so palpably irrelevant that it shouldn't even

12   be exchanged at this point.

13        MR. GLASS:  We received the Linda Hill

14   investigation.  Half of the allegations in that one are

15   substantiated, half are not substantiated.  You know,

16   there's no special privilege because we find out what the

17   results of an investigation he initiated is.  And to say

18   that we can't see it or it's not related to the case -- I

19   mean, this case -- Linda Hill is one --

20        THE COURT:  Well, I --

21        MR. GLASS:  Linda Hill is one defendant.

22        THE COURT:  You haven't explained to me why.  I

23   mean we already, I think as Ms. Giambrone is correctly

24   saying, there's been a significant amount of leeway given

25   to this.

16

Proceedings

1              MR. GLASS:  This was a fairly --

2              THE COURT:  I don't know this --

3              MR. GLASS:  I just want to say that OEO --

4              THE COURT:  Hang on.

5              MR. GLASS:  I'm sorry.

6              THE COURT:  I'm talking.

7              MR. GLASS:  I apologize.

8              THE COURT:  This very --

9              MR. GLASS:  I apologize.

10             THE COURT:  -- thin claim about some kind of

11   pattern and practice which is -- I have heard this

12   multiple times and I still don't really -- really, really

13   think that this is getting anywhere, where you -- I don't

14   even know if it's something that can be sustained but we

15   -- you know, there's been a lot of significant amount of

16   production, at least as I understand it based on the

17   order from 4/18 by the defendants.  So what --

18             MR. GLASS:  Well, we had discussed this --

19             THE COURT:  I don't know what it is that you

20   think these are.

21             MR. GLASS:  We had discussed this on 4/18.  I

22   think we might have discussed it in May.

23             THE COURT:  We didn't.  I looked back.

24             MR. GLASS:  This is really -- now she's just

25   sort of -- it appears that they're just now taking the

Proceedings

1    position, they're making new arguments and now all of the

2    sudden we can't provide it.  It was agreed to that this

3    would be part of what the production was.  I'm not asking

4    for new production here.  I'm just asking -- it was

5    agreed that Mr. Portelos initiated complaints and we want

6    to see what happened to those complaints.  This falls

7    squarely within those complaints.

8             (Pause)

9             THE COURT:  Go ahead.  I'm sorry.  Say that

10   again.

11            MR. GLASS:  I'm saying this falls squarely

12   within the original -- there's nothing new about this.

13   This is just follow-up to say let's just complete that

14   discovery.  I mean, let's complete this portion of the

15   discovery which is -- and we had this whole discussion

16   about he would get redacted or subject to

17   confidentiality, reports that he initiated no matter what

18   the DOE did with it.

19            OEO is squarely part of the DOE.  They're a

20   defendant in the case and to say -- I mean, I understand

21   they've turned over a lot of discovery.  I appreciate

22   that and we're getting very close to the end but now to

23   make an exception to say well, there's something special

24   about OEO as compared to an OSI investigation, there's no

25   weight to that argument.  There's no water to that

Proceedings

1  argument.

2          This is nothing different than DOE deciding

3  we're going to give this one to OEO instead of OSI.  But

4  it's the same vein of investigations that he asked for.

5  It's two little pieces left and we're just saying -- she

6  did turn over most of the OSI investigations.  A lot of

7  the things have been redacted from those and -- but she

8  did turn over what was done with those investigations and

9  that's what we had agreed to.  And so we're saying, there

10 are two that happened to have gotten referred to OEO and

11 we would like to see the outcome of those as well.

12          And to say that this is -- there's nothing new

13 about this and I think it was agreed to.  Now she's

14 making a different argument that it's not relevant is

15 not --

16          THE COURT:  I don't --

17          MR. GLASS:  -- really -- it doesn't sound to me

18 like to the issue at this point.

19          THE COURT:  Have any of the OEO files been

20 turned over?

21          MS. GIAMBRONE:  No, not -- no.

22          MR. GLASS:  There's only two.

23          THE COURT:  You know these are the only two?

24          MR. GLASS:  That's -- yes, I think he was able

25 to track where each of them went and he found out those

19

Proceedings

1  are the only two referred to OEO.

2        MS. GIAMBRONE:  I only know of one.  I don't

3  know what the second one is.  And, your Honor, my

4  understanding was that we were dealing with OSI and SCI

5  and to the extent that we may have been discussing OEO,

6  that was -- I was unaware of that but to the extent that

7  it was previously discussed, at this point I am asking

8  your Honor to reconsider that because I do believe that

9  claims of sexual harassment are a different beast and it

10  was against Joanne Aguirre (ph.), who is not a party in

11  this case, is not in any way a decision-maker with

12  regards to the discipline against Francesco Portelos or

13  his reassignment.

14        And just to be clear, your Honor, in terms of

15  the pattern and policy, I know this is like this theory

16  that counsel has been bringing up that OSI and SCI have

17  not been vigorously investigating his claims, there is no

18  allegation in either the complaint or the amended

19  complaint --

20        THE COURT:  I know.  We talked about that

21  before.  All right.  Look, back in the conference that

22  was held in April, there was a discussion about turning

23  over these OEO files.  It's in the transcript.  It's on

24  file at 46.  Let's talk about the merits of this.  So

25  there's two.  There's one that you know about and your

Proceedings

1   position is --

2          MS. GIAMBRONE:  It's a sexual harassment

3   allegation that Mr. Portelos made against an assistant

4   principal at the school --

5          THE COURT:  Uh-hum.

6          MS. GIAMBRONE:  -- non-party, who factually has

7   not been part of this case or discussed.  She's not a

8   decision-maker in terms of the discipline lodged against

9   him by the DOE.  She was not part of the reassignment.

10  She was not part of the First Amendment speech that

11  supposedly set the ball rolling for retaliation as

12  plaintiff asserts.  And we believe the fact that it was

13  unsubstantiated, that this non-party and anyone that may

14  have been interviewed in connection with that OEO

15  investigation is (a) completely irrelevant and (b) has

16  such strong privacy concerns that it should not be turned

17  over at this point.

18         THE COURT:  All right.

19         MR. GLASS:  Can I just --

20         THE COURT:  And what's the argument, Mr. Glass,

21  that --

22         MR. GLASS:  First of all --

23         THE COURT:  -- this investigation has anything

24  to do with anything?

25         MR. GLASS:  First of all, all these

Proceedings

1   representations about Ms. Aguirre are completely out of

2   left field because Ms. Aguirre was an AP under Ms. Hill.

3   She was very, very much involved in all these

4   investigations against Mr. Portelos.  A lot of them were

5   initiated -- some of them were initiated by Ms. Aguirre

6   and called in by Ms. Aguirre.

7           So to say that she -- I mean this was part of

8   the ongoing war between the administration and him.  Ms.

9   Aguirre was very, very much a part of this.  The fact

10  that we didn't name her as a defendant doesn't mean she's

11  not -- she's all over these allegations, she's at --

12  there are allegations in the complaint I believe about

13  Ms. Aguirre.  To say she's so irrelevant or non-party,

14  she is one of the APs that worked in conjunction with the

15  principal and the other assistant principal to get Mr.

16  Portelos out of the school.

17          So to say that's not relevant, I mean, yes,

18  this is a whole part of it.  The way that allegations are

19  treated differently and we served -- we have very good

20  proof of it now with Ms. Hill's investigation will show

21  you how a June 2012 investigation took two-and-a-half

22  years and was only finished after he was found not guilty

23  of or terminated and then all of the sudden they

24  substantiated it.  I think we have a very strong claim

25  there and it's fully encompassed within the complaint.

22

Proceedings

1          So to take this position now that says it's

2     tangential or it's irrelevant, it doesn't make any sense.

3     This was -- she was squarely a major player in this.  We

4     chose not -- we have limited resources.  We didn't depose

5     every person in this case and Ms. Aguirre could be

6     deposed in this case or could be named as a defendant.

7               But part of the allegations is Ms. Aguirre was

8     making false allegations against Mr. Portelos and one of

9     the allegations, I believe in the complaint is that

10     Mr. Portelos had said something about Ms. Aguirre, you

11     know, flirting with her at a party and so Ms. Aguirre

12     came back and made allegations against him to OSI.

13               And so, you know, and I think this is about one

14     of the very key elements of the case.  So to say that

15     it's irrelevant or not part of this case --

16               THE COURT:  All right.  Look --

17               MR. GLASS:  -- is very, you know --

18               THE COURT:  To City, you should produce the

19     file.  You can produce it subject to a confidentiality

20     agreement.  It can only be shown to counsel and to Mr.

21     Portelos.  Mr. Portelos and counsel cannot make copies of

22     it.  You can't distribute it.  You can't do anything with

23     it except review it.  And --

24               MS. GIAMBRONE:  Meaning that we would make it

25     available at our office for review, your Honor?

23

Proceedings

1        THE COURT:  No, you need to give them a copy

2   but it cannot be circulated.

3        MS. GIAMBRONE:  And this is --

4        THE COURT:  And then you can talk about -- I

5   don't -- without knowing more about the file, if it needs

6   to be brought up in any deposition, you know, I don't

7   know.  The circulation, distribution, knowledge about

8   this file should be limited to only those individuals who

9   have relevant information about it.  So if you're going

10  to ask questions about it at a deposition, it needs --

11  can't be somebody who is unrelated to this file.

12        Who you're going to depose and what these

13  people know, I don't know but, you know, if the file says

14  somebody had some involvement with it, for example, that

15  would be a good basis for raising the issue with the

16  person but --

17        MR. GLASS:  It would probably be relevant to

18  Ms. Hill's deposition because Ms. Hill, you know -- how

19  that was handled, how the allegations were --

20        THE COURT:  All right.  And those parts of the

21  deposition need to be marked separately as

22  confidentiality.

23        All right.  Does anybody know anything about

24  the other EEO filing?

25        MR. GLASS:  Mr. Portelos will be up in a

Proceedings

1  minute.  He's just texted me he's in the building.

2          But we gave you the case numbers, so I --

3          THE COURT:  Well --

4          MR. GLASS:  -- it should be very easy to

5  locate.

6          THE COURT:  -- that's not particularly helpful.

7          MR. GLASS:  There shouldn't be a problem with

8  locating it.

9          THE COURT:  I mean --

10         MR. GLASS:  I don't know why she can't find the

11  other one.

12         THE COURT:  This is a frustrating kind of

13  discovery to deal with because it's like -- you provide

14  very little information and ask for things very broadly

15  and then when you expect counsel on the defendant's side

16  to be able to provide or find an answer, they haven't had

17  a lot of lead time to figure out what it is.

18         MR. GLASS:  Well, with all due respect, Judge,

19  we gave her the case numbers.

20         THE COURT:  Yeah, but you --

21         MR. GLASS:  I don't think we could be any more

22  specific than that.

23         THE COURT:  I'm not arguing with you.  I'm

24  telling you why this is annoying.  It is -- for example,

25  the question right before, any e-mail.  That's a -- in

Proceedings

1    the context of this ongoing discovery process, that is

2    not an appropriate request.  This OEO issue, they already

3    went through all of these OSI, SCI files.  For you not to

4    have information when you say your client has the

5    information is not helpful and it would have been helpful

6    had it been provided in the request.

7             Why don't you find out what that OEO case is

8    about?  See if it's something that fits either the

9    arguments you're making or the basis for which I've said

10   the other one, turn it over and if you can't resolve it,

11   let me know.

12            All right.  What about these investigative

13   notes?

14            MR. GLASS:  This is just follow-up.  I mean, to

15   the extent there are things privileged, there probably

16   should be some kind of privilege log.  I mean, I think

17   it's a little broad.  I mean, I think we're just trying

18   to follow-up with other things to make sure it's

19   complete. For example, Hill e-mails, Claudio e-mails.

20            THE COURT:  Let's talk about the privilege log.

21   Is there a privilege log in general?

22            MS. GIAMBRONE:  There has not been, your Honor.

23            THE COURT:  All right.  When can you produce

24   one?

25            MS. GIAMBRONE:  Are we talking about a

26

                          Proceedings

1    privilege log for all 9,000 documents?

2              THE COURT:  Ideally not.  I don't know what's

3    contested.

4              MS. GIAMBRONE:  Counsel had served in the last

5    e-mail, I believe in July, specific requests as to

6    redactions and I responded with specific details as to

7    what was redacted.

8              THE COURT:  Uh-hum.

9              MS. GIAMBRONE:  And for him to say that there's

10   a number of redactions -- the only redactions are the

11   bank records, the names of minors --

12             THE COURT:  We already went through this.

13             MS. GIAMBRONE:  -- and this conflict of

14   interest board information --

15             THE COURT:  Right.

16             MS. GIAMBRONE:  -- which I specifically

17   identified for him.

18             MR. GLASS:  I think the only thing of interest,

19   I think, encompassed here is some of the investigations

20   ultimately were referred from OSI to the Office of

21   General Counsel and the Office of General Counsel made

22   some final conclusion to the -- what to do with that

23   investigation and that's been redacted when it was turned

24   over.

25             So what we're asking for under confidentiality

27

Proceedings

1   would be what was the result of the investigation and so

2   what's --

3              THE COURT:  Why don't --

4              MR. GLASS:  -- been redacted is, for example,

5   if he launched an investigation that OSI chose not to

6   investigate and it was referred back to let's say the

7   Office of General Counsel for final decision, what we

8   would like is what the final decision was.  And that's --

9   I'm not asking her for a huge privilege log.  That would

10  be crazy.

11             THE COURT:  Wait, what?

12             MR. GLASS:  I'd feel for her.  But the reality

13  is, there are certain things and we can identify the

14  particular documents and maybe we could just follow-up

15  with her.

16             THE COURT:  Okay.

17             MR. GLASS:  And if it raises new questions, we

18  could --

19             MS. GIAMBRONE:  I would like --

20             MR. GLASS:  -- but we would just --

21             THE COURT:  Hold on.  It's an apples and orange

22  -- I don't understand the question.  You're saying you

23  want the outcome of an investigation?

24             MS. GIAMBRONE:  Your Honor?

25             THE COURT:  I don't understand this.  Go ahead.

28

Proceedings

1      MS. GIAMBRONE:  Counsel, I think we're talking

2 about the bullet point investigative notes and reports.

3      THE COURT:  Yes, exactly.

4      MS. GIAMBRONE:  First of all, I don't know what

5 he's referring to.  He doesn't -- I produced all my

6 documents with Bates stamping and if there's something in

7 particular that he has a question about, as he's done

8 before, I've responded specifically with a response.

9      Generally speaking, the Office of General

10 Counsel, if they have investigative notes and reports, I

11 would imagine those are protected by attorney work

12 product privilege and I don't know if there's something

13 more specific that he's asking about.

14      In terms of case outcomes, there were only two

15 or three redactions regarding a case outcome and as I

16 responded to counsel, it had to do with the per se

17 privilege under the conflict of interest board and I

18 provided him with the statute and the authority.

19      THE COURT:  We already ruled on that.  I

20 already ruled on that.  Go ahead.

21      MS. GIAMBRONE:  So I don't know what further

22 information it is that he's requesting and this vague

23 request for investigative notes and reports, I am not

24 even able to respond to this.

25      MR. GLASS:  Well, we can narrow it.  I mean

29

Proceedings

1   basically what -- after reviewing what has been provided

2   to us by Ms. Giambrone, there were four cases that were

3   -- Mr. Portelos said made allegations against Ms.

4   Claudio, I believe, who is a defendant in the case.  In

5   seeing what happened with those investigations, following

6   what she provided, apparently at some point they got --

7   OSI gave up on them and referred them to OGC for final

8   conclusion.

9           When you look at whatever is in there about

10  OGC, everything is redacted or there's nothing at all

11  provided what OGC did with it when they got referred the

12  case.

13          So again, how these investigations are handled,

14  this is essential to the question of how these

15  investigations were concluded that he initiated and we

16  want to know what the conclusion is.  So there's nothing

17  from the OGC once it got referred to them to see what

18  they did with it.  For all we know, they're still open or

19  they're still outstanding or -- we don't know.

20          You know, so that's what we're asking for is we

21  would like to know what the outcomes were for these four

22  -- and we'll identify for her from the discovery she

23  provided, which four cases we're referring to.  So this

24  could be very narrow.  And we don't need a complete

25  privilege log.  I'm just asking for outcomes on these

30

Proceedings

1   four investigations.

2          MS. GIAMBRONE:  Your Honor, the reason I

3   requested that today's conference be in person is because

4   I reach out to counsel, I get e-mails back at 1 o'clock

5   in the morning.  I can't get him on the phone.  I am

6   trying to wrap up discovery on this case and it seems

7   impossible, frankly.

8          MR. GLASS:  Well, that's why we're here.

9          MS. GIAMBRONE:  I don't -- I reiterate, if the

10  Court looks at the complaint, there is no allegation that

11  the Department of Education as a whole had an

12  unconstitutional policy against the plaintiff.  So this

13  fishing expedition about what they did with Erminea

14  Claudio and so on and so forth, has absolutely no

15  relevance to what Linda Hill did to Francesco

16  Portelos in retaliation for his supposed free speech. And

17  this is endless.

18         MR. GLASS:  We keep hearing the word fishing

19  expedition.  I can't even be more targeted.  I can't even

20  imagine how I can be more targeted when I say it's these

21  case numbers or these four investigations.

22         THE COURT:  Mr. Glass, these are -- next to

23  every single time we have a conference, you don't come

24  with enough information and we spend --

25         MR. GLASS:  I am giving you very specific --

31

                        Proceedings

1   she's had this letter for months.  She's had these case

2   numbers for months.  And to say I don't come with

3   information, I'm giving her very targeted information.

4           She turns it over in drips and drabs.  We ask

5   for it again and again and again.  We get it.  Then we

6   need time to look through it and as we get to look

7   through it, we start to see that there are holes in what

8   she's turning over.  It's not her fault necessarily but

9   whatever she has provided is not complete.

10          THE COURT:  We've all --

11          MR. GLASS:  And so what I am just asking for,

12  what is the outcome of the investigation ultimately when

13  you give me half a file and you don't finish, there's

14  nothing to hide with the ball here.  I'm giving very

15  specific targeted things.  I'm giving you case numbers.

16  I'm giving you -- I'll identify the four cases that we're

17  talking about.  These are -- the reason this is coming

18  about is because we finally after many, many months got

19  some of the investigations and as we look through it,

20  there are questions being raised that these are not

21  complete or there's unanswered questions.

22          So this is just natural follow-up to discovery.

23  To say I am coming here with fishing expeditions and

24  asking for a million documents that I've turned over

25  1,100 documents, yes, you did it over a course of two

32

Proceedings

1   years at convenient times while his case was going over,

2   you know, dragging out this case and then giving this

3   stuff after his whole 3020 is over.  And now to say all

4   right, well now we'll decide the substantiated

5   investigation.  It's gamesmanship on part of the DOE

6   here.

7           All we're asking for is at the end of

8   discovery, we're very close -- there's just very targeted

9   things to say.  I mean what is the 2613 about?  I mean

10  it's something you initiated, right, that was referred to

11  OEO.

12          THE COURT:  Mr. Glass, we already moved on from

13  that.  I told the City to provide the one that you said

14  was about the assistant principal and they're going to

15  find out what the other one is about and see if you all

16  can work it out.

17          MR. GLASS:  What was the other one about?

18          THE COURT:  Many of these letters and inquiries

19  that you bring up to me asking for information and

20  documents and for the Court to order discovery are

21  exceptionally lacking in identifying information, which

22  is exactly the complaint that Ms. Giambrone is making

23  about your inquiries.

24          For example, what am I supposed to do with the

25  Rodi request, which is any e-mail?  It's too broad.  It

33

Proceedings

1   isn't even what we talked about before.  Investigative

2   notes without any file numbers, without -- you know, you

3   say you want a privilege log.  You don't say in this

4   letter which was supposed to be the summary letter, what

5   documents we're talking about.  We haven't gotten up to

6   the Hill-Claudio issue but additional e-mail accounts.

7           I don't even know what you have.  I mean in

8   every conference we start out with a lack of specificity.

9   I spend ages trying to figure out what it is that you

10  want.  And, you know, if this is the experience that Ms.

11  Giambrone's having, I understand why it might be

12  extremely frustrating.

13          It's not helpful to get discovery requests that

14  are not targeted and it's certainly not helpful for me to

15  get requests to force the City or the City defendants to

16  follow-up on document requests that are not targeted.

17  There's no trail here about your -- we asked for this, we

18  cut a -- you know, I don't -- these -- I have no context

19  and very -- the Court has -- I've already given you

20  expansive discovery on, you know, it's the City's

21  position that the theory isn't even properly pled.  We've

22  let you proceed with it as an extension of the pleadings

23  that you do have on the theory that maybe one could read

24  the theory that you've been advocating in the last couple

25  of conferences into the complaint but to wrap this up, it

34

Proceedings

1  requires more precision and more effort on  your part,

2  which is something that I have said in other conferences.

3  And so let's finish this up but this is it.

4          The investigative notes and reports and DOE's

5  Office of General Counsel on case referrals; what are we

6  talking about?

7          And let me say one thing, this conference was

8  supposed to start at 3 o'clock.  We didn't start it until

9  about 3:13 in the hope that Mr. Portelos was here.  He's

10 here now.  I was supposed to have a 3:30 call.  I asked

11 them to call back at 3:45.  When they call, I'm going to

12 take that call and then we'll come back to your

13 conference.  So, go ahead.  What's the story with these

14 investigative notes and --

15         MR. GLASS:  Well, I think I just addressed that

16 in my last comment which was that we're looking for the

17 conclusions from the Office of General -- those

18 investigations that Mr. Portelos initiated that started

19 at OSI or SCI that was referred to OGC, we'd like to see

20 the case outcomes.  And we'll identify for her the four

21 cases that was provided in discovery, that the DOE

22 provided to us fairly recently and we'll say -- we'll

23 show her -- we'd like to see what the outcomes were of

24 those investigations; what did OGC do with the case.

25 That's all I am asking for here.

35

Proceedings

1          And I did explain that before and I don't think

2    that this is a -- perhaps it could have been worded

3    better in the letter, I agree, but that's really --

4          THE COURT:  It could have -- would've helped to

5    say there were four cases at least.

6          All right.  What's the story from the City's

7    side?

8          MS. GIAMBRONE:  Well, I don't know what these

9    four cases are.  I don't have the numbers.  So without

10   that information, I don't know what it is.

11         THE COURT:  All right.  So like the OEO case

12   that you don't know about, look at it.  See if you're

13   going to work it out with counsel about what you are

14   going to produce.  To the extent you can't and you're

15   claiming a privilege, give a privilege log and if you all

16   can't work it out at that point or agree that the

17   documents are privileged, let me know.

18         All right.  The additional e-mails from Hill

19   and Claudio, what's the story there?

20         MS. GIAMBRONE:  Well, your Honor --

21         THE COURT:  Well, let me hear from Mr. Glass.

22         MR. GLASS:  Just one second, if I could just

23   confer with Mr. -- see if there's anything left on that.

24         (Counsel and client confer)

25         MR. GLASS:  I guess the question is did Ms.

36

Proceedings

1    Giambrone, have you done a full extensive search of Hill

2    and Claudio's e-mails because he's saying that there was

3    a previous -- at the previous conference, an e-mail you

4    represented that there was a further search to be done.

5              MS. GIAMBRONE:  The way that conference

6    concluded was that plaintiff asserted there was no

7    further search necessary and that you would let me know

8    if there was something specifically, which to date has

9    never been done.  And we believe that in light of the

10   thousands upon thousands of electronic discovery that has

11   been turned over and personally reviewed by myself for

12   privilege, we think at this point we have far exceeded

13   the requirements, particularly in light of the fact that

14   the economic damages in this case are rather low in light

15   of the fact that Mr. Portelos was not terminated.  And we

16   believe that electronic discovery at this point should be

17   concluded.

18             THE COURT:  I'm sorry, when you said the

19   conference, which conference was that, that we talked

20   about Claudio?

21             MS. GIAMBRONE:  I believe the May 27th

22   conference.  Towards the end of the conference --

23             THE COURT:  I'm just looking at the transcript

24   now.  From the May 27th conference?

25             MS. GIAMBRONE:  I believe so, when we were here

Proceedings

1   in person, your Honor.  It finished up after your Honor

2   discussed Zublecki and --

3             THE COURT:  Right.

4             MS. GIAMBRONE:  -- we said we would look for

5   the Katherine Rodi e-mails and it seemed as though there

6   was an agreement that no further electronic discovery was

7   necessary at that point.

8             MR. GLASS:  It was Mr. Portelos' recollection

9   that there were a number of people that we were asking

10  for e-mails about and we agreed to four people including

11  -- that she would do a final search for four, rather than

12  the ten or twelve that were at issue.  And so there was

13  an agreement that she would look for just Hill, Claudio,

14  Rodi, and Gordon, I believe.  Is there --

15            MS. GIAMBRONE:  Well, the transcript shows that

16  that agreement was abandoned.

17            THE COURT:  Do you have the transcript with

18  you?

19            MS. GIAMBRONE:  Unfortunately, I don't but I

20  know it's towards the end.

21            THE COURT:  All right.  We're going to take a

22  break in this case.  I'm going to talk to the folks in

23  the other case and we'll come back.  You're welcome to

24  stay here.  I have that transcript open.  I'm not seeing

25  it but maybe look under a couple of different things.

38

Proceedings

1   Okay.

2           (Off the record)

3           THE COURT:  Okay.  The e-mail agreement, let me

4   just find, if I can -- Ms. Giambrone, you think it was in

5   the last --

6           MS. GIAMBRONE:  It was towards the end.

7           THE COURT:  Okay.  I'm just going to look at

8   the transcript.

9           (Pause)

10          THE COURT:  All right.  I'm sorry, what you did

11  think the discussion was?  It was about the e-mail?

12          MS. GIAMBRONE:  Yes.

13          THE COURT:  And for electronic discovery, you

14  think?

15          MS. GIAMBRONE:  Yes.

16          THE COURT:  I'm just doing a word search here.

17          MS. GIAMBRONE:  I think if you go K. Rodi,

18  there was a discussion there where that -- at the moment,

19  that was all that was going to further searched for.

20          THE COURT:  This is about going back through

21  the e-mails.  It's Rodi and Hill.  Oh, and then -- all

22  right, and then -- all right, and -- it's transcribed

23  incorrectly but I assume it's supposed to be Claudio, for

24  a year period for the first search of these -- you're

25  saying sort of 3,000 documents for a search containing --

39

Proceedings

1   all right.  Let me just read what it says.

2          So this is the Court:

3          "The Court:  So you're agreeing that even what

4   counsel was offering to do in her letter of May 16th with

5   regard to Hill and some of the other people, that she

6   doesn't need to do that now.  You're going to wait until

7   you get the paper discovery and go over what you have and

8   then first try to discuss it between yourselves and after

9   that process, let me know."  Is this what you're talking

10  about?

11         MS. GIAMBRONE:  Yes.

12         THE COURT:  You're going to --

13         "The Court:  She's not going to produce the

14  Hill, Rodi -- so it's LHill, Claudio, Hill and Rodi

15  documents now and then you can cut it down to three

16  people."

17         If we're limiting it to three people, it's Rodi

18  at KRodi@schools, Regina Loughran for the January to

19  April -- January 2012 to April 2014.  We talk about her

20  address, what dates and Wolcott.

21         All right.  So then, Mr. Glass, what's your

22  position?

23         MR. GLASS:  I'm sorry, what -- was there an

24  agreement?

25         THE COURT:  So I --

40

Proceedings

1           MR. GLASS:  Was there a final --

2           THE COURT:  I mean I read -- there seems to be

3   discussion about limiting the e-mail search to certain

4   dates for three people.

5           MS. GIAMBRONE:  But I think later on it was

6   discussed that Regina Loughran --

7           THE COURT:  Is Loughran out?

8           MS. GIAMBRONE:  Yes.

9           THE COURT:  And so what I just read was from

10  around -- before and after page 76.  All right.  Let me

11  find Loughran.

12           (Counsel and client confer)

13           THE COURT:  I can hear what you're saying.  You

14  might want to turn off the mic if you don't want it to be

15  part of the record.

16           So, Loughran, Rodi.  What is -- maybe I'm just

17  not finding it but there's a discussion about why

18  Loughran is relevant.  Is there something after that?

19           MS. GIAMBRONE:  I think ultimately there was --

20  towards the end, it said, okay, we're only searching for

21  Katherine Rodi.

22           THE COURT:  privilege.

23           MS. GIAMBRONE:  Because Regina Loughran is a

24  deputy commissioner at SCI and then there was discussion

25  about Chancellor Wolcott and how he was not part of any

41

Proceedings

1   decision specifically with Portelos and that Portelos

2   would e-mail him and cc him.

3           THE COURT:  I'm just not finding it.  You're

4   saying he says something?  I don't know.

5           MS. GIAMBRONE:  Well I think, your Honor, as

6   you --

7           THE COURT:  I don't know.

8           MS. GIAMBRONE:  I think you were at the section

9   previously where we originally were discussing the e-mail

10  addresses of LHill --

11          THE COURT:  Right.

12          MS. GIAMBRONE:  -- and EClaudio.

13          THE COURT:  Right.

14          MS. GIAMBRONE:  And counsel represented, you

15  know, for the moment we can just look for Katherine Rodi

16  and I'll --

17          THE COURT:  Yes.

18          MS. GIAMBRONE:  -- he's never contacted me,

19  indicating that additional e-mails are necessary.  I

20  don't know what it is -- what the basis for seeking

21  additional e-mails is based upon.  I think there have

22  been thousands of e-mails that have been exchanged to

23  date.  I don't think there's been an adequate showing

24  that further electronic discovery is appropriate or

25  necessary or relevant.  And we could do this to infinity.

42

Proceedings

1          As some point, the temporal proximity of

2    retaliation becomes so attenuated that it's no longer

3    relevant.  I mean, we could just keep this case open and

4    just keep searching for e-mails every month in that case.

5          THE COURT:  So you did a search for -- in

6    Claudio's e-mails already?

7          MS. GIAMBRONE:  Yes.

8          THE COURT:  And you are --

9          MS. GIAMBRONE:  And Linda Hill.

10         THE COURT:  Right.

11         MR. GLASS:  Can I have a second?  Perhaps I can

12   narrow --

13         THE COURT:  So what's the issue?

14         MR. GLASS:  Maybe (indiscernible) some

15   clarification.  So it's my understanding that the

16   (indiscernible) did an e-mail search --

17         THE COURT:  Turn the microphone on.

18         MR. GLASS:  I'm sorry.  I did an e-mail search

19   for Hill and Claudio through July of 2013.  Mr. Portelos

20   is aware from the discovery provided by the DOE that Ms.

21   Hill was launching additional allegations against him,

22   even during the pendency of his 3020-a which started in

23   September of 2013.

24         So our request at this point would be just for

25   a limited search of e-mails.  Ms. Hill's e-mails

43

Proceedings

1  regarding Mr. Portelos from July 2013 going forward which

2  was not searched before and Ms. Claudio was only there

3  until August 2013.  So it would only be a one-month

4  search for July through August until she left in August

5  2013 regarding Mr. Portelos.  It would be a fairly

6  limited search and it just wasn't covered by the time

7  frame when they did it before.

8          So if she could just do search for Hill e-mails

9  because he is aware now that there were further

10 investigations Ms. Hill launched against him after July

11 2013 and Ms. Claudio may have been part of that, at least

12 for that month before she resigned or retired.

13         MS. GIAMBRONE:  So I'm sorry, the request is

14 for Linda Hill from what day to what day?

15         MR. GLASS:  July 1st, 2013 until December --

16         MS. GIAMBRONE:  Until when?

17         MR. GLASS:  Since July 1st, 2013 to present.  I

18 mean --

19         MS. GIAMBRONE:  Well, your Honor, this is

20 exactly the issue; not to mention July 2013 --

21         MR. GLASS:  Well, we'll limit it to December

22 31st, 2013.

23         MS. GIAMBRONE:  Your Honor, I'm still opposed

24 to this.  I --

25         MR. GLASS:  It's part of the continuing --

44

Proceedings

1      THE COURT:  Stop interrupting.  You're opposed

2  to it why?

3      MS. GIAMBRONE:  Your Honor, it takes about an

4  hour of an attorney's time to go over forty e-mails.

5  I've turned over thousands of documents and spent weeks

6  reviewing e-mails for privilege.

7      To start looking at July 2013 when the temporal

8  proximity has become so attenuated, I mean is plaintiff

9  going to allege that everything that ever happens to him

10  at the DOE is related to this First Amendment

11  retaliation?

12      THE COURT:  Yup, that's the way this is shaping

13  up.  There's an ongoing issue.

14      MS. GIAMBRONE:  Well, I don't believe that the

15  economic damages in this case warrant the manpower or the

16  expense of engaging in a further search and furthermore,

17  there's been nothing that's been produced so far that

18  indicates anything that supports his case.  So continuing

19  to search for e-mails, looking for the needle in the

20  haystack, just does not warrant the work that's involved

21  in this.

22      Counsel has not pointed to any specific e-mails

23  that reveal there's a good faith basis to believe that

24  there are further relevant materials.

25      THE COURT:  All right.  So what is it that the

45

Proceedings

1   plaintiff claims supports having this supplemental search

2   of the Hill and Claudio e-mails?

3           MR. GLASS:  It's because the City finally got

4   around to turning over --

5           THE COURT:  Stop.

6           MR. GLASS:  I apologize.  I apologize.

7           THE COURT:  Stop.

8           MR. GLASS:  The City -- the DOE in the last

9   month or so provided some of these investigations that

10  we've been requesting for months and some of these

11  investigations as we're reviewing them finally the

12  ability to review them, we've noticed that there are

13  certain patterns -- things that are being detected.  One

14  of those things that we learned for the first time was

15  that even during the course of trying to fire him, Ms.

16  Hill continued to launch new investigations against him,

17  new allegations of misconduct, which were eventually

18  unsubstantiated but they -- and so apparently Ms. Hill

19  was continuing her pattern which starts -- which she is

20  the main defendant in this case obviously and this is

21  what mostly, as the City has represented is the main

22  issue here, she has -- she apparently was continuing to

23  report things to OSI or to SCI about Mr. Portelos'

24  alleged misconduct.

25           So our search would be limited now to that time

Proceedings

1   period and they did do a search before July 2013.  We're

2   not misrepresenting that she hasn't.  We're saying now we

3   just would like this limited time period to see what was

4   going on during the course of his 3020-a.  There should

5   not be a lot --

6              THE COURT:  What is it that --

7              MR. GLASS:  -- because Ms. Hill is no longer --

8              THE COURT:  What is it that supports the

9   request?  What is it that you learned that says that

10  these go on through the end of last year?

11             MS. GIAMBRONE:  Well, your Honor --

12             MR. GLASS:  If you would like this --

13             THE COURT:  Hang on.  Let me hear the answer.

14             MR. GLASS:  We could look for particular

15  documents and provide it to the Court.  You know, if you

16  would like to see things that they turned over, you know,

17  and show you that this is -- you know, Ms. Hill initiated

18  an investigation on such and such a date.

19             We only know about this because we're getting

20  finally some of this discovery from the City.  So to say

21  that we've been sitting on this or not providing it, we

22  only did it because we're finally getting relevant

23  discovery.  And so if you would like the specific

24  documents to support that, we can find that for you.

25             THE COURT:  Why isn't that a separate claim, to

47

Proceedings

1   the extent that there is some claim there at all?

2            MR. GLASS:  A separate claim?  The whole point

3   of this -- I thought the case was that they initiated --

4   sought to seek his termination based on false allegations

5   that they were substantiating and in the meanwhile, the

6   ones that he brought against him were buried or not

7   addressed --

8            THE COURT:  Right.

9            MR. GLASS:  -- or not -- and now we have -- now

10  we actually have -- finally we have proof based on what

11  was turned over yesterday that, in fact, the allegations

12  that Mr. Portelos was making were valid and, in fact,

13  were in fact being withheld by the City or not being

14  investigated until after his thing was resolved.

15            How could you argue that something took two-

16  and-a-half years to be substantiated when it's --

17  something against Mr. Portelos was investigated within a

18  month or so?  So I think that's a key part of this case

19  and to oh, this is -- I mean there's really a lot of

20  words like to say this is irrelevant, this is so

21  tangential, it's limited economic damage; this is the

22  heart of the case.  And we vigorously dispute that and

23  we're not asking for the world here.

24            We're asking for pinpointed discovery.  I'm

25  giving you case numbers.  I'm giving you file numbers,

48

Proceedings

1  the video --

2        THE COURT:  Stop.  I don't want you -- stop,

3  stop, stop -- going back over the things we already

4  talked about when you're supposed to be talking about

5  Hill and Claudio.

6        MS. GIAMBRONE:  Can I just briefly respond,

7  your Honor?

8        THE COURT:  No.  This is what we're going to

9  do.  I've heard from you both.  Every time you tack on

10  this idea that Mr. Portelos' claims were allegedly not

11  investigated has anything to do with the investigation of

12  him.  I think that maybe the evidence, once you present

13  it in some kind of detail will make more sense but it

14  seems like there's a logical fallacy in what you're

15  saying.  But we're not here to decide that now.

16        Search of the Hill e-mails --

17        MR. GLASS:  If you'll recall, your Honor --

18        THE COURT:  Stop.  I'm giving you what you

19  want.

20        MS. GIAMBRONE:  Well, your Honor, I have to --

21  may I make a record of my response?

22        THE COURT:  Yes, go ahead.

23        MS. GIAMBRONE:  He has the OSI --

24        THE COURT:  No, you already --

25        MS. GIAMBRONE:  He just indicated we now have

49

Proceedings

1  the proof that she made the complaint.  So why are we

2  searching for e-mails?  Is there some good faith reason

3  to believe that the e-mail somehow illuminates or adds

4  some additional information?  He has the facts.  She made

5  a complaint.  What more does he need?

6          THE COURT:  Given that based on plaintiff's

7  counsel's representation that some of the recently

8  produced discovery shows that there was some ongoing

9  interaction between Hill, the primary target of this case

10  and Mr. Portelos with regard to this theory that there

11  was some ongoing desire and actions taken to further that

12  desire by Hill and/or her colleagues or associates in

13  this endeavor, to the extent one can read the evidence

14  that's been produced in that way, then if there are

15  documents or e-mails, there are form of documents that

16  were created on or about the same time as those actions

17  is reasonable to look for them; not dealing with Claudio,

18  just Hill, because she's the main person.  Look for

19  Portelos e-mails through the end of last year, to the

20  extent you haven't looked for it and that's it on the

21  e-mail front.

22          MS. GIAMBRONE:  From July through December

23  2013?

24          THE COURT:  Yes.  And not looking for other e-

25  mails.  We've gone over and over and over, other than the

Proceedings

1   ones we've talked about earlier, the Andrew Gordon and

2   Rodi ones.  All right.

3          What's the story with this video?

4          MR. GLASS:  Just on that point, we just want to

5   point out, he's showing me an e-mail, November 6th was

6   one of the dates that Ms. Hill was in communication with

7   the investigative agencies during that relevant time

8   period.  So --

9          THE COURT:  So I don't know why he has the e-

10  mail,

11         MR. GLASS:  Well, it's part of the production

12  they turned over.

13         THE COURT:  All right.

14         MS. GIAMBRONE:  Right.  So he already has the

15  information.

16         MR. GLASS:  No, but we don't have the e-mail.

17  We have a summary report from -- yeah, okay.  I just

18  wanted to point that out.

19         So the last point we just -- you want to go to

20  the last bullet point now?

21         THE COURT:  What's the story about the video?

22         MR. GLASS:  Well, that -- I don't -- maybe we

23  could just hear from why it hasn't been produced so far.

24         THE COURT:  Well, what is it?  Why do you think

25  this exists?  What is --

51

Proceedings

1              MR. GLASS:  It's --

2              THE COURT:  DOE FOIL Unit F9256?

3              MR. GLASS:  As I understand from Mr. Portelos,

4   he's aware that there's a -- one of the investigations he

5   launched against Ms. Aguirre concerned Ms. Aguirre

6   engaging in alleged corporal punishment against a male

7   student.  Through FOIL, he found out that there was such

8   a video but it has never -- he's asked for it and it's

9   never been produced to him.  And he -- and it was part of

10  this OSI case that is part of the discovery response.

11  There's reference to a video but it's not being produced

12  and it might very well prove that Ms. Aguirre did engage

13  in that conduct.

14         Now I think they chose to unsubstantiate it

15  openly.  Is that what happened?  So it would be relevant

16  to that theory that, you know, if you look at a video

17  that shows corporal punishment and the City's saying no

18  corporal punishment,  you know, it's part of that

19  investigation to see how that investigation was handled,

20  whether that investigation was handled fairly in an

21  unbiased manner.

22         And so I am not sure why the City's not turning

23  it over but apparently there's proof that it exists and

24  I'm not sure -- we're just doing a follow-up to see where

25  that video is.

52

Proceedings

1          MS. GIAMBRONE:  Well first and foremost,

2     plaintiff mischaracterizes statements within the

3     investigatory files and this request was previously made.

4     And I looked at the investigation and the only video

5     referenced is that a witness says there's video and the

6     investigator then does a search and -- well actually,

7     strike that.

8          There's reference that a witness says they

9     observed this supposed corporal punishment and the

10    investigator then goes to a hallway video on another

11    floor and sees the supposed eyewitness at a different

12    place at the exact time that they reported observing the

13    corporal punishment.  So that completely discredited the

14    eyewitness in support of this investigation and that was

15    the only video referenced in the investigatory file,

16    first of all.

17         Secondly, once again, this is completely

18    irrelevant.  This video is irrelevant to whether or not

19    Linda Hill and the DOE retaliated against Francesco

20    Portelos.

21         THE COURT:  Doesn't this help your case?

22         MS. GIAMBRONE:  Your Honor, there's no video.

23         THE COURT:  Does it not exist?

24         MS. GIAMBRONE:  There's no video showing what

25    he supposedly says there is.

53

Proceedings

1          THE COURT:  Right, but what about the video

2     that was --

3          MS. GIAMBRONE:  The eyewitness?

4          THE COURT:  The eyewitness.

5          MS. GIAMBRONE:  I didn't see it but I suppose

6     we could do a search but are we going to have a trial

7     where we're going to attack and analyze every single

8     investigation?  It will be a three-month trial.

9          THE COURT:  I mean, like -- look, I don't want

10    to hear the commentary.  It's not relevant.  It doesn't

11    help advance the ball on getting the decisions made about

12    what needs to be produced.  I think that there's going to

13    be significant motion practice in this case to figure out

14    what the theory is and what's a viable theory, as I have

15    real doubts about what it is that plaintiff's been

16    arguing but maybe when the evidence is pulled together it

17    might make more sense.

18          All right.  What other discovery issues --

19          MR. GLASS:  Wait, I'm sorry.  You're ruling

20    that it's not relevant or -- I'm sorry, I didn't --

21          THE COURT:  She's going to look for the video.

22          MR. GLASS:  Oh, okay.  I apologize.  And that

23    FOIL number would help provide where it is.  There is a

24    video because the investigator told him there was a video

25    during the course of the investigation.  So -- and FOIL

Proceedings

1  represented to him that they preserved it.  So it's

2  there.

3            MS. GIAMBRONE:  Well I(indiscernible)--

4            MR. GLASS:  It's just a matter of getting it.

5            MS. GIAMBRONE:  -- to compel his FOIL.

6            MR. GLASS:  It's just a matter of --

7            MS. GIAMBRONE:  I don't know why we're using

8  this --

9            MR. GLASS:  Why should we bring seven things?

10  We're in a federal lawsuit.

11            THE COURT:  Stop.  This -- Mr. Glass, I don't

12  know how many times to tell you, stop interrupting.  You

13  do this every single time we have a conference.  It's

14  not helpful.

15            All right.  What other discovery issues are

16  there in terms of the documents?

17            MS. GIAMBRONE:  The only other thing is I asked

18  counsel yesterday, apparently there was an anonymous box

19  dropped off to the plaintiff.  I'm asking for a copy of

20  those documents.  And then I think counsel has included

21  an amended complaint which at this point, we are not

22  consenting.

23            THE COURT:  All right.  So what --

24            MS. GIAMBRONE:  And I can argue that point to

25  your Honor --

Proceedings

1          THE COURT:  Sorry.

2          MS. GIAMBRONE:  -- if you care to listen but --

3          THE COURT:  What's the --

4          MS. GIAMBRONE:  At the May 27th conference --

5          THE COURT:  The anonymous box.

6          MS. GIAMBRONE:  -- counsel referred to a box of

7    documents that were anonymously --

8          THE COURT:  Yes.

9          MS. GIAMBRONE:  -- given to the plaintiff.

10         THE COURT:  Right, right.

11         MS. GIAMBRONE:  And I am just asking for those

12   documents.

13         THE COURT:  All right.

14         MS. GIAMBRONE:  Which he has indicated he has

15   no problem providing.

16         MR. GLASS:  Yes, she'll have it by Monday.

17         THE COURT:  All right.  So produce that.

18         Give me the quick overview of your amendments

19   and while -- your arguments and while you're doing it, I

20   guess the question is who is going to hear that motion

21   but just give me the prelude.  All right.  What's the

22   amendment about?

23         MR. GLASS:  The heart of the amendment is that

24   during the course of this -- you know, since the

25   complaint's been filed, you might have been aware at one

56

Proceedings

1   point we mentioned that Mr. Portelos had been arrested

2   for something on his blog.

3            THE COURT:  Yup.

4            MR. GLASS:  And apparently Desmond White (ph.),

5   who at the place is like a security officer or something,

6   initiated a complaint with a precinct here in Brooklyn

7   causing Mr. Portelos to be arrested about a blog post.

8   He was held in custody for 33 hours, I believe, sent to

9   Central Booking and then the DA declined to prosecute it

10  or -- and so he was basically detained for 33 hours.

11           We had considered -- we filed the notice of

12  claim regarding that.  I considered filing it as just a

13  separate 1983 case but I think since this also ties to

14  the course of conduct of the DOE towards Mr. Portelos, it

15  might fall within a retaliation theory, as well.

16           So I thought for efficiency sake, rather than

17  bringing it as a separate complaint and since it ties to

18  the sort of ongoing relationship between Mr. Portelos and

19  the DOE and causing him to be arrested, causing false

20  allegations to be made against him, I think it's related

21  to the pleadings in this complaint, to the initial

22  complaint and I think it would just be more efficient to

23  make it part of this action.

24           I was hoping to make it part of a settlement

25  but obviously that's difficult to do here but it's

57

Proceedings

1   potentially compensable for being falsely arrested on

2   something that -- the only discovery I think might be

3   involved in that would be perhaps deposing Mr. White

4   about why he initiated this complaint against Mr.

5   Portelos during the course of this.

6          And some of the allegations are a little

7   outrageous like Mr. White feared for his life was a part

8   of the complaint and it seems a little overwrought.

9          THE COURT:  This is the second amended -- what

10   complaint is this?

11          MS. GIAMBRONE:  Yes.

12          THE COURT:  Where are the allegations in the

13   complaint about this arrest?

14          MR. GLASS:  Yeah, just let me find it.  I have

15   it.

16          MS. GIAMBRONE:  Paragraph 55.

17          THE COURT:  And what's the basis for the belief

18   that this has anything to do with everything we've been

19   talking about for the last two years?

20          MR. GLASS:  The course of conduct that Mr.

21   Portelos has been subject to seeking termination of his

22   employment, being arrested, being reassigned.  I mean,

23   obviously this case was brought before he was even

24   brought up on disciplinary charges, things that -- this

25   has been on an ongoing thing.  Hopefully things are

58

Proceedings

1   calming down now but during the course of that trial -- I

2   think your charges were still pending at that point or

3   you had a decision already?  That was after the --

4           MR. PORTELOS:  The decision was due around that

5   time.

6           MR. GLASS:  -- decision already came down?

7           THE COURT:  What's the connection between the

8   complaint made by DOE, Chief Information Security Officer

9   Desmond White and the allegations made against Principal

10  Hill and her alleged colleagues, compatriots, whatever

11  word you want to use in connection with the employment of

12  Mr. Portelos at the DOE?

13          MR. GLASS:  Well, Mr. White initiated -- you

14  know, the DOE initiated this complaint that caused him to

15  be arrested.  Also as apparently was reported to OSI, as

16  well, his issue of blog posting and OSI unsubstantiated,

17  so it was also investigated internally by the DOE.

18          THE COURT:  But you're trying to bring the

19  false arrest claim here, not just the ancillary action

20  with regard to employment, right?

21          MR. GLASS:  It doesn't -- yeah, I think that

22  would be --

23          THE COURT:  So what's the connection between

24  White's allegation related to a blog post and Hill and

25  the others who supposedly have been pursuing getting Mr.

Transcriptions Plus II, Inc.

Proceedings

1   Portelos out of the DOE for --

2              MR. GLASS:  Well, the blog --

3              THE COURT:  I'm just looking back at the date,

4   so --

5              MR. GLASS:  -- the content of the blog --

6              THE COURT:  -- it's quite a long time.

7              MR. GLASS:  -- the content of the log post was

8   about his alleged -- he had talked about hacking the DOE,

9   how to hack the DOE, which was an outgrowth of what he

10  was -- some of the allegations that were made to him in

11  the employment case.

12             So the reason this whole thing -- why he got

13  arrested allegedly was that the DOE said oh, now he's --

14  because of his employment and his bitterness about how

15  he's being treated in his employment, he's talking about

16  how to hack the DOE and we find this to be so scary that

17  we're going to turn this into to a we fear for, you know,

18  what he -- this man can do and we're going to have him

19  arrested.

20             So they did initiate it.  That's the only

21  reason he was arrested.  You're right.  It does have an

22  overlap between is it a separate claim or not.

23             THE COURT:  I didn't say it had an overlap.

24             MR. GLASS:  I'm just saying that there is --

25  it's tied to the employment relationship because he was

60

Proceedings

1   blogging about, you know, that -- what he considered the

2   farce allegations made about him and joking that he

3   really could be able to hack the DOE.  And they took it

4   as a serious complaint, even though it was written in

5   sarcasm and caused him to be arrested about it.  And, in

6   fact, I'm aware that they did that to another teacher

7   about the same time about the same period also, you know,

8   in the employment context.

9          So I don't know how to explain it better than

10  that but that's -- there's a link between it was his

11  commenting about he's being treated by Ms. Hill and the

12  DOE regarding his employment status that led to him

13  blogging which led to him being arrested and ultimately

14  found -- it was found to be no merit to that arrest but

15  they did initiate a very scary action against him based

16  on him commenting on his employment relationship.

17         THE COURT:  But who is the they?  I mean it

18  seems who is --

19         MR. GLASS:  Well we have a complaint from

20  Desmond White who is the Department of Education.

21         THE COURT:  Yeah, but what's White got to do

22  with the alleged group of problematic defendants from

23  your original complaint or your first amended complaint?

24         MR. GLASS:  I mean we don't -- we have to do

25  some discovery as to finding out why -- what he was told

Transcriptions Plus II, Inc.

61

Proceedings

1   by why White initiated this complaint, who instructed

2   White to make this allegation and how he even became

3   aware of it.  So I'm not going to tell you that I know

4   exactly how White was instructed or, you know, to

5   initiate this criminal investigation against Mr. Portelos

6   and it will require some discovery.

7            But we have fair -- we're fairly confident to

8   believe that Ms. Hill was somewhat involved in triggering

9   this White --

10           THE COURT:  What is the basis?  You have no

11  facts alleged in this proposed --

12           MR. GLASS:  Well --

13           THE COURT:  -- amended pleading that connects

14  Ms. Hill to this event except that you stuck it in the

15  same document.

16           MR. GLASS:  Well, whether it was Ms. Hill

17  directly or whether it was someone higher up in the DOE

18  was involved -- I mean, obviously at that point --

19  remember, he's being brought up on charges.  They're

20  seeking his termination and then after that or during the

21  course, I think a decision was pending, they're

22  initiating this new allegation against him to say that,

23  you know, higher ups are not involved or some of the same

24  players are not involved in dealing with this employment

25  relationship and the initiation of these criminal

62

Proceedings

1  charges, it would be a fair assumption to make that

2  obviously there were some of the same people involved in

3  triggering that arrest.

4         So that could clearly fall within a retaliation

5  theory or it could just be triggered in a separate false

6  arrest theory but the DOE would be part of that anyway

7  because they initiated it, not the police department.

8  The DOE was the one who triggered the arrest and he's got

9  in the complaint -- I mean, he sees that Desmond White

10 was the person who made the complaint.

11        THE COURT:  All right.  You need to make a

12 motion.  Let me just tell you, you can do it on a letter

13 brief if you want and just so we're clear what the

14 standard is, the Court on the motion and reasonable

15 notice -- well, first of all, I don't think this is an

16 amendment.  This is a supplemental pleading.

17        So it's a supplemental pleading setting out any

18 transaction, occurrence or event that happened after the

19 date of the pleading to be supplemented. It's under Rule

20 15(d).

21        MR. GLASS:  I'm sorry, you said (d) or --

22        THE COURT:  15(d).

23        MR. GLASS:  Okay, thank you.

24        THE COURT:  An application for leave to file

25 supplemental pleading is addressed at the discretion of

63
Proceedings

1    the Court.  Permission should be freely granted when such

2    supplementation will promote the economic and speedy

3    disposition of the controversy between the parties will

4    not cause undue delay or trial inconvenience and will not

5    prejudice the rights of any other party.

6           So for you to succeed on this motion, you're

7    going to have to show that there's some relationship

8    between the original pleadings and what you're saying is

9    a supplement.  So far, I don't see it but I'm open to

10   hearing what you have to say.  And the question is

11   whether it's going to delay this proceeding, given that

12   discovery is supposed to end at the end of this month,

13   I'm not sure how it's not going to delay the proceeding

14   because you're talking about opening up a whole other set

15   of discovery involving the NYPD, which is a completely

16   separate entity from the DOE.

17          And, you know -- so you can -- when do you want

18   to make the motion?

19          MR. GLASS:  Would two weeks be okay?

20          THE COURT:  All right, by the 19th.

21          MS. GIAMBRONE:  And when would I oppose that

22   by, your Honor?

23          THE COURT:  Do you want to do it by the 3rd?

24          MS. GIAMBRONE:  Yes, that's -- the 19th,

25   October -- yes, thank you.

64

Proceedings

1          THE COURT:  I don't need a reply.

2          MR. GLASS:  Your Honor, if it's possible, could

3    I have the following Monday?

4          THE COURT:  Yup.  Do you want till the 6th?

5    Does it matter?

6          MS. GIAMBRONE:  Sure.

7          THE COURT:  All right.  You can actually just

8    serve it by the 19th and then bundle them together and

9    file them by the 6th.

10         MR. GLASS:  So just serve by the 19th?

11         THE COURT:  Uh-hum.  Ms. Giambrone, you can

12   file both of them.

13         MS. GIAMBRONE:  Yes.  Is that by letter motion,

14   your Honor --

15         THE COURT:   Yes, yes.  Letter motion is fine.

16         All right.  So is that the end of the document

17   discovery aside from whatever might have to do with this

18   subject matter of this complaint amendment?

19         MS. GIAMBRONE:  The only thing that might be

20   outstanding is that after plaintiff's deposition if

21   medical authorizations and whatnot need to be provided

22   but --

23         THE COURT:  All right.  Mr. Glass?

24         MR. GLASS:  I'm just want to confer with Mr.

25   Portelos for a moment.

65

Proceedings

1          THE COURT:  All right.

2          (Counsel and client confer)

3          MR. GLASS:  This goes along with sort of

4   amending the complaint but if you look at paragraph 56 of

5   the amended complaint of the proposed amended complaint,

6   there was one other thing that came about and I guess any

7   discovery on that would be related to whether the amended

8   complaint is accepted.

9          THE COURT:  So do you have the memo?

10         MR. GLASS:  I mean there may be some discovery

11  as to how that actually came about and why they recanted

12  that investigation.

13         THE COURT:  I'm sorry, what is it your saying?

14         MR. GLASS:  Well, it's pled in the amended

15  complaint.  Do you want me to try to address that in the

16  letter perhaps, that there be any discovery related to

17  that?

18         THE COURT:  No, I don't want extra stuff in

19  there.  What's -- do you have the memo?  You've got the

20  memo from the 3020-a hearing officer of what happened?

21         MR. GLASS:  He has it on his computer if you

22  would like to see it.

23         THE COURT:  No, I don't need to see it.  You

24  got it from the hearing officer?  So what is it that you

25  want in terms of discovery?

66

Proceedings

1      MR. GLASS:  I would just be curious to see what
2  SCI had to decide to substantiate it and then withdraw
3  it.  What new information did they have perhaps the SCI
4  filed, that led to them withdrawing that allegation.
5  What new information did they receive that caused them to
6  recant the very serious allegation against plaintiff.
7          To even alert the hearing officer during the
8  pending decision that you shouldn't be substantiating
9  this or you shouldn't even be considering this.
10          MS. GIAMBRONE: Well, since plaintiff --
11          THE COURT:  That's not what it says.  At least
12  that's not what your paragraph says here.
13          MR. GLASS:  Well, they would have --
14          MS. GIAMBRONE:  Well I think the memo should be
15  read because it's -- the paragraph mischaracterizes what
16  the memo states but the plaintiff has the entire
17  investigatory file.  So I don't know what more I could
18  search for.
19          MR. GLASS:  Does it include how they recanted
20  it?  We have the file for the original real estate
21  allegation, yes, but the question is what happened to
22  trigger them to go further and say we falsely
23  substantiated this against him?
24          MS. GIAMBRONE:  That's not what happened.
25          MR. GLASS:  Well, the letter speaks for itself.

67

Proceedings

1    I mean I'd be happy to read the letter into the record.

2          THE COURT:  Well, why don't you do that?

3          MR. GLASS:  It's a letter dated March 11, 2014

4    to Felice Busto (ph.), who is the hearing officer.  It

5    says:

6          "The officer, the Special Commissioner of

7    Investigation has discovered an error in a memo in the

8    file of SCI case number 2012-0537 relating to

9    specification number 3 and the charges which recently

10   were litigated in a 3020-a proceeding brought against

11   Francesco Portelos, a teacher at I.S. 49 in Staten

12   Island.  This error also was included in the SCI report

13   regarding Roberta Dreyfus School, I.S. 49.

14          Moreover, SCI has reason to believe that SCI

15   Investigator Robert Laino (ph.), also testified to this

16   error.  Specifically, Investigator Laino reported that

17   related item RR was recovered from a search of the

18   Department of Education computer at I.S. 49 which was

19   assigned to Mr. Portelos.  However, those pages were

20   printed from the Internet.  We apologize for any

21   inconvenience this error has caused.  Sincerely, Richard

22   Condon, by Virginia Lowren (ph.), First Deputy

23   Commissioner."

24          And this was a pending -- one of the charges

25   that were pending against him for engaging in like real

68

Proceedings

1   estate practice and it was reported in the newspaper

2   against him as well during the course of the trial.

3          THE COURT:  And what is it that you want

4   besides the file which counsel says you already have?

5          MR. GLASS:  We have the file, I think, that led

6   to the substantiated allegation.  I don't think we have

7   anything related to them why -- the series of steps that

8   SCI engaged in to decide to unsubstantiate and then

9   decide to contact the hearing officer about why they no

10  longer were going to pursue that, which is --

11         You know, so I think we have the original

12  report but what is the error that they found?  Who told

13  them that there was an error?  How did that come about?

14  So any discovery related to that.  I don't know if it's

15  part of their file and perhaps she just needs to update

16  the SCI case number file or was it a new case number file

17  all together?  I don't know.

18         MS. GIAMBRONE:  I'm not quite sure how SCI

19  acknowledging an error is retaliation.

20         MR. GLASS:  This will be interesting at trial

21  to see how they're going to defend that action but --

22         THE COURT:  You're going to have to work on

23  this case to persuade the district judge that you're

24  going to trial on this issue.

25         MR. GLASS:  I can attest --

69

Proceedings

1          THE COURT:  And I don't understand it.

2          MR. GLASS:  -- that I've never seen that before

3    in my history of doing 3020-a but -- and the fact that it

4    was reported in the public papers, I don't know.  I mean

5    yes, it's not --

6          MS. GIAMBRONE:  I'm sure plaintiff reported it

7    himself to the papers.

8          THE COURT:  All right.  There's no discovery on

9    that issue because we'll see what happens with the

10   amendment.  If you have the file, you have the issues

11   that go with your original case.  You're going to do

12   these depositions.  You'll get a witness who knows about

13   it.  You can ask about it.  You don't need anymore

14   paperwork.  You already have the letter.

15          All right.  What are you going to do about

16   depositions here?

17          MR. GLASS:  I would suggest that -- we were

18   suggesting the day after -- the second day of Rosh

19   Hashana, if we -- perhaps we could finish Mr. Portelos'

20   deposition on that day if Ms. Giambrone is available and

21   that would give her some time to also get the other

22   documents to us before we continue with any depositions

23   of the documents.

24          THE COURT:  You're starting the depositions.

25   These are like little pieces here and there and there's

70

Proceedings

1    no reason to hold up depositions on -- based on the

2    things we've been talking about today.  All right.

3            So what day are you talking about?

4            MR. GLASS:  Well, I think the Andrew Hill -- I

5    mean the Gordon deposition, I mean I would like to see

6    those e-mails at least before I get him back.

7            THE COURT:  Go ahead.  What about the -- are

8    you thinking -- when you say the second day, do you mean

9    -- I think it's starting on the eve of the 24th.  Are you

10   talking about the 25th or the 26th?

11           MR. GLASS:  The Friday I believe, yeah.

12           MS. GIAMBRONE:  The 25th is a Thursday.

13           THE COURT:  All right.  So are you saying the

14   second full day?

15           MR. GLASS:  The 26th.

16           THE COURT:  The holiday is going to be

17   starting, I think, the evening of the 24th, right?  So

18   the 25th or 26th?  Do you want it on the Friday?  That's

19   the 26th.

20           MR. GLASS:  We would like to do it on the 26th

21   if possible.

22           THE COURT:  All right.  Can you do it, Ms.

23   Giambrone?

24           MS. GIAMBRONE:  That's fine.

25           THE COURT:  All right.  So Mr. Portelos'

71

Proceedings

1    deposition will be on 9/26. What time are you going to

2    start?

3              MR. GLASS:  10:30?

4              MS. GIAMBRONE:  I mean I could start at 9:30.

5              THE COURT:  Start at 9:30.

6              MR. GLASS:  I'd prefer to start at 10:30, if we

7    could.

8              THE COURT:  No, because it's a Friday.  You're

9    not going to go late on a Friday and I don't want to hear

10   you need to keep it --

11             MR. GLASS:  Well, it's a continuing deposition,

12   as well.

13             THE COURT:  I know but he's the main player

14   here.  All right.

15             What about these other people?  There's Gordon,

16   who seems to have a complicated schedule.  Who else are

17   the --

18             MS. GIAMBRONE:  Well, Linda Hill and Erminea

19   Claudio.  Linda Hill, I had sent counsel an e-mail with

20   some dates.

21             THE COURT:  Do you know are those dates still

22   good?

23             MS. GIAMBRONE:  I don't know that he's going to

24   want them.

25             MR. GLASS:  They're early in September.

72

Proceedings

1            MS. GIAMBRONE:  They're for like the next week

2  or two.

3            MR. GLASS:  Yeah, I would like to get --

4            THE COURT:  We're doing the depositions.

5  You're supposed to be finished by the end of the month.

6            MR. GLASS:  Well, we got Hill --

7            THE COURT:  Let's go.

8            MR. GLASS:  -- we got Hill's investigation

9  today -- yesterday.  So, I -- I didn't know when I was

10 getting it.

11           THE COURT:  All right.  What are the options

12 for Hill?

13           MS. GIAMBRONE:  Can we just do this in early

14 October?

15           THE COURT:  I want to hear what the options are

16 for Hill.

17           MS. GIAMBRONE:  Yes, your Honor.  I'm sorry.

18 Let me just --

19           THE COURT:  I'm just going to -- for the

20 record, this is a case that was filed back in June of

21 2012.  We're more than two years into this.  It's not

22 unreasonable to push you to get the depositions done.

23           MS. GIAMBRONE:  I know I proposed the 9th for

24 Linda Hill but I don't know that counsel --

25           MR. GLASS:  I have seven things in my life.

                    Proceedings

1           MS. GIAMBRONE:  I'm sorry?

2           MR. GLASS:  I have seven obligations on the

3  9th.

4           MS. GIAMBRONE:  Do you have the dates I

5  proposed to you before?

6           MR. GLASS:  No, not with me.

7           MS. GIAMBRONE:  Unfortunately, I don't have the

8  e-mail.  It's not coming up with the dates.  I mean if we

9  could have counsel speak to me during business hours,

10  perhaps we could pick some dates.

11           MR. GLASS:  I've got to --

12           THE COURT:  So --

13           MR. GLASS:  -- I clearly say I am happy to

14  respond by e-mail at any time.

15           THE COURT:  That's not what she said.

16           MR. GLASS:  And the time of my e-mails -- but I

17  resent that it's sort of like I don't communicate with

18  her because when she sends me an e-mail, I do respond to

19  her very quickly and when she doesn't want to respond,

20  she takes days to respond.

21           MS. GIAMBRONE:  That's --

22           MR. GLASS:  I mean that's -- it's just all

23  these implications that I'm not communicative with you

24  because it's not true.

25           THE COURT:  Mr. Glass, stop the long tirades

74

Proceedings

1   about counsel.

2            MR. GLASS:  Well, she's -- these stated

3   comments are annoying.

4            THE COURT:  Well, they may be annoying but

5   certainly the record that I see doesn't indicate that you

6   provide a lot of information when you're trying to get --

7   allegedly trying to get follow-up.  So it would be

8   helpful if everyone were more precise.

9            All right.  Let's --

10           MS. GIAMBRONE:  I can speak to him Monday

11  morning with her dates and --

12           MR. GLASS:  I prefer she just e-mail me the

13  dates and I'll get back to her.

14           THE COURT:  No.  I want to know when --

15           MR. GLASS:  I am fairly open --

16           THE COURT:  All right.  When you can you -- who

17  are we talking about, Hill?

18           MS. GIAMBRONE:  Linda Hill, yes.

19           THE COURT:  And who else?

20           MS. GIAMBRONE:  Erminea Claudio.

21           THE COURT:  It's Claudio, Hill, who else?

22           MS. GIAMBRONE:  And Andrew Gordon, which I am

23  going to have to get fresh dates for because the ones I

24  previously proposed have now --

25           THE COURT:  All right.  When can you speak to

75

Proceedings

1   them about the dates?

2              MS. GIAMBRONE:  Andrew Gordon -- Linda Hill and

3   Erminea Claudio, I expect should not be an issue.  Andrew

4   Gordon is no longer with the DOE.  So --

5              THE COURT:  Is he going to be produced

6   voluntarily or is he --

7              MS. GIAMBRONE:  Yes, but it's just a matter of

8   reaching him and getting dates.

9              THE COURT:  All right.  So is there a reason

10  that both of you can't talk on, for example, Wednesday

11  morning to nail down the dates for these three

12  depositions?

13             MS. GIAMBRONE:  That's fine with me.

14             THE COURT:  Mr. Glass?

15             MR. GLASS:  I'm at a hearing on Wednesday

16  morning but I'll be happy to answer any e-mails sent to

17  me.

18             THE COURT:  No.

19             MR. GLASS:  I'll get back to her right away.

20             THE COURT:  I'm telling you, you're conferring

21  because it takes too long.

22             MR. GLASS:  No, actually it's faster to tell

23  you the truth but that's --

24             THE COURT:  It's not, Mr. Glass.

25             MR. GLASS:  Because to get someone on the phone

76

Proceedings

1  is difficult.

2         MS. GIAMBRONE:  I'm happy to bring in a paper

3  trail of e-mails that I've got and responded to.

4         THE COURT:  Don't -- stop.  We're trying to

5  schedule this.  I want you to confer.  I'm going to let

6  you confer by phone.  Otherwise, I'm going to make you

7  meet and confer.  So what time is your hearing at?

8         MR. GLASS:  Can I just propose some dates?

9  Because I do have a lot of conflicts and I'll just give

10 you some possible dates and maybe she could get these

11 locked down and maybe that will help push it.

12        THE COURT:  Do you want those dates?

13        MS. GIAMBRONE:  That's fine.

14        THE COURT:  Provide all of the dates when you

15 can do a deposition in September.

16        MR. GLASS:  Okay.  Do you want me to do that

17 now or --

18        THE COURT:  Yes, right now.  And she's going to

19 check on those dates and you're going to talk next week.

20        MR. GLASS:  September 18th would be one date.

21        THE COURT:  All day?

22        MS. GIAMBRONE:  The 18th and the 19th, I am

23 away.

24        THE COURT:  All right.  22nd?

25        MR. GLASS:  22nd is a possibility.

Proceedings

1          THE COURT:  All right, the 22nd.  What about

2     the 23rd?

3          MR. GLASS:  No, I have a hearing.

4          THE COURT:  All day?

5          MR. GLASS:  In the morning.

6          THE COURT:  And how long do you think these

7     depositions are going to be?

8          MR. GLASS:  They all will be fairly long.

9     Claudio would be short, I believe.

10          MS. GIAMBRONE:  Well, Linda Hill has already

11     been produced for a full deposition.  The only matter

12     that was not addressed was the allegations in the OSI

13     because she pled the Fifth.  So I don't think that a full

14     seven-hour deposition is appropriate.

15          MR. GLASS:  Well, as I recall that deposition,

16     she basically -- she didn't answer any questions about

17     any investigations and there were a lot of investigations

18     at issue.  So that's going to be --

19          THE COURT:  The 23rd, are you available in the

20     afternoon?

21          MR. GLASS:  Afternoon -- afternoon -- after

22     12:00.

23          THE COURT:  All right.  So maybe you could do

24     Claudio on the 23rd in the afternoon or Gordon.  I don't

25     know if that's a full day.

78

Proceedings

1          24th?

2          MR. GLASS:  I do celebrate the Passover but if

3   it's an early morning --

4          THE COURT:  It's not Passover.  It's Rosh

5   Hashana and it's starting in the evening.

6          MR. GLASS:  Rosh -- I apologize, Rosh Hashana.

7   And I'm making an exception for the 26th to get this

8   done.

9          THE COURT:  It's up to you.  I don't know what

10  your --

11         MR. GLASS:  I am fairly wide open in the first

12  week of October.

13         THE COURT:  I want to know, are you saying yes

14  or no to the 24th?  It's up to you.

15         MR. GLASS:  I would prefer to say no to that.

16         THE COURT:  All right.  The 29th.  You're doing

17  -- we have the 26th already.  The 29th?

18         MR. GLASS:  That's fine.

19         THE COURT:  30th?

20         MR. GLASS:  That's fine.

21         THE COURT:  The 1st?

22         MS. GIAMBRONE:  I have a pretrial conference in

23  the southern district at 11:30.

24         THE COURT:  All right.

25         MS. GIAMBRONE:  But the afternoon is --

79

Proceedings

1      THE COURT:  The afternoon of the 1st?  All

2  right.  How about the 2nd and the -- well, the 3rd is a

3  holiday.  What about -- yeah, I think it's starting on

4  the 3rd.

5      MS. GIAMBRONE:  Is 10/2 available?

6      MR. GLASS:  Yeah, that's fine.

7      THE COURT:  All right.

8      MR. GLASS:  Is 10/2 --

9      THE COURT:  10/2?

10      MR. GLASS:  What holiday is the 3rd?  Is that

11  Yom Kippur?

12      THE COURT:  It starts on the 3rd in the

13  evening.  Let's do the next week, as well.  How about the

14  6th through the 10th?

15      MS. GIAMBRONE:  I'm available that whole week.

16      THE COURT:  How about the 6th through the 10th?

17      MR. GLASS:  I'm good every day except the 7th.

18      THE COURT:  So, 6, 8, 9 and 10.  All right.

19      So we have September 26th --

20      MR. GLASS:  Well actually the 9th, Mr. Portelos

21  has a PERB hearing.  So I don't think the 9th would be

22  good.  So, the 6th, 8th and 10th are fine.

23      THE COURT:  22nd, this is September.  The 22nd,

24  the afternoon of the 23rd, the 29th and the 30th.  And

25  you're doing Mr. Portelos' deposition.  So that gives you

80

Proceedings

1   three-and-a-half days in September and then in October,

2   you're looking at October 1st in the afternoon, October

3   2nd, is that right?

4           MS. GIAMBRONE:  Yes.

5           THE COURT:  And then the 6th, 8th, and 10th of

6   October.  And we're talking about Claudio, Hill and

7   Gordon.  Any other depositions?

8           MR. GLASS:  We just would be relying on the

9   amended -- the supplemental complaint, I guess, if we

10  would do Mr. White.

11          THE COURT:  Do you represent -- I don't know

12  what --

13          MR. GLASS:  Mr. White is part of the DOE

14  though.

15          MS. GIAMBRONE:  Not in the case --

16          MR. GLASS:  So --

17          THE COURT:  Is that the only thing he has to do

18  with this case?

19          MR. GLASS:  I believe so, yes.

20          THE COURT:  All right.  Any other depositions?

21  Anybody taking any other depositions?

22          MR. GLASS:  The only thing would be if

23  something came out about -- the recanted SCI real estate

24  report.  I don't -- you said we can depose someone

25  perhaps related to that.

81

Proceedings

1          MS. GIAMBRONE:  I think the Court reserved

2   decision.

3          THE COURT:  I said you already had the

4   documents.  What are you going to do about that?

5          MR. GLASS:  Perhaps -- I don't even know who

6   the relevant person would be, I mean, for the --

7          THE COURT:  All right.  You -- I'm not saying

8   you can't notice the deposition related to that issue but

9   it's DOE, we're talking about what you're calling

10  recanting.  I don't know if that's correct or not but the

11  issue about the police, that is not on the table.  You

12  could ask questions if you think Claudio,  Hill or Gordon

13  -- I don't know why Gordon would know anything but -- or

14  Claudio but maybe Hill given the theory that you tried to

15  expound earlier about Hill being a player in the

16  background behind the police officer.

17         MS. GIAMBRONE:  I was --

18         THE COURT:  Go ahead.

19         MS. GIAMBRONE:  I would just note that SCI's a

20  separate entity from the DOE and this is an SCI

21  investigation that they're alleging was reversed.  So

22  again, I don't see the connection.

23         THE COURT:  Yeah, I'm just saying if you had

24  those people there.  It seems like one could think, given

25  that the whole issue has to do with 3020-a, that this

82

Proceedings

1  affected the 3020-a, it's relevance is not as tangential

2  as the arrest which seems to me to be pretty distinct.

3          All right.  Any other depositions?  All right.

4  So --

5          MR. GLASS:  Do you have this on a CD, what you

6  produced yesterday?

7          MS. GIAMBRONE:  No.

8          MR. GLASS:  Because it is Bates stamped.

9          MS. GIAMBRONE:  Okay.

10         MR. GLASS:  Obviously, it was -- it would be --

11  we got some other things from you on CDs, so if you have

12  it on a CD copy, because it is obviously Bates stamped

13  and it was obviously digitally Bates stamped at some

14  point, so to the extent you have that on  -- we were just

15  wondering if the documents produced yesterday are Bates

16  stamped and if she has them digitally, we'd ask that they

17  be turned over digitally.  I imagine they are.

18         THE COURT:  It's up to you.

19         MS. GIAMBRONE:  Well, I would think that

20  counsel could scan the documents and make a digital copy

21  for himself.

22         MR. GLASS:  Unfortunately, it's about a

23  thousand pages and if she has it on an e-mail it would be

24  much easier for everybody if she just --

25         THE COURT:  It's up to counsel, if she wants to

83

Proceedings

1    produce it digitally or not.

2          When can you speak next week to confirm the

3    dates for the depositions?  This is Claudio, Hill and

4    Gordon and then you can figure out what you want to do

5    about if you're doing some deposition related to this

6    alleged recantation.

7          I want you to have a phone call.  I want the

8    dates confirmed and I want a letter saying that you

9    scheduled the depositions.

10          MS. GIAMBRONE:  Anytime other than the morning

11    of the 11th is fine for me.

12          MR. GLASS:  And I'm sorry, you wanted to get a

13    phone call by when?

14          THE COURT:  I want you two to talk and confirm

15    your dates for the Claudio, Hill and the Gordon

16    deposition and counsel said she thought she could speak

17    to them Monday and Tuesday and get a date or at least

18    communicate with them Monday and Tuesday.

19          So the 10th, the 11th, I want you to talk on

20    the phone and confirm and then I want a letter telling me

21    that you've confirmed the dates for those three

22    depositions.

23          MR. GLASS:  Can we talk on the morning of the

24    12th because I do have hearings all day on the 9th and

25    the 11th.

84

Proceedings

1           THE COURT:  What time?

2           MR. GLASS:  First thing, like --

3           THE COURT:  What time is that?

4           MR. GLASS:  9:30?

5           THE COURT:  Can you --

6           MS. GIAMBRONE:  That's fine.  Thank You.

7           MR. GLASS:  Mr. Portelos has one other question

8    or issue he would like to bring up.

9           THE COURT:  Hold on a second.  I want a letter

10   then by the end of the day on the 12th, that you've

11   confirmed the dates.

12           (Pause)

13           THE COURT:  All right.  So all those

14   depositions need to be done by the 10th of -- up to and

15   including the 10th of October.

16           And then -- so your original discovery deadline

17   was the end of September.  So I will give you two weeks

18   after that deposition date to wrap up any document

19   discovery.  So I don't want to hear thirty days to

20   respond to anything.  If you get a document request, you

21   need to respond to it right away.

22           MR. GLASS:  I'm sorry, (indiscernible)

23   supplemental complaint would be or --

24           THE COURT:  If you're allowed to do it, we'll

25   talk about discovery.

85

                    Proceedings

1          MS. GIAMBRONE:  So two weeks from the last

2    deposition?

3          THE COURT:  Well, if you go through the 10th.

4    I'll give you -- so all fact discovery closes 10/24.  It

5    seems like you could still make your motion for summary

6    judgment.  So it's just a three-page letter to the

7    district judge.  It seems like you could probably do that

8    now.   Yes?  No?  Do you want a different date?

9          MS. GIAMBRONE:  I'd have to depose plaintiff.

10   I think after plaintiff's deposition I'll be --

11         THE COURT:  All right.  So that's going to be

12   on -- at the end of September.  So you are going to leave

13   the other dates there.  You should look at the district

14   judge's rules.

15         All right.  Other issues?

16         MR. GLASS:  And the other issue we raised was

17   just the -- I know we're subject to confidentiality in

18   this case but the report of Linda Hill that was

19   substantiated which we just received yesterday, would be

20   subject to FOIL and Mr. Portelos raised the question as

21   to whether that would be subject to this confidentiality

22   or since it's been substantiated or to the extent it's

23   been substantiated given that it's --

24         THE COURT:  Why is it available under FOIL?

25         MR. GLASS:  Well, the City itself publishes

86

Proceedings

1  substantiated OSI reports on its own web site or SCI

2  does, at least and so --

3          THE COURT:  Is it published?

4          MS. GIAMBRONE:  No.  SCI and OSI are separate

5  entities.  OSI is part of the DOE.  SCI is a separate

6  agency.

7          MR. GLASS:  So to the extent SCI is not even

8  part of the DOE, I don't -- and OSI told him to FOIL --

9  to try to get it as well and I know it's been redacted

10 when it was turned over, so --

11         MS. GIAMBRONE:  Well, there's also

12 unsubstantiated findings within and comments as to

13 unsubstantiated complaints within that document which

14 there's no question on part of the confidentiality order.

15 I assume this is for the purpose of his blog.

16         MR. GLASS:  It's a final report and it's our

17 understanding that both the final reports are not subject

18 to, you know, FOIL --

19         MS. GIAMBRONE:  And there's unsubstantiated --

20         MR. GLASS:  To the extent it's unsubstantiated,

21 I agree that that should be redacted but --

22         THE COURT:  All right.  I'm not giving you

23 permission to publish it outside of the confidentiality

24 order.  If you believe and you're correct about it, that

25 because it's subject to FOIL, that somehow it meets the

87

Proceedings

1   publicly available exception to confidentiality, then you

2   do what you want with it unless you are asking for some

3   sort of ruling and you're going to brief the issue.  I

4   don't know the applicability of FOIL to the particular

5   kinds of allegations that are made in the report and

6   what's substantiated and not substantiated because I

7   haven't read the report.

8           So, you know, to the extent that it was

9   produced under the confidentiality order, it's subject to

10  that order.  If under FOIL it's publicly available and it

11  wouldn't be out from the confidentiality order applies,

12  then it applies but I'm not in a position to make a

13  ruling without having read the report or having heard

14  about the applicability of FOIL.

15          MS. GIAMBRONE:  And, your Honor, this is why we

16  moved for a protective order because plaintiff wants to

17  use this litigation as a vehicle for harassment.

18          THE COURT:  Well --

19          MR. GLASS:  Object to that -- I object to that

20  comment and the question of who has been harassed in this

21  is subject to debate.

22          THE COURT:  All right.  So proceed with caution

23  with regard to any dissemination of that report.  If it's

24  not authorized, it's not authorized.

25          (Pause)

88

Proceedings

1          THE COURT:  Anything else?

2          MR. GLASS:  Nothing further from plaintiff.

3          THE COURT:  From the City?

4          MS. GIAMBRONE:  No, your Honor, thank you.

5          THE COURT:  All right.  So I want to hear by a

6     written status report by let's say October 7th as to

7     what's going on.

8          MS. GIAMBRONE:  I'm sorry, what date was that,

9     your Honor?

10          THE COURT:  October 7th.  All right.  What

11     happened with the settlement discussions and --

12          MS. GIAMBRONE:  We had a phone conference, your

13     Honor.  Based upon the demand, we did not believe that

14     there was any hope for a resolution.

15          THE COURT:  All right.

16          MR. GLASS:  It's plaintiff's position that I

17     did try and initiate that again today with Ms. Giambrone

18     and I do feel that given the report of Ms. Hill, that the

19     City should reconsider this but obviously, I can't force

20     the issue.

21          THE COURT:  Well --

22          MR. GLASS:  But I think it makes sense --

23          THE COURT:  What is there about that she thinks

24     that they should change?

25          MR. GLASS:  Well, I think the timing of it

89

Proceedings

1  suggests that it was a report initiated in February of

2  2012, at the time -- just about the time Mr. Portelos was

3  reassigned.  I think January of 2012, is when he was

4  reassigned.  Well, no, he was reassigned later but it was

5  about the time this was happening and I think it does

6  show that the City, you know, deliberately withheld

7  investigating that investigation of fraud -- financial

8  fraud by Ms. Hill for over two-and-a-half years and it

9  was substantiated after his 3020-a was adjudicated.

10            THE COURT:  All right.

11            MR. GLASS:  I just think it's probative to say

12  that there's nothing to this case which the City might

13  believe.  The timing of it is going to raise some

14  question of fact, I think.

15            THE COURT:  All right.  I'm going to interrupt

16  you for one second.  I really -- I've said this a couple

17  of times.  I don't understand your theory and I'm not

18  going to spend a long time on this because it's Friday

19  afternoon; what has one thing got to do with the other?

20  What is your big picture theory here?  You're saying that

21  Mr. Portelos had made complaints and then in retaliation

22  for his complaints, they did X, Y and Z.  I get that and

23  we've talked about that.

24            But what has it got to do with anything that

25  they don't investigate all of his various allegations?

Proceedings

1  Because that's the connection you're trying to make here,

2  that they bury his complaints and they don't pay

3  attention to him.  But, you know, to put it politely, so

4  what?  What's that got to do with going after him?

5          MR. GLASS:  Well, I think it just legitimizes

6  the fact that there was retaliatory actions taken against

7  him and --

8          THE COURT:  Well, how?

9          MR. GLASS:  -- that they record --

10         THE COURT:  You never -- Mr. -- I'm going to

11 ask you again, you never elucidate that point.  You say

12 that over and over again but analytically, what is the

13 connection?  They don't care about him.  They don't like

14 him.  I mean, so what?  It's -- at best it's a little bit

15 of flavor and it does --

16         MR. GLASS:  Well, if he spoke out --

17         THE COURT:  It's not -- as far as I can tell,

18 the theory with regard to failing to investigate his

19 claims, you never make the logical connection.  You say

20 it over and over again but you don't connect it and I'm

21 asking it because what I hear is that you think that you

22 have accumulated evidence that shows that they didn't pay

23 attention to his claims and that makes your case stronger

24 and you think that the City should revisit its settlement

25 posture based on the strength of your evidence.

Proceedings

1           But what is it that is the logical connection

2    between this evidence that you've accumulated and what

3    counsel keeps saying is the heart of your case; your

4    complaints, I think from reading the complaint correctly

5    so, the Hill and the Hill animus and Hill using the

6    people around her or coopting them to basically go after

7    Mr. Portelos?

8                MR. GLASS:  Well, what the triggering event was

9    what got him removed initially was his reporting of

10   financial misconduct of Ms. Hill as a matter of public

11   concern and it has been legitimized now with this report,

12   two-and-a-half years later where it's a series of things

13   have happened to Mr. Portelos during that two-and-a-half

14   year period after -- remember, when he reported this, he

15   had a clean record.  There was nothing in his file to

16   suggest that he had any problems.  After he filed this

17   report of financial fraud, this parade of horribles has

18   come upon him.

19               THE COURT:  Okay.  That's your case.

20               MR. GLASS:  And I think the -- yeah.

21               THE COURT:  I get that.  That's the main case.

22   I got it.

23               MR. GLASS:  okay.

24               THE COURT:  It seems like you could -- I mean I

25   don't know if the evidence supports it but I get that

Proceedings

1  theory.

2          MR. GLASS:  Well, no, the evidence does seem to

3  support that it was a legitimate complaint.

4          THE COURT:  Okay.

5          MR. GLASS:  I have to say that, right?

6          THE COURT:  So what about this failure to

7  investigate his reports that you think is the thing that

8  really shows that there was all of this bad activity

9  going on?  How does that fit in?

10          MR. GLASS:  Well, I think it just bolsters the

11  part of the retaliation in the sense that the very

12  legitimate report that he filed against Ms. Hill was not

13  -- was buried or not investigated or deliberately, you

14  know, put off and meanwhile, a series of 26

15  investigations were launched against Mr. Portelos which

16  led to 3020-a charges which sought his termination.  So I

17  think --

18          THE COURT:  And what?  And --

19          MR. GLASS:  I think the fact, you know -- and

20  that the one substantiated report that was the one that

21  they sat on for two-and-a-half years.  So I think -- are

22  you saying did I not allege enough to say it like a

23  disparate treatment theory, I guess.

24          THE COURT:  Yeah, what's the theory?  I mean

25  you have to -- you know, this is basically First

93

Proceedings

1    Amendment retaliation, right?

2         MR. GLASS:  The theory is that he was subject

3    to termination -- well, I think you'll get it but he was

4    subject to termination charges.  He was subject to false

5    arrest.  He was subject to a series of false

6    investigations launched against him that ruined his

7    reputation.

8         THE COURT:  All right.

9         MR. GLASS:  A --

10        THE COURT:  Putting aside the false arrest

11   because I think that's something that we're going to deal

12   with on the motion papers, you're -- what you have said

13   and which I have allowed you to have pretty generous

14   discovery for which the City has had to put a lot of

15   effort into, is this idea that Mr. Portelos' complaints

16   were not investigated and now you have suggested that

17   this is part of why your case is strong.

18        And what is the connection between not

19   investigating his complaints and the alleged activity

20   that Ms. Hill and her companions, colleagues, whatever

21   they are, engaged in?  Because those are not the sources

22   of his trouble.

23        MR. GLASS:  The ones that were not -- that he

24   brought were not investigated?

25        THE COURT:  Yeah.

Transcriptions Plus II, Inc.

94

Proceedings

1          MR. GLASS:  No, but I understand your point,

2     your Honor, but I think my bigger point is the fact that

3     this has ultimately been substantiated.  The one that

4     started this whole thing has now found some validity by

5     SCI regardless of whether they investigated his

6     complaints and I see your point.

7          But doesn't that bolster his retaliation

8     theory, that he filed a very legitimate complaint that

9     would have triggered an animus on the part of Ms. Hill,

10    including launching, you know, a series of investigations

11    against him?

12         I think you're saying that regardless of

13    whether his reports were considered, I think it's just

14    circumstantial to bolster the idea --

15         THE COURT:  Circumstantial to what?

16         MR. GLASS:  To the idea that the --

17         THE COURT:  I'm asking these questions because

18    you're going to have a motion for summary judgment that's

19    going to try to knock out all of these claims.  And

20    certainly say that most of your evidence is not relevant.

21    And the practical question is is really whether the City

22    should be seriously rethinking its settlement posture

23    because somehow the lay of the land has changed.

24         Now, I don't know and I don't want to know what

25    the demand was.  Maybe it was way too high, particularly

Proceedings

1  considering that the 3020-a did not lead to his

2  termination.  So the economic damages have been

3  curtailed.  So whatever it is, you can all think about

4  how you do those calculations but you're going to get

5  pressed from the motion for summary judgment and it's,

6  you know, I imagine Ms. Giambrone has been thinking about

7  this because she's obviously intimately familiar with the

8  documents and how they are relearnt or not relevant.

9       And we go around and around on what these --

10  his complaint, other than the one against Hill, have to

11  do with anything and I think it matters and I'm pressing

12  you to think about this because the summary judgment

13  motion has the real risk of being completely unwieldy and

14  on this point, unintelligible because the connection

15  doesn't make sense.

16       So you're saying -- I understand.  You

17  complained about Hill.  They didn't look into Hill and

18  now we know two-and-a-half years later that in part, he

19  was right about Hill from the City's perspective.

20  Whether Hill agrees with that or not, that's a different

21  issue.

22       And then because she was in a position of

23  authority, she was basically able to harass him by having

24  either or others make multiple complaints that he claims

25  are without merit and he survived the 3020-a proceeding.

Proceedings

1   So nothing could have been really too bad.

2

3          But there's a lot of discovery in this case and

4   you keep bringing it up that they buried his claims,

5   buried his claims -- you know, his complaints.  And I'm

6   at a loss to understand based on what you've told me and

7   maybe it's because I only get a snapshot of the record,

8   but what it is that the -- that part of the record has to

9   do -- have any legal significance.  You can try it one

10  more time but I mean, you're rolling towards wrapping

11  this up.

12         MR. GLASS:  Isn't the issue for a summary

13  judgment whether there's going to be a question of fact

14  of whether he was retaliated against and now that we have

15  a report that suggests that it's legit -- so you're

16  right.  Even if it's irrelevant, Even if I can't give you

17  an answer to that question, does it matter so much that

18  the City is going to get summary judgment on this case?

19  And they feel confident that they're going to get summary

20  judgment on this case, is it worth investigating

21  exploring settlement, whether that stuff about the way

22  his investigations were treated are considered

23  circumstantial at trial or you're going to say that

24  they're irrelevant or a judge would say they're not

25  relevant at this point for my summary judgment

97

Proceedings

1   consideration.

2           I still think there's an issue of fact here for

3   trial at least that's going to be very hard to win on

4   summary judgment of this case and so it doesn't make

5   sense, you know, for the City to revisit perhaps trying

6   to -- you know, are they confident they're going to get

7   summary judgment in this case.  I think there's a lot of

8   facts and I think the fact that the report has been

9   substantiated bolsters our case  little bit that there

10  was a very legitimate complaint made -- that he made

11  before he had any trouble with them.

12          And I think that's why I think settlement

13  should be revisited but if they want to say they're going

14  to win on summary judgment, they're not going to revisit

15  it but --

16          THE COURT:  All right.

17          MR. GLASS:  So I understand your point but even

18  if it is, even you're absolutely right it's irrelevant, I

19  mean I think it's going to be relevant to the point of,

20  you know, the retaliation theory about how he's treated.

21  I still think it's relevant but it may not be -- you

22  know, prove retaliation completely but the circumstantial

23  way that certain things were treated would speak to the,

24  you know -- her complaints by OSI are treated completely

25  differently than when he makes a complaint to OSI, I

98

Proceedings

1   think could be relevant to --

2          THE COURT:  But how is it relevant?

3          MR. GLASS:  -- the retaliation.

4          THE COURT:  I am concerned, as a practical

5   matter because either I'll have to handle it, maybe, or

6   poor Judge Mauskopf is going to be looking at a huge

7   stack of papers and you just tacked it on, which is what

8   you keep doing and saying Hill, I assume you're talking

9   about, complaints are treated differently from his.  So

10  what?  I mean, it may not be an ideal thing but what's it

11  got to do with retaliation?

12          It may have something, I just -- I don't know

13  what it is.  I'm asking you because I would --

14          MS. GIAMBRONE:  Well, the fact that --

15          THE COURT:  As you're finishing the deposition

16  -- if you're going to do the depositions and finish the

17  depositions, you have the specter of an enormous motion

18  that's going just going to take a huge amount of time

19  from both sides, take the Court a lot of time and it

20  seems to me, runs the risk of having a lot of extraneous

21  information in it.

22          So I am urging you to think about what your

23  theory is, so that what's presented to the Court is what

24  the judge needs to hear to make a decision on your

25  question which is are there material issues of disputed

99

Proceedings

1  fact as to the claims that are made in the complaint?

2          What were you going to say?

3          MS. GIAMBRONE:  No, just in terms of to the

4  extent that counsel keeps pressing the possibility of

5  settlement, I've brought it up on the May 27th

6  conference.  I bring it up again now because in the

7  middle of this discovery conference what plaintiff is

8  concerned about is whether he can post these things on

9  his blog.

10          I don't believe his client is interested in

11  settling this case and at this point based upon what I

12  can see is his focus, my client is not interested in

13  settling either.  And the fact that it was substantiated

14  in my view, helps me at trial.

15          THE COURT:  Okay.  Why?  I'm just -- just to

16  play this out.

17          MS. GIAMBRONE:  Why?  Because if there was such

18  a conspiracy against him, they certainly wouldn't have

19  substantiated the finding against Linda Hill.

20          THE COURT:  Interesting.

21          MS. GIAMBRONE:  So --

22          MR. GLASS:  The timing of it -- well, that's

23  why I think it is relevant because if you look at the

24  timing of the --

25          THE COURT:  All right.  I mean, I am not

100

Proceedings

1  deciding the motion now.

2          MR. GLASS:  No, I know but I am just trying to

3  point out that yes, it's going to help her case to say

4  that two-and-a-half years after they lost, trying to fire

5  him, that they decided to substantiate it, I don't know

6  how you can say how that helps your case.  I just find

7  that funny because they were able to initiate

8  investigations -- you know, investigate him, find him

9  guilty of half of them, start a 3020-a, complete a 3020-a

10  and not be able to get to Hill's allegations of financial

11  fraud for two-and-a-half years and send it to OSI and not

12  even to SCI, even though it's financial fraud.

13          MS. GIAMBRONE:  Not if it's financial --

14          MR. GLASS:  So there's all kinds of funny

15  things going on here.

16          THE COURT:  Don't talk to each other.

17          MR. GLASS:  You know, it's just --

18          MS. GIAMBRONE:  And, your Honor, the financial

19  fraud had nothing to do with his 3020-a.

20          THE COURT:  Right.

21          MR. GLASS:  Nothing to do with it.

22          MS. GIAMBRONE:  Ultimately.

23          MR. GLASS:  Well, that's --

24          MS. GIAMBRONE:  And it was different groups --

25          THE COURT:  Let's stop.

Proceedings

1          MS. GIAMBRONE:  -- investigating both.

2          THE COURT:  All right.

3          MS. GIAMBRONE:  So --

4          THE COURT:  Okay.  I don't know what the dollar

5    amount is but -- for the demand but I don't know how the

6    damages would be huge in this case given the lack of a

7    loss of a job but that's up to you all to --

8          MR. GLASS:  I mean, I will -- I will be --

9          THE COURT:  I don't even know if they were

10   huge.  I just hear from the City that it was too much for

11   them.

12         MR. GLASS:  We have zero offer at this point,

13   so we know it's -- for her to just state he's not

14   interested and he's got other intricals, look when I'm

15   negotiating at zero, there's not much I can do.

16         MS. GIAMBRONE:  Well --

17         MR. GLASS:  So I told her that I would say

18   that --

19         MS. GIAMBRONE:  The worst (indiscernible).

20         MR. GLASS:  -- you know, I would explain to Mr.

21   Portelos that there's no guarantees in this process and I

22   would be happy to talk but when I'm getting zero, zero,

23   zero and counsel is telling me that, you know, this guy's

24   got another agenda, you know, there's nothing to work

25   with.

Proceedings

1          MS. GIAMBRONE:  I think counsel

2    (indiscernible).

3          MR. GLASS:  So, you know, I was hoping that the

4    Court could help us with that and we had a conference

5    scheduled because I thought we were going to have a

6    meaningful discussion but they're not -- it doesn't seem

7    to be much interest in that.

8          THE COURT:  Well, as to the observation he has

9    another agenda, it seems pretty clear that there's an

10   agenda of publicizing Mr. Portelos' view of the DOE.  The

11   City --

12         MR. GLASS:  Which was precipitated by what he

13   went through.

14         THE COURT:  Hey, just stop.  Can you not

15   interrupt?  He has whatever First Amendment rights he has

16   which are extremely broad to say what he wants to say.

17   It doesn't necessarily make the City defendants happy.

18   It doesn't necessarily make everyone have lots of good

19   will towards each other but, you know, as long as he's

20   not doing the same things that he's not allowed to say,

21   then he can do whatever he wants with regard to the

22   publication.  Obviously, some of these issues trigger

23   some people's concerns but -- and whether they're

24   legitimate or not, I don't know.

25              But to me, that's a side issue, except for

103

Proceedings

1   recognizing the reality that you're dealing with a

2   situation where people have particular emotional

3   attitudes towards each other.  That is something that in

4   order to settle, it would be helpful if we could defray

5   the energy that goes behind those.

6           So, anyway, if you have another number, pass it

7   on to the City.  City, you know, you're --- everybody is

8   going to be moving towards thinking about the summary

9   judgment motion.  So I imagine you'll be looking at the

10  evidence and thinking about the law.  And to the extent

11  your positions change, are more nuance you should talk to

12  each other.

13          All right.  So I will hear from you in October.

14  If there's a problem before then, let me know and have a

15  good weekend.  Thanks.

16          MR. GLASS:  Okay.  I just --

17          THE COURT:  What?  You have something else?

18          MR. GLASS:  I might as well bring this up now

19  because, you know, as I said we got the report yesterday

20  and --

21          THE COURT:  You're on the last --

22          MR. GLASS:  Yeah, I understand.  I'm not trying

23  to --

24          THE COURT:  I mean, there are two; it's Friday.

25          MR. GLASS:  He does raise a good point that,

104

                              Proceedings

1   you know, the report just came to us yesterday, as I said

2   we haven't had a chance to look through it but there's a

3   lot of questionable redactions between the investigator

4   and his boss.

5            THE COURT:  All right.  I'm not dealing with

6   something you haven't even read yet.  If there's an

7   issue, you'll let me know about it.

8            MR. GLASS:  Okay.

9            THE COURT:  First, you should obviously talk to

10  the defendant's counsel before you talk to me about it.

11           MR. GLASS:  That makes sense.  Okay.

12           THE COURT:  And since you're talking next

13  week --

14           MR. GLASS:  Uh-hum.

15                     (Matter concluded)

16                         -o0o-

17

18

19

20

21

22

23

24

25

105

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **11th** day of **September**, 2014.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.