UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


FRANCESCO PORTELOS,              *    Case No. 12-CV-3141(RRM)
                                 *
            Plaintiff,           *    Brooklyn, New York
                                 *    October 16, 2014
     v.                          *
                                 *
CITY OF NEW YORK, et al.,        *
                                 *
            Defendants.          *
                                 *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *

     TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
        BEFORE THE HONORABLE VERA M. SCANLON
           UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:            BRYAN D. GLASS, ESQ.
                              Glass Krakower LLP
                              100 Church Street, 8th floor
                              New York, NY  10007


For the Defendants:           JESSICA GIAMBRONE, ESQ.
                              HEIDI GRYGIEL, ESQ.
                              DANIEL LIM, ESQ.
                              New York City Law Department
                              100 Church Street
                              New York, NY  10007




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1              (Proceedings commenced at 11:35 a.m.)

2              THE COURT:  All right.  This is Judge Scanlon.

3    We're on this call for Portelos vs. City of New York, et al.,

4    12-CV-3141.  For the plaintiff.

5              MR. GLASS:  Bryan Glass.

6              THE COURT:  And for the defendants.

7              MS. GIAMBRONE:  For defendants, Assistant

8    Corporation Counsel, Jessica Giambrone, and I'm here with two

9    attorneys from our litigation unit, Heidi Grygiel and

10   (inaudible).

11             THE COURT:  You're breaking up.  Heidi, what's her

12   last name?

13             MS. GIAMBRONE:  G-R-Y --

14             THE COURT:  Hang on.  Somebody is either breathing

15   heavily, or moving, or in the wind or something.  There's some

16   heavy noise on this, so whoever it is, please stop or move to

17   a place where that's not going to happen.  Okay.

18             Heidi and G-R-Y --

19             MS. GIAMBRONE:  G-I-E-L.

20             THE COURT:  Okay.

21             MS. GIAMBRONE:  And Daniel Lim, L-I-M, like Mary.

22             THE COURT:  okay.  And they're both attorneys?

23             MS. GIAMBRONE:  Yes.

24             MR. GLASS:  Are these DOE attorneys or are they

25   other corporation counsels?

1          MS. GIAMBRONE:   These are corporation counsel

2     attorneys who (inaudible) in other (inaudible) discovery and

3     litigation support.

4          THE COURT:  All right. If they're going to continue

5     --

6          MR. GLASS:    Actually --

7          MS. GIAMBRONE:   I'm sorry?

8          THE COURT:  I'm going to speak now.

9          If they are going to continue to work on the case,

10    they should file notices of appearances. I don't know if

11    they're just there for this discussion or something else.  And

12    let me --

13         MS. GIAMBRONE:   Yes, Your Honor.  They've been

14    assisting with the (inaudible) discovery.  They are well

15    versed in it, so they are sitting in on the topic that I wrote

16    to the court about.

17         THE COURT:  Okay.  It's --

18         MS. GIAMBRONE:   But I'll certainly (inaudible), if

19    they have more involvement, I'll have them put in notices of

20    appearances.

21         THE COURT:  I'm going to ask again, if there's

22    somebody who's outside or -- I don't know why but there is

23    lots of background noise like wind or something on this case.

24         And let me be clear.  We have had many telephone

25    conferences in this case.   It sometimes gets very difficult.

4

1              I'm going to ask you not to interrupt each other and

2       wait until somebody's finished speaking, because I don't know

3       if there's a delay on someone's call or whatever happens here,

4       but people end up talking across each other and I've said

5       before, it's very hard for me to hear, it's hard for you each

6       to hear the other, and the recording ends up being completely

7       jumbled and we can't get a good transcript out of it.

8              So please --

9              MS. GIAMBRONE:   Understood, Your Honor.  I don't

10      think the noise is from my end. I'm sitting in a quiet office

11      at the moment.

12             MR. GLASS:  I'm in my office as well on my office

13      phone.  So --

14             THE COURT:  All right.

15             MR. GLASS:  Mr. Portelos is on the call, as you're

16      aware.  So he's listening in.

17             THE COURT:  All right.  I don't know where he is.

18      Maybe that's where the noise is coming from, but something is

19      -- okay.  All right.

20             Another thing.  My -- either the law clerks or the

21      Scanlon chamber's email address, which the law clerks check

22      for me on a regular basis, has been getting various letters

23      and submissions in this case from you all.

24             I don't want those things going to that address.

25      That address is for us if there's something that we need to

1       receive from a party, such as an ex parte settlement position,

2       or something like that.   It is not the equivalent of ECF.   It

3       is not, unless you have particular permission to use it, a

4       submission to the court.

5              So to the extent there has been anything submitted

6       that you think needs to be part of the record, that you want

7       me to consider to be part of the record, you need to file it

8       on ECF.

9              Make sure the other side has it, because that email

10      address is not the equivalent of ECF.  It's only if I say I

11      need something and I ask you to send it to that address does

12      that address constitute submitting whatever it is to the

13      court.

14             So some things were sent there.  Some things have

15      been filed that were sent there.   It seems like other things

16      that were sent there have not been filed.  If they were not

17      filed on ECF and they're not something I asked for, and I

18      didn't ask for anything related to this back and forth, then

19      it's not in the record.

20             All right. I have this -- some various letters, but

21      let's talk about the discovery issues for which these other

22      lawyers are here, and then I guess the other issue is the

23      proposed motion to amend.

24             So you're supposed to be moving along with discovery

25      and it seems like you have hit some road bumps, which are

1    seemingly described in some of these various submissions,

2    again, which are not all filed on ECF.

3            The ones I have right now, just so we're clear, I

4    have the October 7th document from the City. It's a letter

5    filed at 57.  The October 6th letter that was filed at 58.

6    That's from the City.  Hold on a second.

7            (Pause.)

8            THE COURT:  And let me just tell you, this call has

9    to finish at 4 o'clock, if it doesn't finish sooner.

10           All right.  Document 59, which came from the

11   plaintiff's counsel.  Document 60, which seems to have been

12   filed.  It's marked as ex parte.  I don't know what this is

13   supposed to be.  It's something, October 14th.  There's 61,

14   which is an attachment, or something. It's an email, I guess.

15   It doesn't look like it was filed ex parte.  All right.

16           And we had our last conference where we went over

17   several of the various discovery issues.  So let's see.

18           You were supposed to be putting in a joint letter on

19   October 7th. I'm not sure if that's what this one is from the

20   City.  Well, that says 57.  Is that what was the equivalent

21   of that?

22           MS. GIAMBRONE:   Well, yes.  Plaintiff's counsel in

23   his motion had identified discovery issues which I then

24   responded and also updated the court, you know, on what I

25   think is an accurate accounting of where we are on discovery.

7

1          THE COURT:  All right.  Just to be clear, is there

2     no joint letter, because I don't see one that seems to be

3     joint.

4          MS. GIAMBRONE:  No, it's not technically joint, but

5     I told counsel I was proceeding in that manner and he didn't

6     ask me to add anything.

7          MR. GLASS:  That's correct.

8          My letter of September 19th was a motion for relief

9     to amend the complaint, or supplement the complaint, and it

10    also included various discovery issues, and Ms. Giambrone

11    represented that she would just respond to the discovery

12    issues in that September 19th letter as our joint letter, so

13    she did that on October 7th, I -- or 6th or 7th, and that's

14    what that -- her response.

15         THE COURT:  All right.  Well, I'll point out that

16    the 9th --

17         MR. GLASS:  We have made a lot of progress on

18    discovery, so some of these issues are kind of moot, I think.

19         THE COURT:  All right. Let's talk about them.  What

20    from the plaintiff's perspective are the outstanding discovery

21    issues at this point?

22         MR. GLASS:  Well, really, we just need to finish Ms.

23    Hill's deposition.  We got a lot of emails last week from the

24    City and we have to go through them and we had agreed to do

25    her deposition on October 23rd.  And Mr. Portelos has already

1    been deposed more than seven hours, but we've agreed to let

2    Ms. Giambrone a few more hours with Mr. Portelos.  So that's

3    going to be scheduled on the 22nd in the afternoon.

4              There are some follow up issues that we don't have

5    in writing right now, but I'd just ask Mr. Portelos to see if

6    there's any other discovery, written discovery issues and he

7    just -- he emailed me just things, for example, like we don't

8    have the Catherine Rodi email that we had requested.  There

9    was nothing further furnished.

10             And a few of the investigations that were referred

11   to the Office of General Counsel, we believe we don't have all

12   the documents that concluded those investigations.  But I

13   think for the most part we have most of what we're -- we don't

14   think there's a lot more.

15             I mean, I can do a quick follow up letter just to

16   Ms. Giambrone indicating what we think is outstanding, but

17   it's not a lot.  So from our perspective, I mean, we are

18   moving for closure.

19             The only issue would be if the supplemental

20   complaint is going to be granted, that it's going to

21   precipitate more discovery because it's a slightly different

22   issue regarding the rest and we -- you know, that would

23   involve some additional fact finding as to why he was arrested

24   and the players involved in that.

25             THE COURT:  All right.  So are you asking for help

1    with any of the discovery issues at this point?

2           MR. GLASS:  I think in all fairness it's probably

3    best if I sort of put them in a letter to Ms. Giambrone or an

4    email just to tell her what we believe is outstanding at this

5    point.

6           I mean, we have raised some of these issues before.

7    For example, if she knows the status of Catherine Rodi emails.

8    You know, we didn't get any of those and we've discussed it at

9    a previous conference, so I'm not sure why, if they're

10   representing there are none relating to Mr. Portelos or

11   whether that search is complete. Some of the Office of General

12   Counsel referred investigations.  You know, they just sort of

13   peter out and having reviewed the files and we really don't

14   have a conclusion to some of those that Mr. Portelos had filed

15   against various people.  And so we were trying to find out

16   what the conclusion of those investigations were.

17          There's an issue of a video of Joanna Geary that I

18   think Ms. Giambrone might have represented we can review in

19   her office. We're not really sure why that would be necessary

20   if it's under the confidentiality order.  If you could just

21   provide us a copy.

22          But again, they're fairly minor issues so I think we

23   can try to work those out.

24          MS. GIAMBRONE:  Well, Your Honor, while we have the

25   court's assistance, I don't really have much confidence that

1    we can work it out and so I am asking for the court's

2    assistance.

3             In terms of these investigations with (inaudible)

4    counsel, I think this came up last time and counsel was

5    supposed to target what exactly he was referencing.

6             And to the extent the general counsel did an

7    investigation, that would amount to attorney work product and

8    I reiterate, as I have throughout the last several discovery

9    conferences, I don't believe that these materials are in any

10   way, shape or form relevant to the claims that are in this

11   case.

12            MR. GLASS:  Well, we were trying track down the

13   results of certain of investigations and during the

14   depositions it became apparent with Ms. Claudio and Mr. Gordon

15   that they weren't even aware that they were under

16   investigation, that Mr. Portelos had filed against them and we

17   were trying to find out what happened to those investigations

18   and why they were not made aware of those.

19            You know, the problem with this case is that they

20   plug everything with privilege and we have to trust the City

21   that it's legitimately privileged because we don't know what

22   they're disclosing and what they're not disclosing.

23            But just because they take an SCI investigation and

24   refer it to the Office of General Counsel and then bury it,

25   it's not really telling us anything about what happened, did

1    they actually do an investigation.

2            And so to just say everything is privileged is part

3    of the problem we have in this case because the City could

4    have six attorneys on the case and one person is not even a

5    defendant and they claim it's privileged.  And they don't talk

6    about -- a lot of times they don't even talk about legal

7    matters.  They talk about personal opinion about Mr. Portelos.

8            So the problem we're struggling with in this case is

9    we have to rely on the City's representations of what they

10   assume to be privileged.

11           They're not providing any privilege logs or anything

12   and you're not getting a chance to review it and some of these

13   emails that have come about, which precipitated this phone

14   call, reveal very probative things that we think would be

15   useful in litigation in proving intent in this case and we

16   were just fortunate to get them because they were provided to

17   us, I think the City is claiming inadvertently, but -- so I

18   don't know.

19           So the question that really needs to be addressed is

20   is anything privileged that any attorney in the City -- you

21   know, the City has corporation counsel, they have OGC people.

22   They have in-house counsel. And when the principal contacts

23   these people they claim the whole thing is privileged if one

24   attorney touches it.

25           And sometimes there are multiple non-attorneys on

1    the email and they still seem to claim privilege.  So if

2    there's more than one non-attorney on the email, I don't think

3    it's privileged anymore, but they seem to claim it is.  So

4    this is an issue we're having.

5            And as I said, we have received a lot of emails from

6    the City, so I'm not saying there's a lot left, but some of

7    these are very probative to the true intent of how they were

8    training Mr. Portelos, why they reassigned him and I think we

9    think they're truly relevant.

10            MS. GIAMBRONE:  Well, Your Honor, my statement was

11   what is the relevance of an investigation forwarded to the

12   general counsel?

13            Counsel responded that the relevance was that Mr.

14   Gordon and Ms. Claudio did know they had investigations

15   against them.

16            Well, if they are the decision makers who are

17   supposedly retaliated for First Amendment speech, the fact

18   that they don't know is not -- I mean, the fact -- it's not

19   relevant.

20            If he seems to be asserting they didn't know, then

21   there is no relevance.

22            MR. GLASS:  Well, I think we could argue that

23   perhaps the fact that they realize they have no consequence to

24   whatever they do could have some relevance to how this -- why

25   the City took further --

1           THE COURT:  No, no.  That doesn't --

2           MR. GLASS:  I think there is some relevance. I could

3    argue to that point.

4           THE COURT:  Well, hang on.  Two things.

5           One, to the extent this is a privilege dispute,

6    there's a process for doing it.  If the City needs to provide

7    -- if there's documents you're withholding on grounds of

8    privilege, you should provide a privilege log. Plaintiff's

9    counsel, you should review it.

10          If you think there's grounds to doubt the privilege

11   is appropriate based on information provided and what you

12   know, then you should make a motion.  I mean, you should ask

13   them, obviously, to produce it and then we'll resolve the

14   privilege dispute.

15          It's impossible to make these privilege decisions

16   without having very particular information about what

17   documents you're talking about, who saw it, when they saw it

18   and what the document was.  And I don't have that information.

19          MR. GLASS:  Neither does plaintiff.

20          MS. GIAMBRONE:   Well, I don't -- if plaintiff made

21   the complaint, I've asked for more details, because I'm

22   unaware of what these supposed investigations are.

23          THE COURT:  All right.  So hang on.  One is the

24   privilege point.

25          I guess it sounds like the City, you're making a

1     relevance argument before the privilege argument?  Is that

2     what you're saying?

3              MS. GIAMBRONE:   Your Honor, I don't know what these

4     documents are and I think at the last discovery conference

5     plaintiff was supposed to supplement his request because the

6     letter to the court was so vague and over broad about all

7     investigation by the general counsel.

8              And plaintiff was supposed to contact me and give me

9     more clarity as to what it was he was asking for, which he

10    never did.  He simply wrote a letter to the court about other

11    issues.

12             So I still don't know what these investigations are

13    and I'm at a loss of how to respond in light of that.

14             MR. GLASS:  From our position, that's not true

15    because we have specific case numbers.  We have a list of

16    every investigation that Mr. Portelos initiated and you know

17    which ones they are.

18             We can give you the numbers again if you need them,

19    but we'll give you the specific case investigations.   He

20    would have given a list of every investigation and case number

21    that he initiated and we're trying to find the outcomes of

22    those.

23             So if you want the case numbers, you know, we can

24    give you the case numbers again of the ones that we don't know

25    what happened.  There are several, and you're just saying they

1    were referred to the OGC.

2           So we're trying to find out, you know, so what did

3    the OGC do with it?  Did they just say -- just let it go.

4    They didn't further pursue it.  It just gets buried and that's

5    the issue here.

6           And if you need specific case numbers, we're happy

7    to provide that.  We have that.  We know which ones we're

8    looking for and you know too, because there was 20

9    investigations he launched and you gave us -- you did give us

10   the results of many of them, but the ones that were referred

11   for some unknown reason from SCI or OSI to OGC and just get

12   lost is what we're curious about and why that was happening?

13          Why is the ones that initiated against defendant

14   Claudio or Andrew Gordon just referred to OGC and not further

15   investigated?  And that's what we're trying to find out.

16          And that will be very relevant to our argument at

17   trial, or later in this case.

18          MS. GIAMBRONE:   Which then leads to my next point,

19   with this theory that has been advanced in all of these

20   discovery conferences about this policy of burying Mr.

21   Portelos' allegation is not a viable claim.  It's nowhere in

22   the complaint.  There is no *Monel* claim here.

23          Plaintiff has not advanced this theory except in

24   these discovery conferences and it's not part of the case.

25          MR. GLASS:  We respectfully disagree.  It was

1    discussed at one of the earlier settlement conferences.

2            On the transcript I think we quoted some of the

3    language that Judge Scanlon had mentioned that there might be

4    some relevance to and that's why I think it was ordered in the

5    first place.

6            And to say now it has no relevance after it's been

7    ordered and now to take the position that it has no relevance,

8    I mean, why was it ordered in the first place?  It was ordered

9    because it was potentially relevant.

10           And if you recall, Your Honor, you did order them to

11   provide the outcomes of the investigations that he launched

12   and now to say it's not relevant to the case just seems to be

13   sort of a cop out, because they already waived that argument

14   anyway because they provided 18 of the 22.  We're trying to

15   find out what happened to the other four.

16           MS. GIAMBRONE:   No, what the --

17           MR. GLASS:  To say now it's not relevant, why were

18   we doing this the last three months, if it's not relevant now.

19           I mean, obviously, there was some relevance to it.

20   It was articulated at some earlier conferences and it's our

21   position that the fact that some of these investigations are

22   referred to OGC against high level players is relevant to

23   whether he was retaliated against.  The DOE is a defendant and

24   to say that what OGC was doing with these things may have some

25   relevance to how they treated Mr. Portelos.

1          And, in fact, the emails that were -- some of the

2     allegedly privileged emails do seem to indicate that there was

3     a lot of coordination among legal staff and the administration

4     in trying to bring Mr. Portelos down, and some of that is

5     revealed in the emails that have been disclosed.  And this

6     would go along that.

7          So the problem we have, Your Honor, is we can't --

8     we have to rely on Ms. Giambrone's representation.  We don't

9     have a privilege log.  You know, all we get is what we get

10    from the City and without any privilege lot we can't even

11    question whether these are legitimately privileged or not

12    because we don't know.

13         We don't know who the players were.  We don't know

14    who was emailed between and unless the court can do an in-

15    camera inspection, there's no real way for us to even respond

16    to her.

17              THE COURT:  All right.  Hang on.

18              What are we looking for here?  What is it?  Is it

19    four -- is it four investigations and you want to know --

20              MR. GLASS:  For example, let me give me a very --

21              THE COURT:  -- is it --

22              MR. GLASS:  Yes.

23              For example, we have a case number that Mr. Portelos

24    launched an investigation against I believe it was either the

25    superintendent or Andrew Gordon, case no. 2012-4638 R-OGC --

```
1              MS. GIAMBRONE:   Well, that's --

2              MR. GLASS:  -- SCI no. 3708 --

3              MS. GIAMBRONE:   It sounds -- 2012 --

4              MR. GLASS:  For example, case no. 2012-4638 R-OGC

5   SCI no. 3708.  All we know about that investigation is that

6   Mr. Portelos launched an investigation against -- I'm not sure

7   if that concerns -- he'll tell me if that concerns perhaps

8   Claudio.  That was Gordon.

9              Okay.  So what happened was he filed an

10  investigation against Andrew Gordon to SCI.

11             SCI appears to have deferred that investigation to

12  OGC and we're trying to find out the results of what OGC did

13  with it.

14             Now other investigations they kept, and they kept

15  one against Linda Hill, and it was ultimately substantiated,

16  you know, but -- or OSI kept one.  But this one we don't know

17  what happened.  It seems like it was referred to OGC and now

18  they're claiming privilege by not giving us the final outcome

19  of it.

20             MS. GIAMBRONE:   I have the claim (inaudible).

21             MR. GLASS:  All right.  Well, that's what --

22             MS. GIAMBRONE:   I actually -- I'm sorry. I have to

23  respond.  Counsel just goes off on tangents.

24             First of all, what the court previously ordered was

25  the OSI and SCI investigations, which we have turned over.
```

1            Secondly, I have not yet claimed privilege because I

2      don't have -- I haven't seen these investigations.  I don't

3      know what the investigations are.

4            But as a (inaudible) matter based upon the argument

5      that plaintiff's counsel advances on this call, it doesn't

6      seem at all relevant.  But I haven't seen them so I'm not

7      submitting a specific argument to the court.

8            THE COURT:  All right.  Let me ask you how --

9            MR. GLASS:  Well --

10           THE COURT:  Hang on.  Let me ask a couple of

11     questions.

12           First of all, what -- how many files or

13     investigations are you still looking for the outcome from?

14           MR. GLASS:  I believe it's just three cases.

15           THE COURT:  Do you have the numbers of those cases?

16           MR. GLASS:  Yes.

17           THE COURT:  All right.  So you should provide that

18     to defendant's counsel.

19           Defendant's counsel, you should see what the history

20     of those cases are and then decide if there's documents to

21     turn over or whatever -- just get them and figure out what

22     they are.

23           Now to go back to this question about the relevance

24     argument that was being made here. I agree with defense

25     counsel. I don't quite understand it.

1          If they say they didn't know, are you -- the people

2     you deposed, you're connecting these investigations to them.

3     What's the issue?

4          You're saying they should have known, they could

5     have known.  You think this will show they're lying?  What is

6     it that you're saying that is the connection between these

7     three investigations and the testimony that you were reporting

8     on earlier?

9          MR. GLASS:  Well, first of all, we're not really

10    sure whether the documents themselves may reveal that they

11    were contacted about the investigations. They claim in their

12    deposition that they didn't know about them.

13          Now if there's a report from the -- let's say SCI

14    has an allegation against Andrew Gordon, they might have in

15    their files, in their notes, that Andrew Gordon was contacted

16    and perhaps Mr. Gordon just didn't remember that he was

17    contacted about that.  And then we wanted to know what the

18    outcome was.

19          And to the extent that he launched investigations

20    against Gordon and Claudio, who are the very decision makers

21    that reassigned him, coordinated bringing 3028 charges up

22    against him, I mean, these are the actors themselves who, you

23    know, took the retaliatory actions against Mr. Portelos.

24          And so the fact that they knew that they were

25    subject to an investigation and the City investigative offices

1    don't really treat those very seriously, I think that would be

2    relevant to an argument of retaliation and --

3            THE COURT:  See, I'm missing you on the last step.

4            How -- I understand you had the broad argument,

5    which I have given you latitude on, to say that by compare and

6    contrast between how some particular cases are treated versus

7    how your client's complaints are treated, you might be able to

8    show as to him, not a *Monell*, but as to him some kind of

9    improper practice.

10           But what does it have to do --

11           MS. GIAMBRONE:  You --

12           THE COURT:  Hang on.  What does it got to do with

13   these individuals?  I don't understand when you're saying that

14   -- I don't know what it is.  They didn't know and they should

15   have known, or they did  -- you say they didn't know, but they

16   did know.  Or something else.  The last piece of your theory I

17   don't follow.

18           MR. GLASS:  Well, we don't know -- first of all, it

19   might disclose an issue of credibility if we find out that the

20   SCI or OSI is reporting that they did know.

21           But I think it also may relevant to their motive as

22   to how they were --

23           THE COURT:  How do they have a motive if they don't

24   know about it?  That's what I don't understand.  Who has a

25   motive?  These witnesses or somebody else?

1          If they don't know about it, how can they be taking

2     an action based on it?

3          MR. GLASS:  We don't know if they -- I mean, they're

4     representing they didn't know, but I think the report should

5     show otherwise, and there's no reason why they didn't know

6     because they were filed by Mr. Portelos and there's no reason

7     why they shouldn't be alerted.

8          And the fact that they didn't know would also be

9     sort of probative to the issue of why they didn't know.  If he

10    filed a complaint against a subject, what was the reason that

11    the DOE decided that they would not even just tell the person

12    who had a complaint against them, to even get their side of

13    it.

14          So can I give you -- can I articulate a perfect

15    theory in the context of this whole case on -- you're asking

16    me to give you a perfect theory as to how it's relevant.

17    There's a lot of potential relevance here because why did the

18    City not alert the people that they're under investigation and

19    the fact that they're alerted seems to give them umbrage to do

20    whatever they want.  And --

21          THE COURT:  All right. All right.

22          MR. GLASS:  And had they been alerted --

23    investigated properly, I think their actions might have been

24    different.  They might have been more careful.

25          THE COURT:  All right.  That last piece makes zero

1   sense to me.

2           But for the -- going back to the arguments that have

3   been made in the past that by compare and contrast you might

4   have information about one or more actors not treating your

5   client as he should have been treated, so there's some sort of

6   disparate treatment type claim, which I understand defendants

7   are saying somehow needs to have been plead clearly on the

8   complaint and it wasn't, okay.  Let's finish this --

9           MS. GIAMBRONE:   But Your Honor --

10          THE COURT:  Hang on.  No.  Let's just finish this

11  discovery.  You provided the information.  Find out what

12  happened to those three investigations. Look at the files.

13  Compare it to what you've already turned over.

14          If you think you have an objection for turning it

15  over, let me know.

16          MS. GIAMBRONE:   Your Honor, I just want to respond

17  briefly.

18          The actors (inaudible) defendants -- the people who

19  have supposedly retaliated against plaintiffs are not the ones

20  who were involved in the investigation.  So --

21          THE COURT:  But I thought you didn't --

22          MR. GLASS:  Well, let --

23          THE COURT:  Hang on.  I thought you didn't know

24  that. I thought you hadn't seen these files so you don't

25  actually know what's involved.

24

1        MS. GIAMBRONE:   No, I'm saying they were not the

2    investigatory bodies.

3        THE COURT:  No, I understand that.

4        MS. GIAMBRONE:   So whether the investigatory body

5    treated Portelos differently than others, I'm just reiterating

6    is --

7        THE COURT:  I understand.  All right.

8        MS. GIAMBRONE:   So I just want to make a point.

9        THE COURT:  I understand your argument.   Just get

10   the documents.  See if --

11       MS. GIAMBRONE:   Okay.  Very good.

12       THE COURT:  But I am going to repeat what I have

13   said before and this is really directed at plaintiff.

14       You have -- we're wrapping up discovery.  There's

15   going to be motion practice. I understand you're making this

16   comment that you can't give me a perfect theory.

17       Now is the time for you to figure out what your

18   theory is, because you have had broad discovery in this case

19   to examine your client's interactions with his employer.  The

20   City has done a lot of work. They've given a lot of documents.

21       This is going to wrap up and if there is no workable

22   theory, then there's a good chance this case will be

23   dismissed, or you will lose on summary judgment because you

24   have every -- almost everything that you're going to work

25   with.

1          And so -- I mean, this has come up --

2          MR. GLASS:  I certainly appreciate that.

3          THE COURT:  This has come up many times that you

4     said I don't know, I don't know, I don't know.

5          But as we come to the end, if there's nothing that

6     makes sense that is something that's legally viable, this is

7     going to be a problem for your client.

8          And I don't know -- I haven't looked at these

9     thousands of pages. I'm telling you you keep saying to me --

10    and I don't want people wasting time on a summary judgment

11    motion that's going to be -- not make a lot of sense to the

12    district judge who's going to have to deal with this.

13         You need to -- everyone needs to figure out -- and I

14    understand this is a lot of work because there's an awful lot

15    of paper in this case.  But now is the time for this to

16    happen.

17         All right.  That's the issue with the files.  What

18    else is there?

19         MR. GLASS:  Your Honor, if you want me to articulate

20    something --

21         THE COURT:  No, I don't --

22         MR. GLASS:  -- I thought of --

23         THE COURT:  I don't.

24         MR. GLASS:  Okay.

25         THE COURT:  I don't want to know.  What you need is

1   -- because the defendants deserve to know what it is that you

2   think that is going on here. I mean, they're going to be

3   responding -- I mean, look.  We'll deal with this.

4            There will be the -- assuming there's going to be a

5   summary judgment motion, you'll do your three page letters so

6   that people are not, you know, making a summary judgment

7   motion blind.

8            But I just think that figuring out what is going on

9   here, what either did or didn't happen, that was or wasn't

10  correct in terms of any of your clients' various rights, now's

11  the time to do the work that's involved, because over and over

12  again there's an incomplete theory;  something that doesn't

13  quite work and you have had an awful lot of leeway.

14           So what else?  The attorney --

15           MS. GIAMBRONE:   There --

16           THE COURT:  Hang on.  Hang on.

17           From the plaintiff, what else is there or what else,

18  the defendant, do you think is not going to be something you

19  can work out?

20           MS. GIAMBRONE:   Well, Your Honor, there's the video

21  which counsel mentioned he didn't know why we couldn't just

22  turn it over.

23           As I mentioned in my letter it has the images of

24  minors, which we are not at liberty to turn over pursuant to

25  FERPA.

27

1          So I said that we can make a time and meet at my

2     office and watch the video and if there is a specific portion

3     that he would like a copy of, I then will have to go through

4     the process of trying to get those -- the faces blurred out,

5     or something to that effect.

6          MR. GLASS:  Well, that's subject to the

7     confidentiality order, so our position -- I mean, we would see

8     what's the problem because we're not going to disclose it to

9     anyone.  We're just going to look at it and we're not going to

10     use it because we're subject to the confidentiality order.  So

11     I don't really see what the extra protection they're clothing

12     this with, but I don't have a problem with reviewing it there

13     and then I guess we can try to work it out from there if we

14     really have a need for the video.

15          But honestly, I don't see any real protection that

16     they have to be concerned about.

17          MS. GIAMBRONE:   Well, the paper documents, the

18     names of minors were redacted --

19          THE COURT:  Right.

20          MS. GIAMBRONE:   -- because we -- the DOE would be

21     in violation of federal law if we turned it over.  And that's

22     the basis of my saying that (inaudible) first at my office.

23          THE COURT:  All right.  Look, there's no -- you

24     don't even know if this thing has anything to do with

25     anything.  So go look at it.  See if it's something you need.

1    See if you can work out some way to have a copy of it.

2         The confidentiality order only covers discovery.  It

3    doesn't deal with what is going to happen at trial, and at

4    least the last time we talked about this was a video that was

5    somehow going to prove a negative.  You know, that's the last

6    thing we talked about.  So go find out if it actually does

7    that and then go from there.

8         All right.  What else?

9         MR. GLASS:  Just one other issue we have with the

10   Catherine Rodi emails.  We had brought it up previously. I'm

11   not sure what the City's position is; if they've exhausted

12   their search or whether -- because at first there was a

13   representation that we had the Andrew Gordon emails and then a

14   lot more were uncovered.

15        So we'd like to know whether there's any other

16   Catherine Rodi emails concerning Mr. Portelos, if that search

17   is completed or are they still searching.

18        MS. GIAMBRONE:   I did rerun the search and I think

19   I came up with one or two more documents.  I thought I had

20   turned it over, but if I didn't do that, I'll do it within the

21   next 24 hours.

22        THE COURT:  Okay.

23        MR. GLASS:  Okay.

24        THE COURT:  What else?

25        MS. GIAMBRONE:   And we'll look into it further just

```
 1    to triple check, but certainly he'll have a response on that

 2    before the close of discovery.

 3              MR. GLASS:  Yes, we don't have any Catherine Rodi

 4    emails at all, so I just want to represent that.

 5              THE COURT:  All right.  What else?

 6              Anything else from the plaintiff?

 7              MR. GLASS:  The only question is how are the -- do

 8    you want to deal with that later, the proposed supplemental

 9    complaint or --

10              THE COURT:  I want to finish talking about discovery

11    first.  And I'm telling you I have a 4 o'clock, so let's keep

12    going here. What else?

13              MR. GLASS:  There was some reference at a deposition

14    to a signature page.  We'll follow up in writing with that and

15    see if that's an issue, but again, we'll follow up on -- it

16    was called a CAP signature page.  There was a representation

17    that the original was in Principal Hill's office and I guess

18    I'll be asking her about that and see what she says.

19              (Inaudible) Claudio represented that it was in

20    Principal  Hill's office and we'd like them to provide that to

21    us.

22              THE COURT:  All right.  How do you spell Rodi, just

23    for the record?

24              MS. GIAMBRONE:   R-O-D-I, or Rodi I think she might

25    actual --
```

```
 1            THE COURT:  All right.  Anything else from the
 2   plaintiff?
 3            MR. GLASS:  No, not concerning the present
 4   complaint.
 5            THE COURT:  All right.  From the defendant?
 6            MS. GIAMBRONE:   Yes, Your Honor.  We had apprised
 7   the court last -- on the 30th of September, we exchanged a
 8   number of emails, I think something like 700 pages associated
 9   with emails related to Andrew Gordon.
10            And evidently there were a handful of documents that
11   were attached as native attachments which inadvertently were
12   produced without appropriate redactions.
13            And the very next day we had a deposition and
14   (inaudible) --
15            THE COURT:  Hang on.  You're --
16            MS. GIAMBRONE:   -- where these
17            THE COURT:  You're fading out.  Come closer.
18            MS. GIAMBRONE:   I think it's something to do with
19   plaintiff's phone.
20            MR. GLASS:  I think he's on mute, so I don't know
21   why -- you shouldn't be hearing anything on his end.
22            MS. GIAMBRONE:   Or counsel.  Your phone has a lot
23   of breathing on it and it's just taking away from --
24            MR. GLASS:  I apologize. It's my office phone. I
25   can't do too much about Regus, if it's a bad connection.
```

1           MS. GIAMBRONE:   Do you want to put me on speaker on

2     your line perhaps, or -- am I on speaker?

3           MR. GLASS:  Let me try to put it on speaker and see

4     if that helps.

5           THE COURT:  All right.

6           MR. GLASS:  Can you hear me?

7           THE COURT:  Yes, we can hear you. Go ahead.

8           MS. GIAMBRONE:   Yes, Your Honor.

9           So there were about a handful of documents.  The

10    very next day Andrew Gordon was deposed and plaintiff marked

11    these emails as exhibits.

12          And once I realized that these had been

13    inadvertently produced, I immediately on the record requested

14    that they be returned. I said pursuant to federal law that I

15    was not waiving my privilege and I asked that they be

16    returned. Counsel did not agree and said that he would look

17    into it.

18          I followed up with a letter the next day asking for

19    him to let me know by the day after that, which he never did.

20          That following Monday we had a deposition.  He said

21    he was continuing to research the issue, which is when I then

22    wrote to the court, and I apologized doing it via email, just

23    based upon the fact that plaintiff had used the email.  I

24    decided to follow suit.

25          But regardless, Your Honor, where it stands now,

1    there are a handful of documents that were produced within the

2    700 pages.

3            We submit that we have taken reasonable measures to

4    protect the attorney/client privilege.  These documents are --

5    contain communications and attorney work product between DOE

6    attorneys and Principal Hill and others whereby legal theories

7    are discussed amongst them regarding Mr. Portelos.

8            We believe that they absolutely should be returned

9    or at the very least should be recovered by plaintiff's

10   counsel and not maintained within plaintiff's hands and which

11   I also then wrote an email to the court, which I did not

12   refile on ECF because we do have the conference now.

13           But Mr. Portelos did file a Tweet where he said --

14   and he actually posted it on the New York City School's

15   Twitter account where he said we are breaking at New York City

16   School's attorney/client privilege including accidentally

17   leaked info showing corruption.

18           Your Honor, we believe this is wholly inappropriate.

19   We are again requesting that these documents be returned

20   immediately and we submit that no attorney/client privilege

21   has been broken.

22           And I will gladly turn them over to the court for

23   further review because I don't believe there's any question

24   that these documents should be afforded privilege.

25           And obviously, just for plaintiff's benefit, this is

1    spelled out in Federal Rule 26(b)(5) and Federal Rule 502(b).

2                    THE COURT:  All right.  What's plaintiff's position?

3                    MR. GLASS:  Yes.  It was an issue I was not familiar

4    with.

5                    I did a little research on it and -- when it became

6    an issue after she was -- obviously, she provided these emails

7    and we did mark them. She's correct.  We did ask questions of

8    Mr. Gordon and Ms. Claudio about some of these and I think

9    it's already been out there.

10                   I wouldn't have a problem with the court reviewing

11   these emails as well. I think they really are just emails

12   between a number of DOE attorneys and HR people, or Linda Hill

13   or Claudio, and they're talking about what they're going to do

14   with Mr. Portelos.

15                   And it's very relevant to -- for example, why was he

16   reassigned in April?  A big part of our complaint is what was

17   the policy that caused him to be reassigned.  And these are

18   probative to the motives as to when -- at what point did they

19   reassign him.  Why did they need to reassign him?  What kind

20   of case they would have to build to reassign him?

21                   THE COURT:  All right.  So --

22                   MR. GLASS:  It's extremely probative to our theory

23   and these are the kinds of things that they're clothing with

24   privilege.  We would not have known about them had not defense

25   counsel disclosed them. Then we'd be in the dark about it.

34

1      They're extremely probative and I'm not even sure

2   they're covered by the privilege, honestly, and that's

3   something I'd want to research, too because --

4      THE COURT:  All right. So this is what we're going

5   to do. This is what we're doing.

6      You need to return all of those emails.  You need to

7   segregate the testimony that has anything to do with those

8   emails.

9      The way to deal with a privilege question is not

10  because somebody inadvertently reveals something amidst the

11  production in this case overall of thousands of pages.

12     Somebody's mistake is not a waiver of privilege.  As

13  has been reported, and you have not disagreed, or the

14  plaintiff's counsel, that they promptly identified the error

15  and asked for them back.

16     The appropriate way to do it is to return those

17  documents.  Plaintiff can't have a copy.  Plaintiff's counsel,

18  you cannot have a copy.  You have to give them back and to the

19  extent you asked questions and marked those as exhibits at the

20  deposition, they need to be, as I said, isolated, segregated

21  and you can't use that testimony.

22     If you're going to have this privilege dispute,

23  which so far it doesn't seem to have been resolved, to the

24  extent the plaintiff -- sorry -- the defendants are

25  withholding documents based on privilege, they need to produce

1    a privilege log.

2            These documents can be on that privilege log.  And

3    the plaintiff's counsel, you should review to see if there is

4    any issue as to the nature of the communications.

5            Just because it talked about something that you

6    think is probative, doesn't mean you can have access to it.

7            Now I don't know enough about these documents to

8    know was there somebody who was participating in the

9    conference that somehow destroys the privilege. I don't know.

10           But you're not going to get an advantage in this

11   case as to getting information because somebody made a mistake

12   and made a good faith effort to correct that mistake promptly.

13           So give them back.  You need to do that by Monday

14   morning, because that --

15           MS. GIAMBRONE:   Thank you, Your Honor.

16           THE COURT:  -- is not happening here.

17           Now --

18           MR. GLASS:  Your Honor, I mean, I don't know --

19           THE COURT:  No.  There is no -- this is not going to

20   be gamesmanship here.  And people -- everybody has been

21   working hard on this case.  Everyone has -- it seems to me

22   from everything I've heard there was a lot of effort put into

23   review.

24           And just because something slipped inadvertently by

25   doesn't mean that now you can operate from the position of

1   having access to confidential information.

2           If it turns out when you exchange the privilege log

3   and you try to resolve the issue and you can't resolved the

4   issue, that's not privileged and maybe on some of these

5   documents we'll have an in camera review. Then you can have

6   those documents.

7           But not because somebody made a mistake.  There's

8   things --

9           MR. GLASS:  Your Honor, with all due respect, these

10  are the types of documents that I'd want you to review for in-

11  camera and I'm not going -- unless and until I get that

12  privilege log, which I have to say is going to be a huge task

13  for the City, because there's going to be thousands of emails

14  that should be on this privilege log -- because I'm telling

15  you, there are probably 5,000 emails that the City is going to

16  claim are privileged that we have no access to.

17          So if we're going to do go down that route, it's

18  going to be very problematic for the City, because the City's

19  going to have to come back with a huge privilege log that

20  we're going to need to go through and then ask you to look at

21  these things.

22          And I actually think it would be a lot easier if you

23  look at these -- there's only about ten emails at issue.

24          THE COURT:  No.  I told you, no.

25          MR. GLASS:  If they have to be logged or not --

1          THE COURT:  No.  Mr. Glass --

2          MR. GLASS:  I mean, I think that would be a lot

3    easier for the City, actually.

4          THE COURT:  Mr. Glass, I already made the decision.

5    You're not re-arguing it.  If that's what the City wants to do

6    and propose something else, I'm giving them the option of

7    having the privilege log.

8          And if somehow --

9          MS. GIAMBRONE:  Well, Your Honor,

10         THE COURT:  -- and somehow you're doing it by

11   groupings, you know, you can figure out the right way to do

12   it.

13         MS. GIAMBRONE:  Well, Your Honor, I just want know

14   -- because I think the issue of privilege log came up

15   previously.

16         THE COURT:  Right.

17         MS. GIAMBRONE:  I've always redacted the documents

18   clearly so it was never a question of not turning over

19   documents.  In the OSI and SCI records, the only things that I

20   redacted were the bank records and the student information and

21   things of that nature.

22         With regards to emails, there have been thousands

23   upon thousands of documents that were previously turned over,

24   which has never been raised by plaintiff.

25         I'm happy to do a privilege log with regard to the

1    Andrew Gordon emails. I just want to be sure if we are going

2    back to everything, then I'm going to need a lot of time to do

3    that.

4            THE COURT:  Look, I don't need a -- there doesn't

5    need to be a privilege log that is every single document, if

6    there are groups and there's no dispute.

7            You've taken out -- and we already went through this

8    back when we were talking about the different kinds of files,

9    and different kinds of information.  I let financial

10   information be taken out.  I let children's names be taken

11   out.  I let -- you know, we've already covered all that.

12           This is not to go back and redo all this and have

13   somebody waste their time on administrative work that makes no

14   difference to the case.

15           And if there are categories of documents in which

16   the same information was redacted over and over and over

17   again, just have a grouping.

18           And if you don't disagree as to what happened, then

19   I don't need to know anything about this.  And there doesn't

20   need to be a privilege log.

21           If you have some kind of dispute about some issue,

22   for example, these Gordon documents, then handle it with a

23   privilege log.

24           But it's not going to be some half baked approach

25   and it's not going to be, to repeat myself, because there was

1    some kind of mistake that there's some kind of advantage in

2    this case.

3          So I don't have a sense of the scope of what it is -

4    - you know, I don't know why it's being said that there are

5    thousands of documents for which you need a privilege log.

6          You know, if it's --

7          MS. GIAMBRONE:  No, I just want to be sure that I'm

8    not in violation of any court order.

9          THE COURT:  No.

10         MS. GIAMBRONE:  I'm happy to do a privilege log

11   with regards to the Andrew Gordon documents that were turned

12   over on the 30th.  I mean, there were about 700 pages, but I

13   think I can do that in a relatively expeditious way.

14         So if that's amenable to the court and I think that

15   will satisfy Mr. Glass, because it covers the documents in

16   question --

17         THE COURT:  Look.  You should have a conversation

18   between yourselves, because it doesn't seem like you've talked

19   about what it is and now plaintiff is complaining about, you

20   know, this allegation was made early in today's conference

21   about some effort by the defendants to cloak everything in

22   some -- in privilege.  I don't know what you're talking about.

23         So it's --

24         MS. GIAMBRONE:  Well, neither do I.

25         THE COURT:  To the extent this is an issue, you

40

1      should have a discussion, you have -- in relation to

2      particular documents, or particular categories of documents,

3      and figure out the most expeditious way to raise any dispute

4      you have about privilege.

5              So you all need to talk. And to the extent --  I

6      mean, you're supposed to be finished discovery next Friday,

7      right?

8              MS. GIAMBRONE:  Yes.

9              THE COURT:  So you need to talk about this and let

10     me know by next Friday what, if any, privilege issue there is.

11             MS. GIAMBRONE:  Well, Your Honor, just -- what I

12     had previously proposed to counsel was to specify what

13     documents he had questions about and I actually attached it to

14     my discovery letter and he did and I responded specifically.

15     I said that redaction is information of a minor.  That

16     particular redaction is related to a banking record.

17             So I've tried, when he gives me enough information,

18     to respond in kind so when he gets on these discovery

19     conferences and makes these grand statements about cloaking

20     everything in privilege, I'm quite surprised.

21             THE COURT:  All right.  Well, you need to try to

22     narrow the issues.  So I want a letter by next Friday as to

23     what outstanding --

24             MR. GLASS:  (Inaudible).

25             THE COURT:  You're breaking up now.  Say it again.

1          MR. GLASS:  I mean, I think we're going to be at the

2     same place which I suggested in which it might just expedite

3     matters to review the emails at issue and decide if these

4     should be returned or not.

5          I mean, I think it would --

6          THE COURT:  I do not want to hear that you have

7     those documents after Monday morning.  You know, even if what

8     ends up happening is you send it to them and they end up

9     sending them back to you after we make this discovery

10    decision, you know --

11         MR. GLASS:  I mean, the question becomes -- they've

12    been questioned, there's been testimony -- extensive testimony

13    about some of the emails --

14         THE COURT:  I don't even know why that happened.

15    They told you they wanted the documents back as soon as they

16    realized it.

17         MR. GLASS:  No, they only did that after we asked

18    the question.

19         And I think if you look at the cases I cited --

20         MS. GIAMBRONE:  Yes.

21         MR. GLASS:  -- the article I cited, it says that --

22    you know, Your Honor, with all due respect, I think there's

23    law that the privelege is waived and it's very hard to recall

24    the privilege and their representation that they really took

25    prompt action is not really the law that -- is not the way the

1   law works, because the cases I saw that I researched and I put

2   that in the letter today, seems to suggest that she would not

3   win on this -- the recall of these documents, because it's not

4   to say that once the documents are used to say we made a

5   mistake, let's take them back.  That's not really what

6   happened.

7        I mean, what happened is the deponent was

8   embarrassed by information being asked and became very

9   uncomfortable and then she realized that her deponent was very

10  uncomfortable and said I've got to call these back.

11       MS. GIAMBRONE:   The record will speak for itself as

12  to what transpired.  They were marked and I immediately said

13  these should be returned, and the appropriate way is to return

14  them and then for us to (inaudible) them.

15       If what counsel wants is to return them to me, and

16  then I will specifically identify the privilege in each of

17  those documents, then perhaps that's another way to handle it.

18       But, you know, Your Honor, I do agree that we should

19  absolutely -- he should not maintain ownership of those

20  documents.

21       THE COURT:  Look. I don't know what -- I mean, based

22  on all the information that's been provided this is, as

23  defendant's counsel referred to, a matter that's addressed in

24  Rule 26.

25       And when there has been a situation -- it says,

43

1    "after being notified a party must promptly return, sequester

2    or destroy the specified information, any copies of it, must

3    not use or disclose the information until the claim is

4    resolved, must take reasonable steps to retrieve the

5    information that the parties disclosed it before being

6    notified and may promptly present the information to the court

7    under seal for a determination of the claim.

8            You need to do the first part of that, which is I do

9    not want the information to be out there.

10           And the safest way to do that is I'm ordering you,

11   to plaintiff's counsel, to return the documents to the City's

12   counsel.  The plaintiff cannot keep a copy of it.  Plaintiff's

13   counsel cannot keep a copy of it for now.

14           In order to make this a very orderly thing, you can

15   -- I'm giving the defendant's counsel the option of providing

16   a privilege log as to those documents.  This is aside and

17   apart from whatever dispute you have about privilege and all

18   these other documents that are redacted, which you seem to

19   have taken some steps to resolve.

20           But you have to return those documents.  This is not

21   an option.  And then you can litigate the issue in a more

22   orderly fashion.

23           And I want that deposition testimony, if you have

24   it, it needs to be separated from the rest of the deposition

25   and you cannot use it, because you should -- at least on

44

1    what's been presented, right now you should not have had that

2    information.  You shouldn't have used it once they told you it

3    was accidentally, whatever word was used, turned over.  They

4    claim the privilege.

5         So that is the ruling and I'm not changing it.

6    You're going to get a process by which you can litigate

7    whether or not that's information you're entitled to have.

8    But it's going to be based on the substance and not on this

9    mistake that seems to have been made and that was promptly

10   identified.

11        And I mean, I'm saying mistake.  There are plenty of

12   times when people decide to do a global production and then

13   you have the claw back option in order to expedite the

14   process. So I don't know what happened. Maybe it's even an

15   over statement to call it a mistake.

16        But it was brought to your attention and so

17   privilege is something that it's fair to take seriously. I'm

18   taking it seriously and I do not want this information used

19   until you resolve this issue properly.  So then --

20             MR. GLASS:  Well --

21             THE COURT:  -- to be clear.  I know Mr. Portelos is

22   on the line.  Whether he hears what I'm saying or you tell

23   him.  This information cannot be circulated based on its

24   having been obtained through the production of these

25   attachments to these emails.

1          If after we cover these bases it turns out yes,

2     there's not a privilege, fine.  You have it and it's whether

3     it comes under the confidentiality agreement or not.  Or

4     confidentiality agreement/order.

5          MR. GLASS:  Yes, we understand, Your Honor. I just

6     want to make clear from Ms. Giambrone's representation about

7     the Twitter.  Nothing was disclosed regarding the content of

8     those emails to anyone.

9          He did say -- he posted an article to whether a

10    waiver of privilege applies.  It was a generic article which I

11    asked him to take down immediately, which he did, but nothing

12    about these emails have been disclosed to anyone in this

13    litigation, you know, other than -- and he's not disclosing it

14    outside this litigation.

15         So there's nothing to violate any order. In fact, I

16    mean, he didn't post anything about this other than the fact

17    that we think we got some information that's very helpful to

18    our case.

19         But we didn't get any specifics of information. It

20    was just a generic article about the waiver of privilege

21    doctrine.

22         And also just from a practical standpoint, I

23    understand your ruling. I believe these were provided on a CD

24    and I mean, I'll -- there's really nothing physically to

25    return. I mean, if you're saying we can't use them, I

46

1   understand your ruling.  We're not going to use them.  We're

2   not going to use them in any fashion.

3           But I mean, I don't think there's anything

4   physically for us to do other than to agree that we won't use

5   these emails that she's designated.  I think you made your

6   final ruling.

7           Would that be sufficient, because I don't -- I can't

8   give her a disc back. I mean, there's really nothing to give

9   her at this point.  They've been asked.  We haven't --

10          MS. GIAMBRONE:  Well, they were printed --

11          MR. GLASS:  We'll just agree not to use it. I mean,

12  that's -- not to disclose it to anyone.

13          THE COURT:  Hang on. I'm just going to interrupt you

14  one second.

15          (Court addresses another matter.)

16          THE COURT:  Okay. I'm sorry.  Go ahead.

17          MR. GLASS:  I'm just saying from a --

18          THE COURT:  All right. So for the City --

19          MR. GLASS:  I don't think there's anything

20  physically for me to return because I think it was a CD and

21  we're not going to use it in any fashion. I mean, I understand

22  your ruling.  Until you make any further rulings about this,

23  we'll just --

24          MS. GIAMBRONE:  Well, the documents were printed

25  out and marked as exhibits.  So plaintiff certainly has those.

1           At one point they were actually turned over via

2     Dropbox and I believe that Mr. Portelos may have downloaded

3     them and the rule does require that they promptly return,

4     sequester or destroy.

5           So I would like an assurance that to the extent

6     there's an electronic copy saved on someone's computer, that

7     they are promptly destroyed.

8           THE COURT:  So do you know, Mr. Glass, what the

9     story is in terms of the production on your end?  Was it

10    downloaded?  Was it on a disk?

11          MR. GLASS:  I think they gave us 700 pages on a

12    Dropbox link.  They told me to download the link.  And so some

13    of these emails are on that link.

14          THE COURT:  All right.  But can you --

15          MR. GLASS:  I figure ten pages she wants to recall

16    so if she wants those pages recalled, just identify those

17    pages and --

18          MS. GIAMBRONE:   And, Your Honor, in my letter I

19    then dropped off another CD reproducing the production and

20    simply having those documents properly redacted.

21          So we can literally delete the first production

22    because I've reproduced it in an appropriate manner.

23          THE COURT:  All right.  So why don't you do that.

24          So Mr. Glass -- and if your client has a copy, he

25    needs to do the same.  Just destroy the old copy, delete it

1    off your computer.  Destroy those copies, or send them -- if

2    you have them marked as exhibits, mail them, or deliver them,

3    however you want to do it, to the City.  They can keep custody

4    of those documents and if and when you get that transcript,

5    isolate the copies of those -- the pages of the transcript

6    that are the discussion and send them to the City.

7              MR. GLASS:  But I would like to argue the point. I

8    mean, the emails themselves --

9              THE COURT:  I'm not -- no, no, no.

10             MR. GLASS:  The privilege --

11             THE COURT:  No.  No, no.  Mr. Glass, no.  We're

12   talking about the issues that have been raised and I have a

13   process by which you're going to resolve the issue.  And this

14   conference is already going well over. It's just that the

15   person happens to be late for the next case.

16             MR. GLASS:  No, I understand your waiver of

17   privilege argument.  My only question was if we were going to

18   assert, as you suggested, the privilege log and we disagree

19   with their privilege log, how do we come back to you on that

20   issue?

21             THE COURT:  You write me a letter, a joint letter,

22   by next Friday as to whatever issues are outstanding with

23   regard to privilege.

24             All right. I have the two letters that are the

25   proposed issues with regard to the -- I don't know --

49

1    amendment, supplemental complaint.  Do you want to put

2    anything else in writing?

3            MR. GLASS:  You're asking plaintiff's counsel or

4    defense?

5            THE COURT:  Both.

6            MS. GIAMBRONE:   I don't believe so. I think

7    everything else should be within this transcript, Your Honor.

8            Oh, there is the issue, of course, of the motion.

9            I guess Your Honor will just decide based upon the

10   letter --

11           THE COURT:  Well, that's what I'm asking.  Do you

12   want to put anything else in?

13           MS. GIAMBRONE:   No, no.

14           THE COURT:  Okay.  For the plaintiff? I have the

15   draft complaint and your letter. I assume that's the draft

16   complaint, the one that's attached.

17           MR. GLASS:  Yes.

18           THE COURT:  Do you want to put anything else in?

19           MR. GLASS:  I don't believe so.

20           THE COURT:  Okay.  So -- all right. Let me get your

21   letter next week and let's talk -- how is the 28th at 12

22   o'clock?

23           MS. GIAMBRONE:   I have an oral argument that

24   morning.  If there is an afternoon time that works for Your

25   Honor, that might be better.

50

1          THE COURT:  Okay. How about -- right now -- hang on

2     a second.  All right.  How about the Monday before, the 27th

3     at 2:30.

4          MS. GIAMBRONE:   That's fine.

5          MR. GLASS:  Is it okay to make it at 3 o'clock so

6     Mr. Portelos can listen in.  Is it going to be in person or

7     over the phone?

8          THE COURT:  On the phone.  That's fine.  Is that all

9     right?

10          MS. GIAMBRONE:   Yes.  Yes.

11          THE COURT:  All right. So let's do a telephone

12     conference --

13          MR. GLASS:  Let me just say one other issue. I know

14     you don't want to extend the case forever and, again, I don't

15     want to keep amending the complaint, or supplementing the

16     complaint, but I think you should be aware that Mr. Portelos

17     in September, the last couple of weeks, was written as

18     unsatisfactory on two evaluations in (inaudible) outside his

19     license area.

20          And the issue of -- the question would be would that

21     part of the ongoing retaliation, which we -- it's rather

22     obvious, but I don't know. I don't want to keep serving you

23     with supplemental complaints and I understand you have to

24     bring closure to the case as well, but I think I just need to

25     identify that and --

1          THE COURT:  All right.  Well, you all should talk

2     about it.  I don't really know where that's going to go.  Is

3     this something -- this is a 2012 case.  I don't know.  I don't

4     know.

5          I mean, on the one hand, maybe you have some sort of

6     retaliation theory.  On the other hand, not everything that

7     happens in his employment can be cast as part of this case.

8          So I think you need to explore it and you need to

9     have discussion with defendant's counsel about how, if at all,

10    it's relevant to this case.  I don't know who the players are

11    in this current employment, who's the supervisor, who wrote

12    him up.  What happened.

13         If there's a method for him to complain about that,

14    I mean, I assume there's some kind of -- well, I don't know if

15    it's right to assume, but some sort of grievance process.

16         MR. GLASS:  (Inaudible) you know, the UFT bargained

17    away the right to really challenge your ratings, so it's a

18    difficult process.

19         THE COURT:  Well, I don't know. You all should talk

20    about it before you put it forward here.

21         MS. GIAMBRONE:   I think we have pre-motion letters

22    due on the 30th.  Is that -- if we wanted an extension on

23    that, would that be directed to Your Honor or to --

24         THE COURT:  Yes.

25         MS. GIAMBRONE:   -- Judge Mauskopf.

52

1          THE COURT:  Let's -- I'm just looking at the

2     schedule. Which date are they on?

3          MS. GIAMBRONE:   I don't have the docket up, but

4     it's on the 30th.

5          THE COURT:  All right.  We'll push that out till say

6     the 21st of November.

7          MS. GIAMBRONE:   And the joint pretrial order is due

8     that day.

9          THE COURT:  All right. Let's push them both out, but

10    effectively we'll talk about it on the 27th.

11         MS. GIAMBRONE:   Okay.

12         THE COURT:  So 11/21.  Okay.  Okay.  All right. So

13    see if you can work out some of these or all, ideally, of

14    these privilege issues and let me know next week where you

15    stand.

16         MR. GLASS:  I'm sorry.  Can I just -- one more about

17    the returning of the documents.  Is it okay if we drop them

18    from Dropbox?  Would that be sufficient, or do you need

19    something physically back from me?

20         THE COURT:  If you have paper copies, either destroy

21    them or send them back.

22         But since you mentioned -- it seems to me that there

23    were deposition exhibits, rather than destroy them, send them

24    back to the City.  If there are electronic copies, delete them

25    and -- or delete the whole file, because the City's

53

1    representative provided you with a replacement.

2            And then just confirm to the City that that's what

3    you've done.  And it's clear to you and your client.

4            MR. GLASS:  All right.

5            THE COURT:  All right.  Anything else?

6            MS. GIAMBRONE:   Not from defendants, Your Honor.

7            THE COURT:  All right.  So we'll talk on the 27th

8    and see where you're all at, okay?

9            MS. GIAMBRONE:   Thank you.

10            THE COURT:  All right.  Thank you.  Take care.

11            MS. GIAMBRONE:   Bye. Have a good afternoon.

12        (Proceedings concluded at 4:19 p.m.)

13        (Proceedings concluded 4:13 p.m.)

14    I, CHRISTINE FIORE, court-approved transcriber and

15    certified electronic reporter and transcriber, certify that

16    the foregoing is a correct transcript from the official

17    electronic sound recording of the proceedings in the above-

18    entitled matter.

19

20    *Christine Fiore*

21    _____            November 17, 2014

22      Christine Fiore, CERT

23

24

25