UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


FRANCESCO PORTELOS,             *     Case No. 12-CV-3141(RRM)
                                *
              Plaintiffs,       *     Brooklyn, New York
                                *     October 30, 2014
       v.                       *
                                *
CITY OF NEW YORK, et al.,       *
                                *
              Defendants.       *
                                *
* * * * * * * * * * * * * * * *

        TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
             BEFORE THE HONORABLE VERA M. SCANLON
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          BRYAN D. GLASS, ESQ.
                            Glass Krakower, LLP
                            100 Church Street
                            New York, NY 10007


For the Defendants:         JESSICA GIAMBRONE, ESQ.
                            New York City Law Department
                            100 Church Street
                            New York, NY  10007




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1          (Proceedings commenced at 5:10 p.m.)

2          THE COURT:  (Delay in start of audio). -- 3141.  And

3     we have Mr. Glass for the plaintiff and Ms. Giambrone for the

4     defendants.  And this is --

5          MR. GLASS:  Mr. Portelos is on the line, too.

6          THE COURT:  Okay.  And this is a continuation of a

7     conference we started earlier this week and postponed so that

8     the plaintiff could look over some of the defendant's

9     production.  All right.

10          So have you talked about the issues that are in this

11     letter, which is the Rodi emails, some documents related to

12     Mr. Gordon, Ms. Hill, notes, and then a bigger question about

13     privilege claims?  Any discussion -- have you had discussion

14     about them at all?

15          MS. GIAMBRONE:  No, Your Honor.  Because the only

16     thing that counsel directly addressed with defendant was the

17     Rodi deposition, which I -- I asked him, you know, I didn't

18     see the relevance because she was not part of the reassignment

19     decision.  She came on after he was reassigned to the Queens

20     location, which is what he asserts is retaliatory, and I just

21     don't see how she is at all relevant to the proceedings here.

22     So -- and he never responded to that question.  So I don't

23     know --

24          THE COURT:  All right.

25          MS. GIAMBRONE:  -- what the Court wants to do.

1           THE COURT:  So what's the issue with -- what -- why

2   do you want to do the Rodi deposition?

3           MR. GLASS:  Well, we just received 800 pages of

4   email from Rodi, which, you know, after -- at the Court's

5   direction, we finally got.

6           And there -- we haven't gotten through the whole

7   production yet.  We've gone through about half of it.  But

8   there are some interesting emails about -- that are relevant

9   to the First Amendment complaint that has been filed.

10          I mean, she took over for Andrew Gordon, who we did

11  depose, and there were -- you know, this is an ongoing thing

12  that's been happening to Mr. Portelos.

13          So there's a lot of issues that came up during the

14  course of the -- you know, after he left.  He left, I believe,

15  in January, 2013.  And the complaint addresses allegations,

16  you know, well into 2014.

17          And so, you know, there -- there are emails, for

18  example, between the UFT president -- the UFT counsel and Rodi

19  about him being reassigned to a classroom at some point and

20  Rule 3028 charges.  She was in place when 3028 charges were

21  brought against him.

22          And there's a number of these emails that are

23  addressing issues in the complaint.  So, I wouldn't -- I would

24  just ask for a very limited deposition.  I don't think it

25  would be more than two hours, but it would be sort of the

4

1     nature of a lot of these policy making decisions that caused

2     Mr. Portelos the damages.

3            I mean, he is alleging he lost PDs, he lost per

4     session. It appears that human resources was making a lot of

5     those decisions, and when she took over, there was -- you

6     could talk about whether they would change some of their

7     policies.  Some of those emails reflect this is Andy's

8     decision.  This is Andy Gordon's decision.  Do we stick with

9     it?  I mean, we've seen emails like that in there.

10           So, we haven't gone through the whole thing, but if

11    I could just say it was, like, one or two questions, I would

12    just do it by interrogatory.  But it seems like it is a lot

13    broader than that.  So --

14           THE COURT:  All right.  So --

15           MR. GLASS:  -- again it would be in accordance with

16    the nature of Gordon's deposition to find out why he was

17    prevented from doing things that causes actual damages in this

18    case.

19           THE COURT:  All right.  So I'm confused now.  We've

20    got apples and oranges.  You have after the fact information

21    looking backwards saying do we stick with it?  That's one

22    thing.  And then you're also saying some things happened after

23    January, 2013 that she might have something to do with it.  Is

24    that what you're saying?

25           MR. GLASS:  Correct.  I mean, he got reassigned in

5

1    April, 2012.  The charges were brought against him in May,

2    2013.  She took over in January, 2013.  Mr. Gordon had left

3    the DOE, but it was the chief, you know, Andy, chief human

4    resources officer.

5              So, after he left there in 2013, you know, it fell

6    in her lap to make a lot of these, quote, "decisions" and some

7    of that is reflected in the emails that we are receiving, and

8    we'd like to ask questions about the email production for

9    clarification of some of those decisions being made because we

10   see emails --

11             MS. GIAMBRONE:  But --

12             MR. GLASS:  -- from the players without --

13             THE COURT:  I'm --

14             MR. GLASS:  -- and it is relevant to the allegations

15   in the First Amendment complaint because we allege -- when we

16   amended the complaint, they were -- the concern that time with

17   Ms. Rodi would be -- would have been charged.

18             THE COURT:  What decisions do you think she had

19   something to do with?

20             MR. GLASS:  There were a number of issues that came

21   up about -- well, his reassignment during the pendency of the

22   charges.  In fact, he eventually became a APR during the

23   course of the pendency of the charges where he was reassigned.

24   Could he -- could he conduct professional development -- could

25   he do per session work?  Could he attended SLT meetings during

1    the course of, you know, his reassignment?

2            There were issues about his union, being chapter

3    leader at the time.  What he could and couldn't do.  And then

4    some of the PD decisions affected actual damages, so we're

5    claiming that, you know, his inability to do PD is because,

6    you know, financial consequences on him.

7            MS. GIAMBRONE:  Your Honor, professional -- PD, I

8    believe, is professional development as counsel is using it

9    and Ms. Rodi simply said you cannot attend professional

10   development during business hours.  You cannot attend -- we're

11   not going to pay you to attend professional development and

12   you cannot attend DOE professional development programs while

13   you are reassigned.  You are free to do so, you know, at other

14   times.

15           So, and -- and certainly she had nothing to do with

16   the per session decision, because reassigned teachers cannot

17   engage in per session activity.  That's just a clear-cut rule.

18           She had no input on the SLT meetings and whether he

19   could attend those as a reassigned teacher.  That was

20   something that the General Counsel's Office or through the

21   Office of Labor Relations.

22           Additionally, the emails that I think counsel is

23   referring to is when she took over Andrew Gordon's role, she

24   asked the managers who had been in place at the time do you

25   know what the basis of Andrew's -- Andy's decision was?  I

7

1    agree with him.  I just want to know what the background of it

2    was.  She never once said that she would have decided

3    differently.

4              It is after the fact.  This is a fishing expedition.

5    Andrew Gordon was deposed for quite a number of hours and he

6    is the person that reassigned Mr. Portelos and then reassigned

7    him again -- openly reassigned him again out to Queens, which

8    is what he takes issue with.

9              So really, there is absolutely nothing relevant that

10   Ms. Rodi could engage that could provide to this case other

11   than Mr. Portelos trying to somehow, you know, continue to

12   search for the needle in the haystack that doesn't exist.

13             MR. GLASS:  That's what -- we would respectfully

14   disagree.  There -- you know, first of all, it's not -- she is

15   stating a rule that's not really a clear-cut rule regarding

16   reassigned teachers.  The question is when investigations are

17   pending, are they prevented from doing PD --

18             THE COURT:  You know --

19             MR. GLASS:  -- direct, which is --

20             MS. GIAMBRONE:  PD or per session, Counsel?

21             MR. GLASS:  -- direct from (inaudible).

22             THE COURT:  I can only --

23             MR. GLASS:  She's character -- she's characterizing

24   emails --

25             THE COURT:  -- hear one person at a time.

1          MR. GLASS:  -- so when she stated that they are not

2     relevant, I'm just saying they are absolutely relevant to the

3     decisions in the -- allegations in the complaint.  And --

4          THE COURT:  Yes.  But -- okay.  Hang on.  It is not

5     Rodi, is not the decision -- the policymaker; is she?

6          MS. GIAMBRONE:  No.

7          MR. GLASS:  Yes.  She is a policymaker --

8          THE COURT:  How --

9          MR. GLASS:  -- because --

10         THE COURT:  -- could she be a policymaker?

11         MR. GLASS:  -- after Gordon left.  Gordon was the

12    policymaker before.  Now she is the policymaker after that.

13         She had to make these calls in her emails back and

14    forth between high level people, saying what do we do in this

15    situation?  Do we stick to Andy's rule? Or what do we do in

16    this situation?  Something new is being developed --

17         MS. GIAMBRONE:  That's --

18         MR. GLASS:  -- SLT, what do we do?"  She had to --

19    she had to create these rules and these are the rules that

20    cause the actual damages.  So -- but to characterize it as

21    absolutely not relevant or a fishing expedition -- Andy Gordon

22    was relevant. So is she.  She is -- she is the chief HR

23    person.

24         So it would be a limited deposition in the nature of

25    what we did with Mr. Gordon, just ask about some of the

1    decisions that were made along the way.  Just strictly about

2    Mr. Portelos.  And we got through Mr. Gordon and this would be

3    the last deposition, you know.  So if the complaint is not

4    amended --

5            MS. GIAMBRONE:  Well, exactly.  Then we open the

6    door into another five depositions.

7            MR. GLASS:  That's what they're (inaudible).

8            MS. GIAMBRONE:  Your Honor, counsel -- counsel is

9    talking about PD, which is professional development, which is

10   akin to CLE, and then per session.  Per session is what he

11   found his economic damages upon.  The fact that when he was

12   reassigned, he could not participate in per session work.  And

13   that is the only economic claim that he can make in this case.

14           And that is not at all -- that was not up for the

15   discretionary decision of anyone.  Reassigned teachers cannot

16   engage in per session, and I don't think Mr. Glass can even

17   dispute that.

18           With regards to the PD, Ms. Rodi did not say he

19   could not do PD.  She simply said you can't do it during work

20   hours and you cannot attend DOE professional development

21   during work hours.  We're not going to pay you for that as a

22   reassigned teacher, but you're free to do so that are -- are

23   offered by other organizations or on your own time.

24           THE COURT:  So what --

25           MS. GIAMBRONE:  If you want to take your own day,

1    you're free to attend professional development in that manner.

2    Or presumably, you can do it over the summer when you're not

3    attending reassignment centers.

4            So, I continue to, you know, insist that this

5    deposition is not relevant and frankly discovery -- it is time

6    for discovery to conclude at this point.

7            MR. GLASS:  Well, the reason we're raising this now

8    is we've been asking for these Rodi emails and CDs in this

9    case.  But --

10           THE COURT:  All right.  Let me -- let me just --

11           MR. GLASS:  -- then, at the end -- at the end of the

12   period here.  I mean --

13           THE COURT:  Stop.

14           MR. GLASS:  -- this would not have been an issue now

15   had it prevent -- prevent -- given to us before we even

16   started depositions.  So, the reason we're asking now is

17   because we just got them after we came back to you three times

18   asking for you to order it.  And you did order it and we

19   finally got it.

20           Why weren't they -- in the beginning of the case we

21   should have had this two years ago.  So the reason this was

22   coming on -- why were you -- she's saying we're extending

23   discovery, we're trying to drag this out.  This is not

24   dragging this out at all.  For the first time, we got 800

25   emails two days ago and now we're going through it and they

1    are legitimate questions.

2              THE COURT:  All right.  Let's just -- okay.

3              MR. GLASS:  And --

4              THE COURT:  For -- a couple rules.  Stop

5    interrupting each other and stop talking over me.

6              And then it is not helpful to go back over the

7    history of this.  This has been an evolving theory in this

8    case and you have looked in different places for information.

9    You've had lots of access to the information.  So, I don't

10   need a rehash.  I already know what happened in this case.

11             Let me ask about the per session.  When you're

12   saying that the reassigned teachers can't do this -- this is a

13   question for defendant's counsel.  What's the source of that

14   rule that you're saying that the per session isn't available

15   to certain class of teachers?

16             MS. GIAMBRONE:  I don't have -- I don't have it in

17   front of me, but I don't think Mr. Glass will argue this

18   point.  It's a DOE rule.  I'll certainly get the basis of it,

19   you know, if Your Honor wishes to have it.

20             But per session is basically, you know, engaging in

21   after school -- like overtime. Overtime projects.  And

22   reassigned teachers, that's not available to them.

23             THE COURT:  Why?

24             MS. GIAMBRONE:   I don't know the progeny of the

25   rule, Your Honor.  I just know that that's just a blanket

1    rule.

2              MR. GLASS:  May I respond to -- it's -- I'm just

3    saying the emails actually show that there was no rule.  They

4    couldn't find it.  That was some of the emails we're asking --

5              MS. GIAMBRONE:  No.  That's --

6              MR. GLASS:  -- we're --

7              THE COURT:  Stop.

8              MR. GLASS:  -- we're going to need to get this rule

9    to prevent them from doing PD, which is paid for.  And why --

10   where did you get this per session?

11             The emails actually reflect -- the emails actually

12   that I want to ask about or have questions about -- one of the

13   emails actually asks, you know, she was saying to Andy

14   Gordon's, you know, to a subordinate where is this rule that

15   he can't do PD?  Because he is asking about it. Where do we

16   find it?  And they said I think Andy just made the call.

17             So, these are rules that they are making up along

18   the way and these are relevant decisions for this case.  To

19   say --

20             MS. GIAMBRONE:  Now --

21             MR. GLASS:  -- there's no such issue -- she can

22   research the rule.  She's not going to find a rule because

23   there was no such rule.

24             MS. GIAMBRONE:  Your Honor --

25             MR. GLASS:  They are creating policies on the fly.

1    That's what it -- and the emails reflect that.  That's what I

2    want -- that's why we would ask her about that.  That's

3    exactly --

4              MS. GIAMBRONE:  Your Honor --

5              MR. GLASS:  -- why we want to take her deposition.

6              MS. GIAMBRONE:  Your Honor --

7              THE COURT:  Yes.

8              MS. GIAMBRONE:  -- I'd ask -- I'd ask counsel to

9    listen to what I am saying.  PD is professional development.

10   Per session is the after school overtime project.

11             THE COURT:  Right.

12             MS. GIAMBRONE:  So they're two different things.

13   There are -- there are emails --

14             THE COURT:  Stop.  Look.  Stop interrupting her.  I

15   can't hear both of you at the same time.  Go ahead, Ms.

16   Giambrone.  Go ahead.

17             MS. GIAMBRONE:  I'm sorry, Mr. Glass.  I'm sorry.

18             This is new to me that PD is paid for over and above

19   the work -- I mean, the emails were about Mr. Portelos wanting

20   to attend a PD program during school hours and it was a DOE

21   professional development program.

22             And Ms. Rodi said no.  That's not available to you

23   as a reassigned teacher.  And that was founded upon something

24   that her predecessor had represented.  And yes, there are

25   emails where she asks the manager, hey, what was the basis of

1    Andy's rule on this point?  I agree with him.  I just don't

2    know what he was basing that rule upon.

3           But that's not an economic -- that's not -- that's

4    not the claim of economic damages that plaintiff has in his

5    complaint.  What he complains of is that he was not allowed to

6    engage in per session.  And --

7           MR. GLASS:  Mr. Portelos is texting me right now

8    saying that he has had professional development.  That it has

9    been paid for for years.  It lasted, you know, it was right

10   after the school day.  He was (inaudible) able to do that.

11   That was the issue.  These are a couple of hours that because

12   of his reassignment he was no longer able to do.  These are --

13   so I don't know what to tell you.

14           MS. GIAMBRONE:  Well, it's not in the complaint.

15           MR. GLASS:  Because you're not actually representing

16   the reality.  I mean, you might not know it.

17           MS. GIAMBRONE:  Well, it's not as --

18           MR. GLASS:  I'm not blaming you.  I'm just saying

19   you probably don't know how this works.  I can have Mr.

20   Portelos explain it, if you'd like.  He is on the phone, but

21   you --

22           MS. GIAMBRONE:  Well, I will look at his complaint

23   right now.  I don't think per session is listed and

24   professional development is listed anywhere in there.  But I

25   will look right now.

1          THE COURT:  Look, it doesn't matter.  The plaintiff

2     is allowed to conform the damages claim to the evidence.  Like

3     he did --

4          MS. GIAMBRONE:  And Your Honor, I deposed the

5     plaintiff and I asked him what all of his lost monetary --

6     economic damages were and he did not list a loss of -- of

7     professional development.

8          He said he was not allowed to engage in per session

9     and he said that he incurred fees associated with his travel

10    to Queens.  And I asked him point blank what are -- what is it

11    that you're claiming you lost monetarily?

12         THE COURT:  Okay.

13         MS. GIAMBRONE:  And he never once mentioned

14    professional development.

15         THE COURT:  But I don't understand about what you

16    were saying, Ms. Giambrone, is why -- what you say that Ms.

17    Rodi said.  She says I agree with Andy's rule, but I don't

18    know where it comes from.  How does she agree with him if she

19    doesn't know what it is about?  I don't understand --

20         MS. GIAMBRONE:  Agreed that reassigned teachers --

21         THE COURT:  -- what this comment is about.

22         MS. GIAMBRONE:  -- should not be allowed to go to

23    DOE professional development during school hours.

24         THE COURT:  Okay.  What -- what is -- see, okay.

25    Maybe there's some dollar value to PD, but what about per

1    session?  What does she have to say about that with regard to

2    him or --

3              MS. GIAMBRONE:  He doesn't have --

4              THE COURT:  -- more general?

5              MS. GIAMBRONE:  She -- he doesn't ask to engage in

6    per session.  There are no emails about him asking to engage

7    in per session because I think it is just an understood -- I

8    think it was very understood from the beginning that it is

9    just not available to reassigned teachers.

10             So she has no -- she -- that wasn't presented to

11   her.  She didn't engage in any alteration of the policy.  So

12   that's -- there's really nothing relevant there as far as she

13   is concerned.

14             THE COURT:  And I don't -- Mr. -- okay.  For --

15             Mr. Glass, what's the issue with per session and Ms.

16   Rodi?  Because your letter says you want to know if she

17   applied a different standard than her predecessor regarding

18   professional development, per session, other compensable

19   opportunities.

20             MR. GLASS:  Your Honor, there seems to be some

21   emails addressed -- I don't know if we're mixing per session,

22   PD, and she's trying to say that these are separate category.

23   There is some overlap between per session.

24             There's compensable hours after the school day that,

25   you know, could be summer school, it could be -- it could be

1      right after the school day.

2                 You know, per session implies that it is not during

3      a typical 8:00 to 2:00 day.  That it's after school.

4                 THE COURT:  And are you claiming that PD is --

5                 MR. GLASS:  So, I don't --

6                 THE COURT:  -- per session?

7                 MR. GLASS:  I think PD in some -- some of these PD

8      sessions are also encompassed within per session.  So, I don't

9      -- I don't know if we're really mixing -- I mean, she's trying

10     to characterize it as a separate thing.  I think there is an

11     overlap between what PD is part -- is a subset of per session

12     is my understanding.  And obviously being reassigned from a

13     school prevents him from doing that.

14                THE COURT:  Well, how is this -- I don't --  how is

15     this not just de minimis, then, if you are talking about a --

16     professional development classes, or whatever these things

17     are, sessions.  I mean, per session --

18                MR. GLASS:  This is a -- this is a --

19                THE COURT:  -- where you are the gym -- where you're

20     the coach, or the whatever, you know, the person who

21     supervises the regions, or whatever.  I don't know, whatever

22     people do in per session.  That adds up.  How does this -- I

23     don't understand.  Is she -- does she say anything about per

24     session that's not PD?

25                MS. GIAMBRONE:  No.

1          MR. GLASS:  Just a quick -- I only ask, you know, to

2     question the administrator as to why he was not allowed to do

3     professional development.  He was objecting to be reassigned

4     to Queens and why he couldn't do this after school.  That was

5     compensable.  That was taken away from him.

6          And they -- and basically they've contact -- they

7     basically sent the question up to Ms. Rodi at some point

8     obviously and she was trying to find out where Mr. Gordon had

9     made up this rule that he couldn't do it.

10          I mean, there's no real basis to say a reassigned

11     teacher can't -- can't do this work, especially if they are

12     falsely accused of something, which you've --

13          THE COURT:  Did you say --

14          MR. GLASS:  -- allege.

15          THE COURT:  -- workers and --

16          MR. GLASS:  And why should -- they don't need to

17     show what caused him to lose this money by potentially lodging

18     false investigations against him.  Then why should he lose?

19     No, this is Andy's rule.  Andy's rule is that we do this.

20          Now, Ms. Rodi has to make her own determination on

21     that.  So that's -- that's completely related relevant to the

22     damages that we're going to try to prove in this case is that,

23     you know, they -- they protected the false investigations and

24     he lost --

25          THE COURT:  Forget it.

1          MR. GLASS:  -- all this money --

2          THE COURT:  Forget it.

3          MR. GLASS:  -- as a result of that.

4          THE COURT:  Forget -- forget --

5          MR. GLASS:  (Inaudible.)

6          THE COURT:  -- forget it.  Wait.

7          MR. GLASS:  (Inaudible.)

8          THE COURT:  Stop.  Stop.  Stop.  Stop.  That is not

9     what is going on here.

10          This is a -- this is a very small inquiry about

11    damages based on these emails that some long -- you know, the

12    poor trajectory of his career because of this is not what we

13    are talking about with regard to -- hold on, one second.  Hang

14    on.  Just hold on folks --

15          (Pause.)

16          THE COURT:  Yes.  Thanks.  That's okay.  Okay.

17    However off-track loss of whatever hopes he had for his

18    career, that's not the issue with regard to these Rodi emails.

19    The question is what, if anything, do these emails have to do

20    with his alleged damages?

21          And so far, you say that -- you say all this money.

22    There's -- no teacher does a lot -- PD is not a lot of money.

23    It is just a tiny, tiny, tiny part of what they do.

24          So, but per session could be a lot of money if it

25    means something like doing a regular after-school activity

1       that you do on a regular basis and/or some substantial project

2       that you do and you get paid for.

3              So what is it?  I mean, if it is just a couple of

4       classes that he is not getting paid for, it is de minimis and

5       we're not going to have a deposition about that.

6              If you're saying there's something more to this Rodi

7       issue, then let me hear it.  Because I -- so far I haven't

8       heard it.  Go ahead.  That's for Mr. Glass.

9              MR. GLASS:  Well, for the summer -- well, for the

10      summer school, they -- why can't he do summer school the year

11      that she was in in 2013, the summer of 2013?  Why was he

12      charged in May of 2013 with disciplinary charges under Ms.

13      Rodi's watch?  I mean --

14             THE COURT:  Is that what it says?

15             MR. GLASS:  -- because -- no.  He said -- he said he

16      lost $3,000 for summer school, and that's Ms. Rodi's decision

17      whether he can do summer school or not at that point.

18             THE COURT:  Is that --

19             MR. GLASS:  You know, you are saying it's de

20      minimis, but that's what the damages in this case are about.

21      All these lost sessions -- you know, his reassignment

22      causing --

23             THE COURT:  Okay.  All right.  All right.

24             All right.  Hang on.  Hold on.  Hold on.  I'm going

25      to talk to you.  Stop.  You do this multiple times and I've

1    already talked about it.  Do not mischaracterize what I say.

2    Don't mischaracterize what the City said.

3         I did not say that summer school was de minimis.  I

4    said that PD is often de minimis relative to what the teachers

5    do.  That's a tiny part of what they do.  It does not add up

6    to a lot of money.

7         Summer school is not usually professional

8    development.  It is a different category.  If you are telling

9    me that these Rodi emails talk about the decision to not let

10   him do summer school and then you're adding -- not from the

11   emails, but from your information, that that's some $3,000

12   worth of work, that's a different issue.

13        But really, you've got to stop changing what the

14   other -- either the Defense attorney -- defendant's attorney

15   or I say.  All right.

16        So, are you saying that Rodi in these emails is

17   talking about him not being able to do summer school in the

18   summer of 2013?

19        MR. GLASS:  We're talking about the policy where

20   reassigned teachers can and can't do.  You know, whether it is

21   -- or what -- it didn't address PD, the one I saw, the email,

22   and so we're not -- as I said, I'm not through the complete

23   production of 800 pages.  We've gone through about 250 so far.

24        We've got them, you know -- so -- so, I'm telling

25   you that there are emails in there that have to do with these,

1    you know, economic opportunities for Mr. Portelos during his

2    pendency of his reassignment, during the pendency of his 3028.

3    You know, what the consequences are for that.

4          And I think they're relevant questions.  I might not

5    know all the answers.  That's why I want to do a deposition to

6    find out what -- where she is making these decisions and how

7    they're making the decisions, and that's why she is relevant

8    on these questions.  I frankly don't know all the answers.

9    Maybe she can clarify what the difference is between

10   professional development and per session, and everything like

11   that.

12         So, you have to understand that -- that's the

13   purpose of the deposition here and that's what we were doing

14   with Mr. Gordon, to get clarification as to what the policies

15   were, what he could and couldn't do, and who -- where was the

16   source of that.

17         Your Honor, ask the questions of Ms. Giambrone.

18   What is the source of this policy that she -- he couldn't do

19   this work?  She didn't have an answer because she's not going

20   to find an answer.  Because the answer was they made it up as

21   they were going.

22         So that's the heart of why I want to do depositions

23   to clarify from Ms. Rodi why these decisions were being made

24   and what -- what actually does relate to his economic loss,

25   whether it is summer school, whether it is for professional

1    development, whether it is per session or coaching.  You know,

2    but that's -- that's clearly the heart of the case here.

3          But our damages -- he didn't lose the job as we've

4    discussed.  You know, he lost -- he lost his other

5    opportunities, and that's where our damages claims are going

6    to lie in this case.

7          MS. GIAMBRONE:  May I respond?

8          THE COURT:  Yes.  Go ahead.

9          MS. GIAMBRONE:  First of all, with regards to

10   plaintiff's statement, I just have -- I'm sorry, I have to

11   respond about the false allegations.  An independent

12   arbitrator found him guilty of ten charges and fined him

13   $10,000.  So, that's -- that's one.

14         Secondly, I have gone through all of the emails

15   myself ad nauseam.  There is absolutely no email about Ms.

16   Rodi talking about his ability to teach at summer school.  And

17   if the Court is even considering this application, I would ask

18   that Mr. Glass produce the specific emails that he now says

19   indicate that, because they just aren't there.

20         The reason I don't have an answer about the policy

21   is because this has never been claimed.  It has never been

22   alleged.  But this case has been a moving target since day one

23   --

24         THE COURT:  I know.

25         MS. GIAMBRONE:  -- and the theory changes every time

1      we speak about it.

2              Mr. Portelos was asked about his economic damages,

3      mentioned nothing about professional development.  So, again,

4      I would just ask that Ms. Rodi's deposition not be granted at

5      this point.  I don't think there has been a sufficient showing

6      to support continued testimony being held in it.

7              THE CLERK:  Hi.  This is the Judge's law clerk.  The

8      Judge's deputy is going to adjourn that.  So it is not going

9      to happen tomorrow.  You don't have to come in.

10             MS. GIAMBRONE:  Hello?  Hello?

11             THE CLERK:  Hi.  Can you hear me?

12             THE COURT:  Yes.  That's --

13             MS. GIAMBRONE:  I think we have the parties on

14     Portelos here.

15             THE CLERK:  Oh.  I'm so sorry.  All right.  I picked

16     up the wrong line.  Thanks.  Sorry.

17             THE COURT:  All right.  Well, she was ready to make

18     a decision.  All right.  Look.  You can depose her --

19             MR. GLASS:  I'm trying to find --

20             THE COURT:  -- you -- look, you can depose her for

21     two hours.  I -- this -- it's --

22             MS. GIAMBRONE:  I have to note my objection to that.

23             THE COURT:  That's fine.  You can object.  There is

24     800 plus in that --

25             MS. GIAMBRONE:  And, Your Honor, Mr. Glass had the

1       opportunity to depose Mr. Gordon and the issue of professional

2       development never once came up with him, who is the -- who is

3       the original decision-maker and the person who made all these

4       decisions in the wake of the First Amendment speech that is

5       supposedly what caused all of this.

6               So, now, we're going to ask a party who came in on -

7       - who came onto the set months later these questions about

8       professional development that never came up when the relevant,

9       pertinent decision-makers were deposed.

10              THE COURT:  Well, it's plain to --

11              MR. GLASS:  Your Honor --

12              THE COURT:  I don't need to -- I don't need to hear

13      from it anymore.  I told you you could have the deposition for

14      two hours.  The plaintiff's claim is that there was ongoing

15      damages.  That there were multiple decision-makers.  Decisions

16      were made after.

17              It sounds like Ms. Rodi, as the head human resources

18      person, the person who would have some information about the

19      policies that applied to how he was allegedly treated after

20      Mr. Gordon left, and it seems like she is somebody who could

21      have relevant information.

22              That being said, it is a pretty thin case for

23      getting this information from her, but given how it would be

24      relevant to the plaintiff to establish some economic damages

25      to possibly keep this case alive, at least in --

26

1          MS. GIAMBRONE:  Well, could, Your Honor, could Mr.

2     Glass point to the emails --

3          THE COURT:  No.

4          MS. GIAMBRONE:  -- first?

5          THE COURT:  No.  He can ask her about them

6     generally.  She's the person --

7          MS. GIAMBRONE:  No.

8          THE COURT:  -- she's --

9          MS. GIAMBRONE:  For the -- for the Court.  Because I

10     don't think --

11          THE COURT:  I -- no.

12          MS. GIAMBRONE:  -- that what he's arguing to the

13     Court, I don't think -- it does not exist.

14          THE COURT:  Well, even if -- even if it doesn't

15     exist, she is the person with the human resources information

16     for a later period in his -- he claims that there was ongoing

17     damages.  I mean, there's a theory that -- that they lasted,

18     if not -- if they are not continuing, that they lasted until

19     very recently.  Depending on which version of --

20          MS. GIAMBRONE:  Well, see --

21          THE COURT:  -- the story that you take.  So, two

22     hours --

23          MS. GIAMBRONE:  And could we maintain the status

24     quo, Your Honor?  You know --

25          MR. GLASS:  I'd be happy to identify one, if you'd

1    like.  I mean, I have one right here.

2              THE COURT:  I mean --

3              MR. GLASS:  I think it raises a lot of questions

4    about, you know, she's making up the rule on the fly.

5              THE COURT:  I don't need to -- I don't need to hear

6    it.

7              MR. GLASS:  Like, you know, maybe Mr. --

8              THE COURT:  Stop.  I don't need to hear it.  Enough.

9    Enough.  Two hours of the deposition.

10             MR. GLASS:  Enough.

11             THE COURT:  She's the human resources -- senior

12   human resources decision-maker.  He claims that he suffered

13   ongoing damages.  There's one theory that he says he is still

14   suffering damages.  There's another that it was through an

15   earlier period.

16             But certainly, well beyond the -- well, into the

17   period in which Ms. Rodi had the job.  So he can ask her those

18   questions.  Two hours.  It is done.  All right.  Let's talk

19   about this number -- well, what are you going to do on

20   privilege logs generally?

21             MS. GIAMBRONE:  Oh, I provided a privilege log about

22   the emails that were inadvertently produced and now counsel is

23   asking for a privilege log in connection with the

24   substantiated allegation against Ms. Hill.  I --

25             THE COURT:  Well, I mean, there's a --

1          MS. GIAMBRONE:  -- mean there's a specific --

2          THE COURT:  Hang on.  There's a couple of times.  He

3   asks for when in number one for the Rodi emails.  There's one

4   for Hill.

5          And then obviously there's this bigger question

6   about when does the attorney-client privilege apply.  So my

7   question was more for --  I was asking it generally, but

8   really about the Rodi emails.

9          Is there a privilege log for those or what's the

10  issue there with these redactions?

11         MS. GIAMBRONE:  Well, I can certainly present his

12  rights.  So if he wants a privilege log, then I will have to

13  create one, but it is going to -- I mean, I have a trial

14  starting on -- we pick a jury next Monday and then it starts

15  the following Monday, and we're anticipating to have, at

16  least, 11 witnesses.

17         So, to be frank, I'm completely swamped for the next

18  three or four weeks.  I mean, Your Honor, I don't believe

19  Katherine Rodi is a decision-maker.

20         I don't believe she is a retaliator even -- even

21  taking plaintiff's allegations on their face.  I don't think

22  there is a way that we could find any of those attributes to

23  her.  So I really think that the Rodi emails were irrelevant

24  to begin with.

25         THE COURT:  Argue?

1          MS. GIAMBRONE:  But if that's what counsel wants,

2     then --

3          THE COURT:  Well, wait.  Hang on.  Can you tell me

4     generally what were the kinds of redactions that were made?

5     Are they privacy redactions, are they -- are they attorney-

6     client --

7          MS. GIAMBRONE:  The redactions were largely -- there

8     were -- because she is essentially in charge of those who are

9     reassigned, there would be Excel spreadsheets about all of the

10    various reassigned teachers within the entirety of DOE.  So we

11    would redact all of those non-party individuals because

12    certainly, you know, they are entitled to confidentiality

13    about allegations against them and they are completely

14    irrelevant.

15          And then, other than that, I believe that there were

16    a number of redactions where she might be on email with the

17    General Counsel's Office where the General Counsel is

18    advising, you know, DOE personnel on legal issues.

19          THE COURT:  But the legal issues --

20          MS. GIAMBRONE:  I guess that's really the only two

21    that I can think of.

22          THE COURT:  -- legal issues --

23          MR. GLASS:  Your Honor --

24          THE COURT:  -- in this case.

25          MR. GLASS:  -- if I could just take --

1          THE COURT:  No.  No.  No.  Stop.

2          MR. GLASS:  -- a look on page --

3          THE COURT:  Look, Mr. Glass, if you don't cut it

4     out, we're going to do this conversation in person.  Because

5     it is hard enough to do it in person, but I'm saving you the

6     effort, both counsel, of coming in here.  Stop interrupting,

7     please.

8          All right.  So, are the privilege issues -- all

9     right.  When you said she is on emails with the General

10    Counsel, are they about Portelos or are they -- they're more

11    general about, for example, all the people on the spreadsheet,

12    or what's the gist of it?  Are you saying --

13         MS. GIAMBRONE:  I think they're about Portelos most

14    likely.

15         THE COURT:  Okay.  Are there any other kinds of

16    redactions?

17         MS. GIAMBRONE:  The only other thing that would be

18    redacted would be the information of minors.

19         THE COURT:  Mm-hmm.

20         MS. GIAMBRONE:  I think that there are some

21    spreadsheets that contain allegations about the other

22    reassigned teachers and there are occasions where, you know, a

23    minor's name might be listed.  You know, so-and-so's mother

24    called alleging sexual harassment by a teacher on her child.

25    Something like that.

1          THE COURT:  How big a project would it be to do a

2     privilege log about the attorney-client redactions, but not

3     about the others, which all sound to me as if they are

4     acceptable and really not an issue that's in dispute in this

5     case?

6          MS. GIAMBRONE:  And I would think I would need at

7     least a week.  I just don't see it happening -- I just don't

8     think I'm going to have time in the next three weeks because

9     of this trial.

10          MR. GLASS:  Your Honor, may I make a suggestion that

11     might make it easier for Ms. Giambrone and --

12          THE COURT:  Go ahead.

13          MR. GLASS:  Okay.  I'm looking at one email on one

14     of the productions, page 4932, and it seems to be a series of

15     emails naming Connie Pankratz.  And in the middle of the page,

16     there's some redaction.  There's a series of emails between

17     all those same people and she has a black redaction, April

18     20th of 2013, for no apparent reason because it is the same

19     players.  And I think there's a black mark over it.

20          And maybe it would be easier if I just identify for

21     her the ones where we raise concerns about why this is

22     redacted because this -- you know, this is in the middle of

23     the five page email back and forth -- of emails going back and

24     forth and for some reason, for some unknown reason, this is

25     just blacked out.

1          MS. GIAMBRONE:  And who is to and from --

2          MR. GLASS:  And it's the same players.

3          MS. GIAMBRONE:  Who is it from?

4          MR. GLASS:  It is from Connie Pankratz to Tracy

5    McClaren, Brown --

6          MS. GIAMBRONE:  And who sent the --

7          MR. GLASS:  -- by Jackson --

8          MS. GIAMBRONE:  The blacked-out email, who is that

9    from?

10         MR. GLASS:  Look at page 4932 of your production.

11         MR. GIAMBRONE:  I'm just asking, who is that email

12   from?

13         MR. GLASS:  It's from Connie Pankratz, who is a

14   media person there.

15         MS. GIAMBRONE:  Yeah.  I don't think so.

16         MR. GLASS:  So we have some random redaction here.

17   I mean, we have no idea what it says, and it's just weird

18   because the rest of it is not redacted.  So maybe it's --

19   maybe I can identify for her the pages and maybe she can kind

20   of just tell us, you know, if she's got a page that she'll

21   redact or maybe she'll release it.  You're going to have to --

22         THE COURT:  How many -- well, you haven't finished

23   going through.

24         MR. GLASS:  I haven't finished it.  But, you know,

25   it's going to probably be, you know -- it's probably not going

1    to be hundreds of pages.  It'll -- well, if it looks to me

2    like there's something missing for no apparent reason, I'll

3    say to her, you know, can you tell us what this is?  Or why --

4    why is it in your good faith basis to redact this?

5         Maybe they will -- I know she's afraid

6    (indiscernible) done a lot, so maybe that will just shorten

7    it.

8         THE COURT:  All right.  Let's try it that way.  But

9    I'm -- you know, the only -- we don't need a privilege log

10   about redactions that have to do with privacy of other

11   employees or minors.  Just -- let's just focus on the legal

12   redactions.  All right.  So when do you want to give her the

13   list?

14        MR. GLASS:  Can you give us a week or so?  Maybe

15   next Friday.

16        THE COURT:  I mean, it doesn't seem like you're

17   going to gain much by rushing it anyway.  I mean, is your

18   trial definitely going forward?

19        MS. GIAMBRONE:  Yes.  It's in front of Judge Cogan.

20        THE COURT:  Okay.  It's definitely happening.

21        MS. GIAMBRONE:  Yeah.

22        THE COURT:  All right.  Plaintiff -- all right.  So

23   today's the 30th.  And I'm sorry.  Tell me the dates for your

24   -- what's your trial schedule again?  You pick --

25        MS. GIAMBRONE:  We pick the jury on the 3rd with

1    Magistrate Judge Orenstein, and then on the 10th, we pick --

2    we start trial.

3            THE COURT:  And how long?

4            MS. GIAMBRONE:  But the court is closed on the 11th,

5    and my understanding is there are at least 11 witnesses.  So,

6    I would think we'll be going into the week of the 17th at

7    least.

8            THE COURT:  All right.  So -- all right.  Why don't

9    you try for this?  Why don't you give her the list -- if --

10   you can work -- you can alter these dates between yourselves

11   if your trial schedule changes.  Give her the list by the

12   12th, and why don't you try to respond by the 26th, which is

13   before Thanksgiving.

14           MS. GIAMBRONE:  Okay.  Thank you.

15           THE COURT:  Just see how it goes.  Okay.  Let me

16   just take some notes here.

17       (Pause.)

18           THE COURT:  All right.  So that's 11/12/14 and

19   Defense will respond by 11/26.

20           MS. GIAMBRONE:  If counsel wants to do the same

21   thing for his next request and perhaps just give me a couple

22   more -- a little more time, we could resolve that issue in the

23   same manner.

24           THE COURT:  Are you talking about Hill or the --

25           MS. GIAMBRONE:  Number --

1          THE COURT:  -- Gordon --

2          MS. GIAMBRONE:  -- number three.

3          THE COURT:  Three.  Okay.  What do you want -- what

4     do you say, Mr. Glass?

5          MR. GLASS:  Fine.  That's fine.

6          THE COURT:  All right.  So when do you want to do

7     those, the Hill ones?

8          MR. GLASS:  Well, we'll try to do it the same time.

9     I think we might have gone through those already.  So, 12th is

10    -- is that a Friday or --

11         THE COURT:  It is a Wednesday.

12         MS. GIAMBRONE:  It's a Wednesday.

13         THE COURT:  All right.  So when do you want to

14    respond?  The third?

15         MS. GIAMBRONE:  December 3rd?

16         THE COURT:  Yes.

17         MS. GIAMBRONE:  Yes.  Thank you.

18         THE COURT:  All right.  I will rely on you if the

19    trial changes that --

20         MS. GIAMBRONE:  Yes.

21         THE COURT:  -- you'll update the schedule.  All

22    right.  Okay.  So, all right.  Then what about these number

23    two, the -- these investigation --

24         MS. GIAMBRONE:  Number --

25         THE COURT:  -- numbers?

1          MS. GIAMBRONE:  I mean, number two, Your Honor, we

2     have -- we've requested them.  The representation is that

3     there is no investigation, no record of investigation, and I

4     don't know why counsel needs a sworn affirmation or

5     declaration.

6          If I -- if I show up -- you know, I'm not going to

7     show up at trial with an investigation.  I don't think the

8     fact that these were not investigated at all supports any

9     claim in plaintiff's case.  And I would just object to having

10    to obtain an affidavit on these.

11         THE COURT:  So, can I -- let me just say -- what are

12    these?  These are numbers that he got when he made a

13    complaint; is that what it is?  I'm not -- I don't even

14    necessarily understand what --

15         MS. GIAMBRONE:  Plaintiff --

16         THE COURT:  -- these numbers are.

17         MS. GIAMBRONE:  Plaintiff made a number --

18         THE COURT:  Right.

19         MS. GIAMBRONE:  I think he admits to making 20-

20    plus --

21         THE COURT:  Twenty-eight, 20 -- yes, something like

22    that.

23         MS. GIAMBRONE:  -- complaints to OSI and FBI and/or

24    SCI, and a number of them were then referred to OSI.  And SCI

25    is part of the Department of Investigation, which is now part

1    of the DOE.

2              THE COURT:  Right.

3              MS. GIAMBRONE:  And OSI is part of the DOE, so some

4    things were referred back to the DOE to say that this is not,

5    you know, an investigation for us.  You guys can investigate

6    it internally and, I guess, then a number of those were sent

7    over to the Office of the General Counsel, and there are no

8    investigatory materials associated with them.

9              So presumably, there were no investigations.  But

10   the General Counsel is not -- General Counsel has not been --

11   is not part of this case.

12             MR. GLASS:  May I --

13             THE COURT:  All right.

14             MR. GLASS:  -- respond briefly --

15             THE COURT:  Yes.  What's --

16             MR. GLASS:  -- to express a concern that Mr.

17   Portelos has?

18              (Inaudible) he's saying is that certain -- and

19   these are investigations that he launched.  One was against

20   Andrew Gordon.  He got a -- he got a number for -- SCI number,

21   I believe, initially for it.

22              And for some reason, the DOE referred him to the

23   Office of General Counsel, or SCI referred him to the Office

24   of General Counsel.  He inquired about it at some point and

25   was told by a Theresa Europe, who works in the Office of

1    General Counsel, you know, about the status of vetting and

2    told her it was being investigated.  And now there's a

3    representation that there's, like, no documents whatsoever.

4           So, I mean, if the City's position is, you know, we

5    didn't do anything.  And I just, you know, I was just trying

6    to get certification that there's really nothing else out

7    there because he was told by Ms. Europe that it was being

8    investigated and now they're representing that there is

9    nothing there.  That's his concern.

10          And, you know, so I was trying to get an affirmation

11   because I think it is relevant to our case.  She doesn't think

12   it is relevant for the fact that the investigations were

13   buried may have some relevance to our case.  And so, we wanted

14   just a certification.

15          I know there were a lot of investigations and she

16   has provided a lot of documents for a lot of the

17   investigations.  So these are the ones we didn't get anything

18   back.  And so we were asking, you know so what happened?  Are

19   you sure everything has been investigated? There's nothing out

20   there that's missing?  And we have been -- you know, they seem

21   to just disappear in the investigation.

22          THE COURT:  All right.  So, Ms. Giambrone, did you

23   check with SCI and the Office of General Counsel as to whether

24   there were files in these cases?

25          MS. GIAMBRONE:  Yes.  I did provide the referrals.

1     They were --

2              THE COURT:  Mm-hmm.

3              MS. GIAMBRONE:  -- referred back to OSI --

4              THE COURT:  Okay.

5              MS. GIAMBRONE:  -- and the Office of the General

6     Counsel and there's just -- there was no investiga -- there

7     were no investigatory materials that follow those referrals.

8              But what -- I mean, I'm trying to contemplate a

9     situation where this would come up at trial.  I mean, is

10    counsel going to call the General Counsel and sa why didn't

11    you investigate my client?  She's not -- she's not the one

12    that retaliated supposedly.

13             THE COURT:  All right.  I can't --

14             MS. GIAMBRONE:  There's no -- there's no -- there's

15    no claim that the DOE has a policy -- you can't have a policy

16    against a single -- I mean, I just -- I'm not understanding

17    plaintiff's theory on this point or why it would warrant me

18    obtaining an affidavit.  There's representation there's no

19    investigation.  It is what it is.

20             THE COURT:  Okay.  Let me -- let me just understand

21    what you are saying.  There's no investigation or you said --

22    I think you used the ter there's no investigatory file that

23    follows?

24             MS. GIAMBRONE:  They were --

25             THE COURT:  What does that mean?

1          MS. GIAMBRONE:  They were referred and my

2     understanding is that nothing followed.  There was no --

3          THE COURT:  Oh, followed.

4          MS. GIAMBRONE:  -- investigation --

5          THE COURT:  I got it.  Okay.

6          MS. GIAMBRONE:  One of them -- one of them had the

7     letter, whereby it says Mr. Candia should be disciplined.  But

8     there's nothing that follows from that.

9          THE COURT:  Okay.  I don't see the point in making

10    her go back.  She has already looked, asked these potential

11    sources of documents do they have any files?  There are no

12    files.  It is not as if they withheld all of the files.  They

13    have produced files.  This is enough.  So no, you don't have

14    to get a sworn affidavit or affirmation or declaration about

15    these investigations.

16          All right.  We dealt with Hill.  What's the story

17    with investigatory notes?  Where are we at with that?

18          MS. GIAMBRONE:  Your Honor, counsel had asked for

19    the OEO cases and if you recall, I think, on September --

20          THE COURT:  Right.

21          MS. GIAMBRONE:  I think in September, we argued this

22    point and on page 25, Your Honor said why don't you find out

23    what the OEO case is about?  And I did.  And apparently, Mr.

24    Portelos made an allegation against Principal Hill.  Principal

25    Hill wrote -- had written an email to a local school on Staten

1    Island because she does administrate at a school that is

2    largely minorities.  And she wrote an email to a local

3    teachers's college and said we're looking for candidates for

4    science teachers, and especially if you have candidates who

5    are male and/or minorities, you know, please encourage them to

6    apply, in sum and substance.

7            THE COURT:  Mm-hmm.

8            MS. GIAMBRONE:  Mr. Portelos took that to make an

9    allegation.  It was unsubstantiated.  I turned over the

10   closing report, you know, because I don't really see the point

11   of arguing over this record.

12           Additionally, there was the OEO investigation

13   allegation that he had made against an assistant principal,

14   Aguirre, that she sexually harassed him.  I turned over the 24

15   page closing report that goes through everyone who was

16   interviewed, who was found credible, who was not found

17   credible, why ultimately the investigation was

18   unsubstantiated, and now, I guess, Mr. Portelos is asking for

19   the complete investigatory file associated with these OEO

20   investigations.

21           And, you know, I would continue to argue to the

22   Court that these materials are highly confidential.  He has

23   obtained the necessary information.

24           He has -- he had listed everyone who has been

25   interviewed and the sum and substance of what they told the

1    investigators and the basis of the findings.  And I just don't

2    think it is necessary to turn over handwritten notes of the

3    OEO investigator and things of that nature.

4           I don't think it is relevant.  I don't think it is

5    appropriate.  And it involves non-party witnesses and I would

6    ask the Court to deny this request.

7           THE COURT:  And why do you think -- why do you think

8    you need it, Mr. Glass?

9           MR. GLASS:  Well, we think Your Honor ordered it,

10   because when she says sum and substance, what they do is they

11   take investigative notes, which is the actual talking to the

12   individual, and then they cherry-pick what they want to put in

13   their final report.

14          So, the notes are more -- they actually provide the

15   accurate, you know, renditions of what someone is told.

16          When you write a report, you pick and choose how you

17   want to write the report and you pick out the details.  So

18   when you have a -- you know, a case against a teacher, the

19   teacher is entitled to the notes of the file because you would

20   want to find out, you know, what actually was said at the

21   time.  Not how the investigator interpreted it for their, you

22   know, for whatever the agenda is.

23          So, and I believe the order is from Your Honor

24   because you're -- all we're looking for -- it was part of what

25   was already ordered.  We're just saying some of these cases we

1    didn't get to know it.  And there's no real basis to withhold

2    these notes.

3         I mean, if there -- if there are, again, minorities

4    or other -- other, you know -- you know, privilege issues or

5    things like that, that's one thing.

6         But I think what she is saying is yeah.  There are

7    notes here in these cases and for some reason I'm withholding

8    them.  And they're not really -- I mean, it is clearly just

9    part of the same.

10        We want -- you know, you ordered the reports for

11   each of these cases and you ordered a conclusion.  Whatever is

12   in that file should be turned over.  There's nothing -- unless

13   she has an independent valid basis to withhold it, that's one

14   thing.

15        But if it is part of the file, I don't see why they

16   would be, you know, keeping back part of those files.  There's

17   no validations for doing that unless there's some independent

18   objection.  It is all part of that investigative file.  How

19   was Mr. Portelos's allegation against Linda Hill addressed?

20   What and who was interviewed?  And what notes were taken?  You

21   know, who was in the investigator's notes?  And do they go

22   into the final report?

23        The problem with the final report is, you know,

24   there's a lot of things that may be omitted from that report

25   because, you know, our contention is Ms. Hill is treated much

1    differently than Mr. Portelos when an allegation is made

2    against her as she testified to her deposition.

3            You know, so that's the point of it, and I think it

4    is not really a new request.  It is really just a follow-up to

5    seeing, you know, if there are notes to these files, you know,

6    that are not otherwise privilege, we'd like -- we'd like to

7    have the notes.

8            MS. GIAMBRONE:  But the problem that Mr. Glass has

9    throughout these -- this proceeding is that the -- the

10   individuals who supposedly retaliated are not the individuals

11   who had anything to do with the investigations.  So the OEO

12   investigator.  Is the assertion now that that person is part

13   of this First Amendment retaliation?

14           And frankly, Your Honor, this is a 24 page closing

15   report.  It is extremely detailed.  It certainly contains

16   facts that are not favorable to the subject.  Here it says Ms.

17   Diaz, who is a witness, told the OEO that AP Aguirre was

18   definitely tipsy, happy, and talkative.  And this witness says

19   Ms. Aguirre is the type of AP that comes off as snotty.

20           I mean, they -- they gave full accountings of what

21   these witnesses were reporting, and ultimately made a finding

22   that there's nothing there to support an allegation of sexual

23   harassment.  And Ms. Aguirre is not -- was not identified as

24   someone engaged in the First Amendment retaliation in any

25   event.

1          So this is just a complete red herring and,

2   furthermore, OEO investigations have to be shrouded generally

3   in confidentiality so that they don't have a chilling effect.

4          The fact that we've turned over a closing report

5   that identifies all of these non-parties by name and not --

6   and have not been redacted and -- and when Mr. Portelos has a

7   history of retaliating against people and putting their names

8   on his blog and smearing people --

9          MR. GLASS:  I object --

10          MS. GIAMBRONE:  -- you know, it was a very --

11          MR. GLASS:  -- to that comment.

12          MS. GIAMBRONE:  -- dangerous --

13          MR. GLASS:  It's ridiculous.

14          MR. GIAMBRONE:  That's not -- it's not ridiculous,

15   actually.

16          MR. GLASS:  (Inaudible.)

17          THE COURT:  Stop --

18          MR. GLASS:  That's what the whole case is about.

19   Come on.

20          THE COURT:  Mr. Glass.

21          MS. GIAMBRONE:  Yes.  It is.

22          THE COURT:  How many times do I have to tell you?

23   Stop interrupting.  I've asked you.  Now I'm telling you.

24   Stop.  Ms. Giambrone, what is it -- what do you want to say?

25          MS. GIAMBRONE:  I just -- I think that the closing

1    report more than adequately addresses everything that Mr.

2    Portelos could possibly want.  It lists everyone who has been

3    interviewed.  It gets to the heart of what they reported.  It

4    includes details that are not favorable to the AP, but

5    ultimately do not rise to the level of sexual harassment.

6          And ultimately, Your Honor, this entire OEO

7    complaint against Ms. Aguirre is irrelevant to his claim.

8    With regards to the claim against Ms. Hill, the OEO reported

9    only four pages because the OEO investigator said that

10   ultimately no one was interviewed in connection with this

11   email.

12         And in any event, the fact that she is trying to

13   elicit candidates -- candidates of color and who are male,

14   both of which are needed in the school system because they are

15   predominantly white females, is not something that violates

16   OEO policy.

17         MR. GLASS:  Okay.

18         MS. GIAMBRONE:  So I -- this is just irrelevant

19   stuff that I don't think warrants continuing discovery in this

20   case.

21         THE COURT:  All right.  So what do you want it for,

22   Mr. Glass?  And then I'm going to go on.  Go ahead.

23         MR. GLASS:  For example, Mr. Portelos just advised

24   me that he was told that the investigator -- that he knows

25   that people told things to the investigator about Ms.

1     Aguirre's investigation that were not in the final -- that he

2     didn't see in the final report.

3            So this is -- there's really no basis for the City

4     raising as a basis to withhold it.  Just -- red herring -- I

5     mean, it's just -- there's nothing -- if there's -- like I

6     said, it's an independent valid basis to withhold it, that's

7     fine.  But all they're saying is we don't want to turn it

8     over, and they're not even articulating a reason why it can't

9     be turned over.  What are they hiding here?

10           As I said, we do know instances where he was told we

11    just was asked -- was interviewed by the investigator.  It is

12    not in the report.  It may be in the notes.  It may not be in

13    the report.  And why -- why were they withheld from Mr.

14    Portelos?

15           I haven't heard any reason from Ms. Giambrone, you

16    know, saying that this is a, you know, retaliatory and him

17    being, you know, aggressive against someone.  That's what the

18    whole case is about.  I mean, if he was retal -- you know, he

19    would be fired if that was the case, and he wasn't fired.  So

20    we can argue about that later.

21           But the reality is there's no basis.  I haven't

22    heard any reason why she is withholding it other than saying

23    it is a red herring.  And what is the basis?  So, we're just

24    saying it is part -- a natural part of the report.

25           If you -- if you got an investigative -- you know,

1     if you've got an investigative report, you know that it is

2     edited and they're leaving out perhaps prosecutory things that

3     should have been substantiated if it's -- there might be

4     things in their report that we can argue.

5              So, we're just asking for things that were already,

6     I think, previously ordered and just to make sure that we have

7     the notes related to that, and that she's not cherry-picking

8     what she wants to turn over.  That's the concern, always the

9     attorney-client privilege in all these issues, is that the

10    Defense counsel has the discretion to choose what she wants to

11    turn over.  And we're -- we're in the dark about it.  So --

12             THE COURT:  All right.  So, you don't -- they don't

13    have to turn over the reports.  While you have been talking, I

14    looked back at the transcript from the last time we had a

15    discussion about this, and Mr. Glass repeatedly say we're just

16    looking for the conclusions of these investigations.

17             These reports sound thorough enough to give you and

18    your client enough information about what was involved and the

19    scope of the investigation.

20             They're -- I'm giving -- you already had enormously

21    way in discovery to see the investigations that your client

22    was involved in, whether as the protagonist or the victim, or

23    however, you know, whatever he thinks his role was in these

24    different things.

25             And really, the whole point of it is that they

1    happened.  And these -- and that there was some, you know,

2    what the scope of the investigations were.

3            It is not to go through every investigation and look

4    at exactly what happened and who they talked to and what

5    happened.  Because the particular events that are complained

6    about are not at the heart of this case.

7            It is the overall picture of supposedly a pattern of

8    complaints are being handled one way when some people make

9    them and complaints are being handled a different way when

10   other people make it.

11           You can -- to the extent that that's actually true,

12   which I don't know if it is or not, there's enough information

13   it sounds like in these reports, which are many, many pages.

14   Plus, it's not what you asked for before.  It is not what was

15   ordered.  And so, we're not doing it.  So they don't have to

16   give you the additional information.

17           All right.  So, what about this issue about the

18   attorney-client privilege?  I mean, there's two questions

19   here, at least, broadly.  One is how is this issue to be

20   examined in the process of what happened here?  I mean,

21   meaning -- let me try that again.

22           In terms of discovery, there have been intermittent

23   privilege logs in part because the way the documents are

24   produced in this case involves so many redactions that don't

25   have to do with privilege.  And that's really kind of the

1    example that we work through with regard to the Rodi and Hill

2    emails.

3              So, how would we even get to this question?  And

4    how, then, the substance of the question, which is what do you

5    do when it seems in some decisions it's the regular practice

6    of the government agency, but which is effectively analogous

7    to a business, has its general counsel be involved in many

8    decisions?  That's the allegation that's being made.

9              So if you took the business comparison, you start to

10   blend into the business judgment aspect of the involvement of

11   a general counsel and the general operating decisions of a

12   business, or even the strategic decisions of a business.  And

13   just because there's a general counsel looped in, doesn't mean

14   the item is privileged.

15             But here, you're talking about, at least as far as I

16   can tell from the general area of what's contentious,

17   personnel decisions are often very contentious.

18             And so, there is need for counsel, especially when

19   they're done against the backdrop of a CBA and other concerns.

20             For example, we're looking -- these complaints that

21   were made make allegations about items or aspects of the

22   workplace that involve the OEO.  That's obviously very close

23   to a legal question.

24             So, on the one hand you have where I think plaintiff

25   is going, which is just because your general counsel or

1    someone from your General Counsel's Office is looped in, not

2    privilege.  On the other hand, the whole case involves issues

3    that one would expect might have a lawyer looped in.

4           So, in terms of a legal analysis, how to do it, but

5    first the question how would one -- how, given the state of

6    the production in this case, would we ever get to figure out

7    the question here without redoing all of the discovery.

8           So, at least, all the discovery that has redactions,

9    which is obviously a lot of it and discovery that was

10   withheld.

11          And that's not a criticism about being withheld. But

12   I'm not saying there's any -- it is really not an issue that

13   we talked about.  So, I don't know.  What do you want to say

14   about it, Mr. Glass?  And then I'll hear from corporation

15   counsel and we'll see where we're at.  Go ahead.

16          MR. GLASS:  Honestly, I don't the answer to this

17   either.  It is a complicated question.  I'm just trying to

18   wonder if it's something similar to what we should do on the

19   other issue.  Maybe just identify her emails, you know, that

20   might be at issue.  Because we know why David Brodsky served

21   as a -- I know he was an attorney in the corporation counsel's

22   office.  He was a labor relations counsel.  You know, was he

23   functioning as an attorney on these decisions and on

24   (inaudible), you know?  I don't know.

25          Because when he practices as an attorney in that

1    function, you don't have to be an attorney.

2            Is she claiming that he's privileged?  You know,

3    anything he does is privileged?  And there were fundamental

4    personnel decisions concerning Mr. Portelos.  And that's the

5    issue and --

6            THE COURT:  I mean, one problem is bringing --

7            MR. GLASS:  I know we did a lot of discovery so --

8            THE COURT:  Well, yes.  So that's that one problem

9    is bringing up this issue so late, when there have obviously

10   been ongoing productions and something that could have been

11   dealt with analytically much sooner.

12           And then if it was something that went in the way

13   that you're suggesting it should, then the corporation counsel

14   could have been looking at the documents as she went along

15   with this eye, which obviously she wasn't.

16           MR. GLASS:  Well, I'm not -- I don't think it is the

17   first time we raised it.  This has been raised previously.  I

18   just don't think --

19           THE COURT:  No.  You've made -- you've made comments

20   along the way I don't know why.  I don't know why.  But you

21   haven't presented any legal argument about it before.  So,

22   what are you -- what are you suggesting be done here?  And

23   what's the scope of what you're talking about?

24           MR. GLASS:  Perhaps in the same vein.  Maybe a --

25   I'll have Mr. Portelos identify the emails that have been

1    provided with a lot of redactions and we can identify the

2    specific ones that we -- I think, you know, listening to that,

3    we have got to come up with specific ones to say this looks

4    (inaudible).  Her (inaudible) was one it.  It looks like a

5    personnel decision.

6              And perhaps we should -- maybe Your Honor should

7    object or explain particularly why, you know, why it was

8    withheld, or she is maintaining that that person is an

9    attorney in his function.

10             So, you know, maybe that will be the best way to do

11    it efficiently.  I don't think it is -- yeah.  Maybe that way

12    will be the best way to do it.

13             THE COURT:  You don't --

14             MR. GLASS:  (Inaudible.)  Okay.

15             THE COURT:  -- you don't think it's what?

16             MR. GLASS:  Yeah.  Understood.

17             THE COURT:  You don't think it's what, were you

18    going to say?

19             MR. GLASS:  I'm sorry?

20             THE COURT:  You started to say -- I think you were

21    going to say you don't think it's a big project but --

22             MR. GLASS:  I think it should be done in the same

23    vein as the other issues regarding -- well, we'll identify

24    specific emails that had extensive redactions or redactions

25    that are curious, and then approach Ms. Giambrone with those

54

1    emails and get a response from her.  I guess it's been raised.

2         MS. GIAMBRONE:  But I've already done -- I mean, I

3    think specifically the emails that counsel is talking about is

4    the emails that were inadvertently produced which I did

5    provide a privilege log for last week.  So I think he knows

6    what my claim is.

7         First of all, there are a lot of people at DOE.  You

8    know, Katherine Rodi is an attorney.  But I don't ever allege

9    that she is entitled to attorney-client or attorney work

10   product in her communications because I do and -- I do

11   recognize that she is not working in that capacity.  You know

12   --

13        MR. GLASS:  What about Brodsky?

14        MS. GIAMBRONE:  Yes.  David Brodsky is the Office of

15   Labor Relations.  I mean, he is dealing with the nuances of

16   the law on a day-to-day basis.  And as a matter of fact, his

17   emails weigh in on his legal analysis, which I think is

18   classic attorney work product.

19        You know, if counsel wants to specify which

20   documents within the most recent privilege log it is that he

21   takes exception to, I can perhaps try to, you know, further

22   clarify the basis.  But I don't know what more I can do.  He

23   knows who it's to and from and I'm -- I'm pretty confident

24   that those emails were -- were -- are covered by privilege.

25        MR. GLASS:  And I think the only issue, maybe

1  someone like Brodsky, because -- and, you know, again, unless

2  you agree that he is acting as legal counsel here, but he's --

3  he's a contractual -- he's a (inaudible) bargaining agreement.

4  He's not Office of General Counsel.  And (inaudible) --

5          MS. GIAMBRONE:  Well, I don't think general --

6          MR. GLASS:  That -- he's no different than Rodi

7  weighing in on these decisions.  You know, I know she's a

8  lawyer, too.  I don't see how she's different than -- he's

9  different than Rodi and he's probably using her, you know, for

10  legal judgment as well on a lot of these issues.

11          MS. GIAMBRONE:  Well, maybe I should have -- maybe I

12  should have redacted her emails, too, then.

13          MR. GLASS:  Gordon doesn't happen to be an attorney,

14  so I guess they wise up and --

15          MS. GIAMBRONE:  No.  Gordon's also an attorney.

16          MR. GLASS:  -- (inaudible), you know.  He was --

17          MS. GIAMBRONE:  Andy Gordon is also an attorney.

18          MR. GLASS:  How else can (inaudible).

19          THE COURT:  All right.  Look, you can talk between

20  yourselves.  Provide the list to her.  She'll look at it.  I'm

21  going to give you until 12/5 to give me a letter outlining

22  whatever the particular disputes you haven't been able to

23  resolve or, you know, withdraw this claim that somehow these

24  documents are not privilege, whatever it is, and we'll go from

25  there.

1          So, I'm going to move the date for the pre-motion

2     conference letter to the 23rd of December, because if you're

3     putting that in on the 5th I think we'll have a phone call

4     about it after that.  And then, it's still -- it seems larger,

5     like, again, both of you can write your summary judgment

6     letters now, but we'll give you some time to finish it up.

7          All right.  If there -- again, if your trial

8     schedule changes then, you know, talk --

9          MS. GIAMBRONE:  And, Your Honor --

10          THE COURT:  -- talk to each other.

11          MS. GIAMBRONE:  -- I think the joint pre-trial order

12     is currently due November 21st.  Will that -- that also

13     changes I assume?

14          THE COURT:  Sure.  We'll make it January 23rd.

15          MS. GIAMBRONE:  January 23rd?

16          THE COURT:  Yes.

17          MS. GIAMBRONE:  And I'm sorry, the pre-motion letter

18     was December or January?

19          THE COURT:  December.

20          MS. GIAMBRONE:  December.  Okay.

21          MR. GLASS:  My last question is with the

22     amendment -- with the supplemental complaint --

23          THE COURT:  Yes.  I don't know what we're going to

24     do about that.  I mean, if there's a situation where you need

25     to have more discovery, we'll revisit this but, I don't know.

1    All right.  Anything else we should talk about today?

2              MS. GIAMBRONE:  Your Honor, I just mentioned in my

3    letter to the extent that we just had -- we just finished

4    plaintiff's deposition.  To the extent that I need updated

5    authorization for economic records, I can supple -- I can make

6    a request at a later point, I assume?

7              THE COURT:  I'm sorry.  I saw his letter but I

8    didn't see yours.  So --

9              MS. GIAMBRONE:  I filed it last night by 5:00,

10   because I thought, you know, we had to.

11             THE COURT:  Okay.  Hold on.

12             MS. GIAMBRONE:  Simply saying that the only issue

13   that defendants foresee is that we need updated authorizations

14   about the medical and mental health providers.  And I had

15   asked at his deposition -- he mentioned that he incurred fees

16   associated with traveling to Queens.  I would just ask for any

17   documentary proof he has to that effect.

18             THE COURT:  Well, why not get the updated

19   authorizations now?  You're talking about pre-trial or

20   something?  Or what are you -- what are you --

21             MS. GIAMBRONE:  I had -- he represented at the

22   deposition that he had already provided that.  I just need to

23   check who it is versus who he testified to.

24             THE COURT:  Mm-hmm.

25             MS. GIAMBRONE:  But if counsel just wants to go

1    ahead and provide me with -- with some fresh authorizations

2    about those individuals, that can resolve the issue as well.

3              THE COURT:  Yes.  He should provide them.

4              MR. GLASS:  Actually, can you put a date for that in

5    for Rodi's deposition because we didn't talk about when that's

6    going to happen.

7              THE COURT:  I was going to leave it up to you all to

8    do that.  You should provide the updated authorizations by

9    next Friday.  So the -- by the 7th.  I mean, I don't know what

10   to tell you about Rodi because of this trial schedule.  I

11   mean, it's only two hours, so certainly it should be done by

12   the next time I talk to you.

13             MS. GIAMBRONE:  Yes.

14             THE COURT:  I mean, I'll put that as the outside

15   date.

16             MR. GLASS:  Do you think you can give us a standby

17   date in December maybe?

18             THE COURT:  It's 12/5 or 12/4/14.  Obviously,

19   Thanksgiving falls in there, so you should plan accordingly.

20   Okay.  11/7 for the authorizations.  Okay.  Was there anything

21   -- I'm just taking a quick look at City's letter.  Okay.

22             MS. GIAMBRONE:  And I'm sorry, Your Honor.

23             THE COURT:  Mm-hmm.

24             MS. GIAMBRONE:  Is the district judge deciding

25   the -- the motion to supplement or is that Your Honor?

59

```
 1                THE COURT:  I think I'm doing it.

 2                MS. GIAMBRONE:  Okay.  All right.

 3                THE COURT:  And I have to go -- my deputy keeps

 4      track of all that stuff, but I think I'm doing it.

 5                MS. GIAMBRONE:  Okay.

 6                THE COURT:  All right.  So we're going to do Ms.

 7      Rodi's deposition for two hours by 12/4.  As to the Rodi

 8      redactions, the plaintiff will provide a list of the documents

 9      that he thinks are at issue by 11/12 and the Defense will

10      respond by 11/26.

11                As to the Hill emails, same process, but plaintiff

12      by 11/12 and the defendant by 12/3.  That request for the

13      investigatory notes for the OEO cases is denied.  And you're

14      going to confer about this attorney-client privilege and give

15      me a letter by 12/5/14 as to whatever you can't work out.

16                The pre-motion conference letter or letters for

17      summary judgment motion due 12/23.  The joint pre-trial order

18      by 1/23/15.  And the updated authorizations should be provided

19      by 11/7.

20                All right.  And that's where we're at.  I think once

21      we get your 12/5 letter, we'll set a telephone conference.

22      Okay.  Anything else?

23                MS. GIAMBRONE:  No.  No.

24                MR. GLASS:  Okay.

25                MS. GIAMBRONE:  Thank you.
```

60

1          THE COURT:  All right.  Thank you.  Have a good

2     night.  Bye.

3          MS. GIAMBRONE:  Same to you.

4       (Proceedings concluded at 6:16 p.m.)

5     I, CHRISTINE FIORE, Certified Electronic Court Reporter and

6     Transcriber and court-approved transcriber, certify that the

7     foregoing is a correct transcript from the official electronic

8     sound recording of the proceedings in the above-entitled

9     matter.

10

11     *Christine Fiore*

12     _____        January 23, 2015

13          Christine Fiore, CERT

14

15

16

17

18

19

20

21

22

23

24